JUDGE SCHEINDLIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

14 CV          7091

MEEHANCOMBS GLOBAL CREDIT
OPPORTUNITIES MASTER FUND, LP,
RELATIVE VALUE-LONG/SHORT DEBT
PORTFOLIO, A SERIES OF
UNDERLYING FUNDS TRUST, SB 4 CF
LLC, CFIP ULTRA MASTER FUND, LTD.,
and TRILOGY PORTFOLIO COMPANY,
LLC,

Plaintiffs,

v.

CAESARS ENTERTAINMENT
CORPORATION and CAESARS
ENTERTAINMENT OPERATING
COMPANY, INC.,

Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO.:

COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

JURY TRIAL DEMANDED



        Plaintiffs MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-

Long/Short Debt Portfolio, a Series of Underlying Funds Trust, SB 4 CF LLC, CFIP Ultra

Master Fund, Ltd. and Trilogy Portfolio Company, LLC (collectively, "Plaintiffs"), by and

through their attorneys Drinker Biddle & Reath LLP, submit the following Complaint and in

support thereof respectfully allege upon personal knowledge as to themselves and their own acts,

and upon information and belief as to all other matters, as follows:

## SUMMARY OF THE ACTION

        This is an action for declaratory judgment, violations of the Trust Indenture Act of 1939,

15 U.S.C. §§ 77aaa, et seq. (the "TIA"), and breaches of (i) two series of notes, (ii) two

guarantees, and (iii) two indentures qualified under the TIA under which the notes and

guarantees were issued.  Plaintiffs are beneficial holders of certain notes issued by Caesars

Entertainment Operating Company, Inc. ("CEOC") and guaranteed by Caesars Entertainment

Corporation ("CEC," and together with CEOC, "Caesars")[1] that were sold pursuant to registered public offerings in 2005 and 2006, and are governed by the TIA.

CEOC and CEC engaged in a "backroom deal" with a specific group of noteholders (the "Favored Noteholders") to provide them with special treatment and compensation in exchange for the Favored Noteholders' assistance in impairing the fundamental rights of all other noteholders.  To be clear, CEOC and CEC did not make any offers or solicit the consent of all noteholders.  Rather, CEOC and CEC rejected the fair and inclusive path where an issuer makes an offer available to all noteholders, in favor of cutting its separate deal with the select few Favored Noteholders, who as a result of such deal exited all or substantially all of their economic stake in the Notes (defined below).  This conduct takes place against the backdrop of a forthcoming restructuring for CEOC.  Gary Loveman, chief executive officer and president of CEC, admitted the same in an August 12, 2014 Financial Times article:  "We have indicated that the company requires deleveraging and that a restructuring is appropriate.  A bankruptcy is a different thing.  It is one option."  Through this purported transaction, CEOC and CEC seek to impair the basic fundamental rights of all other noteholders, without their consent, including the stripping of the guarantee of CEC which provides critical credit support for the Notes.  Accordingly, Plaintiffs have filed the following Complaint.

## NATURE OF THE ACTION

1.      Plaintiffs are collectively the beneficial holders of approximately $15,318,000 of 6.50% Senior Notes due 2016 ("2016 Notes") and $5,632,000 of 5.75% Senior Notes due 2017 ("2017 Notes" and, together with the 2016 Notes, the "Notes," each evidenced by a global note)

---

[1] Upon information and belief, CEOC and CEC were named, respectively, Harrah's Operating Company, Inc. and Harrah's Entertainment, Inc. until 2010.

issued by CEOC and unconditionally guaranteed by CEC (for the 2017 Notes, the "2017 Guarantee"; for the 2016 Notes, the "2016 Guarantee"; and together, the "Guarantees").

2.     While Plaintiffs are sophisticated investors, upon information and belief, the vast majority of the other holders (whose holdings collectively equal approximately $137 million) are individual investors whose Notes have also been stripped of all value as a result of the Agreement (defined below).  Upon information and belief, the individual holders have few avenues through which to band together to challenge the Agreement.

3.     Plaintiffs bring this action against Caesars because of its course of self-dealing and collusion related to the Notes, designed to deprive Plaintiffs and other holders of the Notes including individual investor noteholders (collectively, the "Disenfranchised Noteholders") of their guaranteed protections under federal law, the Indentures (defined below) governing the Notes, and the Guarantees in order to favorably position the Favored Noteholders and certain of Caesars's creditors and other stakeholders, including CEC, in a looming restructuring that will deprive the Disenfranchised Noteholders of their rights to receive principal and interest under the Notes and Guarantees, and the benefit of their bargain under the Indentures.

4.     Specifically, on August 12, 2014, Caesars entered into a Note Purchase and Support Agreement (the "Agreement"), in which it offered to pay a vast premium over market to purchase over $155 million of Notes from only certain noteholders—the Favored Noteholders— in exchange for votes that would strip the remaining Notes of certain fundamental provisions, while excluding Plaintiffs and other Disenfranchised Noteholders from the transaction entirely. The transaction was negotiated and executed in secret, and was not publicly announced by Caesars until the filing of a Form 8-K with the U.S. Securities and Exchange Commission ("SEC") on August 12, 2014.  *See* CEOC Form 8-K, filed Aug. 12, 2014, attached hereto as

Exhibit "A."  That Form 8-K omitted the identities of the Favored Noteholders and other material information.  The form of the Agreement itself was not made public until August 14, 2014, when CEOC filed its Quarterly Report on Form 10-Q, and even that disclosure omitted material schedules and the forms of supplemental indenture purportedly voted on, as well as the Favored Noteholders' identities once again.  *See* Note Purchase and Support Agreement, Schedule A, attached to the CEOC Form 10-Q, filed Aug. 14, 2014, and attached hereto as Exhibit "B."  It was not until August 25, 2014 that CEOC and CEC filed an amendment to their Form 8-K announcing the consummation of the Agreement and attaching as exhibits certain amended indentures which purported to govern the Notes (the "Supplemental Indentures") as of that date.  *See* CEOC Form 8-K and exhibits, filed Aug. 25, 2014, attached hereto as Exhibit "C."

5.      The Agreement required the Favored Noteholders to consent to certain amendments that stripped two critical provisions:  (1) the Guarantees by CEC for payment of principal and interest, and (2) a covenant in the governing Indentures that would prevent Caesars from transferring all or substantially all of CEOC's assets (the "Amendments").  The Agreement also required the Favored Noteholders to agree in advance to support any future restructuring proposed by Caesars, subject to certain conditions.

6.      Without the benefit of the Guarantees by CEC, the Notes are effectively worthless.  The removal of the Guarantees constitutes an *ipso facto* impairment of the Disenfranchised Noteholders' right to receive principal and interest, and as such was, *inter alia*, a violation of the TIA and the Indentures themselves, as set forth fully below.

7.      The Agreement disenfranchised the Disenfranchised Noteholders by enabling Caesars to purchase and pay for the votes of the Favored Noteholders.  The Agreement required

4

the Favored Noteholders to vote Notes in which they no longer had any economic interest.  Such vote-buying and empty-voting in a secret transaction from which all other noteholders, including individual investor noteholders, were excluded violated both public policy and the norms of the bond market and if allowed would clear a dangerous path for future abuses of the rights of noteholders, particularly individual investors in broadly distributed bond deals who have no practical means of engaging in separate discussions or transactions on a one-off basis, all for the benefit of large and highly sophisticated issuers and their favored stakeholders and insiders.

8.      The Agreement also amounted to a constructive partial redemption in violation of the Indentures.  Caesars did not negotiate a market price for the purchased Notes, or even a reasonable and customary premium to market.  Rather, by offering to pay par plus accrued interest for $155.4 million of Notes (nearly 40% over the total amount of Notes outstanding), Caesars made an offer that was economically impracticable for the Favored Noteholders to refuse, and thus tantamount to unilateral action.

9.      As detailed below, the Amendments forced through by the Agreement—which purport to bind the Disenfranchised Noteholders—are merely part of Caesars's larger strategy to restructure CEOC's debt by transferring out valuable assets and abandoning CEC's Guarantees on the debt, and to leave the Disenfranchised Noteholders out in the cold in favor of other creditors and stakeholders

10.     As soon as the Agreement became public following the August 12, 2014 8-K, it was recognized by the marketplace as yet another bit of chicanery in advance of Caesars's imminent restructuring.  For example, an August 22, 2014 article in Bloomberg News described the deal as "one of the most egregious things [Caesars has] done so far" in the course of effectuating its strategy for dealing with Caesars's and its consolidated subsidiaries'

approximately $24.4 billion in debt since two private equity firms took the company private for $30.7 billion six years ago.  The article stated that "[i]n agreeing last week to pay some holders of its most junior bonds $155.4 million in return for them giving up certain protections, Las Vegas-based Caesars gets their support in a restructuring… [and] [t]hat might make it easier for the company to force all classes of creditors to accept whatever agreement it reaches with senior bondholders."

11.     As set forth fully hereinafter, Caesars's course of conduct violates and will continue to violate the TIA, Plaintiffs' contractual rights under the Notes, Indentures, and the Guarantees, and its implied duty of good faith and fair dealing, and entitles Plaintiffs to the declaratory and non-declaratory relief for which Plaintiffs respectfully pray below.

## THE PARTIES

12.     Plaintiff MeehanCombs Global Credit Opportunities Master Fund, LP is a Cayman Islands limited partnership with its principal place of business at c/o MeehanCombs, LP, its Investment Manager, 40 Signal Road in Stamford, Connecticut.  MeehanCombs Global Credit Opportunities Master Fund, LP is the beneficial owner of $5,862,000 of the 2016 Notes.

13.     Plaintiff Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds Trust is a Delaware statutory trust with its principal place of business at c/o MeehanCombs, LP, its Sub-Advisor, 40 Signal Road in Stamford, Connecticut.  Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds Trust is the beneficial owner of $4,432,000 of the 2016 Notes.

14.     Plaintiff SB 4 CF LLC is a Delaware limited liability company with its principal place of business at c/o Chicago Fundamental Investment Partners, LLC, its Investment

Manager, 71 South Wacker Drive in Chicago, Illinois.  SB 4 CF LLC is the beneficial owner of $2,361,000 of the 2017 Notes.

15.     Plaintiff CFIP Ultra Master Fund, Ltd. is a Cayman Islands exempted company with its principal place of business at c/o Chicago Fundamental Investment Partners, LLC, its Investment Manager, 71 South Wacker Drive in Chicago, Illinois.  CFIP Ultra Master Fund, Ltd. is the beneficial owner of $3,271,000 of the 2017 Notes.

16.     Plaintiff Trilogy Portfolio Company, LLC is a Delaware limited liability company with its principal place of business at c/o Trilogy Capital Management, LLC, its Investment Manager, 33 Benedict Place in Greenwich, Connecticut.  Trilogy Portfolio Company, LLC is the beneficial owner of $5,024,000 of the 2016 Notes.

17.     Defendant Caesars Entertainment Corporation, formerly known as Harrah's Entertainment, Inc., is a Delaware corporation with its principal place of business at One Caesars Palace Drive in Las Vegas, Nevada.  Through its various affiliates, CEC owns, manages, or operates dozens of casinos throughout the United States.  CEC is controlled by its large and sophisticated private equity Sponsors, Apollo and TPG (both defined below).

18.     Defendant Caesars Entertainment Operating Company, Inc., formerly known as Harrah's Operating Company, Inc., is a Delaware corporation with its principal place of business One Caesars Palace Drive in Las Vegas, Nevada.  CEOC is a direct operating subsidiary of CEC.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to Section 322(b) of the TIA, 15 U.S.C. § 77vvv(b), and Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a), and 28 U.S.C. §§ 1331, 1367, and 2201.  This controversy arises under federal law, involves claims herein so related to Plaintiffs' federal claims that they form part of the same case or controversy,

and Plaintiffs seek a declaration of their rights and other legal relations, whether or not further relief is or could be sought.

20.     This Court has personal jurisdiction over Caesars under New York's long arm jurisdiction statute, N.Y.C.P.L.R. § 302(a), because those entities have, at least, minimum contacts with the State of New York.  Among other things, Caesars transacts business within the State, regularly does or solicits business or engages in other persistent courses of conduct in the State, expects or should reasonably expect its acts to have consequences in the State, and/or derives substantial revenue from interstate or international commerce.

21.     Venue is proper in this District pursuant to Section 322(b) of the TIA, 15 U.S.C. § 77vvv(b), and Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a), and 28 U.S.C. § 1391(b) and (c).  Among other things, Caesars is found or transacts business in this District, the offer or sale of debt at issue took place at least in part in this District, and/or a substantial part of the events giving rise to the violations of law complained of herein occurred at least in part in this District.

## FACTUAL BACKGROUND

### The 2016 and 2017 Notes

22.     On September 28, 2005, CEOC issued $750 million of the 2017 Notes pursuant to an Indenture, dated as of September 28, 2005, among CEOC, CEC as guarantor, and U.S. Bank National Association ("U.S. Bank") as Trustee (as supplemented or amended, the "2017 Notes Indenture").  The 2017 Notes Indenture is attached hereto as Exhibit "D."

23.     On June 9, 2006, CEOC issued $750 million of the 2016 Notes pursuant to an Indenture, dated as of June 9, 2006, among CEOC, CEC as guarantor, and U.S. Bank as Trustee (as supplemented or amended, the "2016 Notes Indenture," and together with the 2017 Notes Indenture, the "Indentures").  The 2016 Notes Indenture is attached hereto as Exhibit "E."

8

Pursuant to the 2016 Notes Indenture, the terms of the 2016 Notes were set forth via an Officer Certificate delivered to the Trustee on June 9, 2006.

24.     U.S. Bank resigned as indenture trustee with respect to the Notes (as well as six other CEOC debt issuances) on July 31, 2014.  Caesars appointed The Law Debenture Trust Company of New York ("Law Debenture") as successor indenture trustee, which became effective as of Law Debenture's acceptance on August 11, 2014.

25.     Collectively, Plaintiffs are holders of the Notes.  Specifically, Plaintiff MeehanCombs Global Credit Opportunities Master Fund, LP is the beneficial owner of $5,862,000 of the 2016 Notes, Plaintiff Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds Trust is the beneficial owner of $4,432,000 of the 2016 Notes, Plaintiff SB 4 CF LLC is the beneficial owner of $2,361,000 of the 2017 Notes, Plaintiff CFIP Ultra Master Fund, Ltd. is the beneficial owner of $3,271,000 of the 2017 Notes and Plaintiff Trilogy Portfolio Company, LLC is the beneficial owner of $5,024,000 of the 2016 Notes.

26.     As holders of the 2017 Notes, Plaintiffs SB 4 CF LLC and CFIP Ultra Master Fund, Ltd. are entitled to receive interest payments on April 1 and October 1 annually.  The entire outstanding principal of the 2017 Notes matures on October 1, 2017.

27.     As holders of the 2016 Notes, Plaintiffs MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds Trust and Trilogy Portfolio Company, LLC are entitled to receive interest payments on June 1 and December 1 annually.  The entire outstanding principal of the 2016 Notes matures on June 1, 2016.

28.     While Plaintiffs are sophisticated investors, upon information and belief, the vast majority of Notes (approximately $137 million) are held by individual investors whose notes

have also been stripped of value as a result of the Agreement.  On information and belief, these individual investors include many retail "moms and pops" who otherwise have no practical means of engaging in separate discussions or transactions on a one-off basis.

**Critical Indenture and Guarantee Provisions**

29.     The Notes, the Indentures, and the Guarantees and each provide certain essential protections for Plaintiffs and other noteholders.

30.     One such provision—mandated by Section 316(b) of the TIA, 15 U.S.C. § 77ppp(b)—is the unconditional right of noteholders to receive principal and interest.  This provision is found in Section 6.8 of the 2017 Notes Indenture:

> Unconditional Right of Holders to Receive Principal and Interest
>
> Notwithstanding any other provision in this Indenture, the Holder of any Notes shall have **the right, which is absolute and unconditional, to receive payment of the principal of and interest, if any,** on the Notes on the Stated Maturity (or, in the case of redemption, on the Redemption Date) **and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder**.

Ex. D, 2017 Notes Indenture, § 6.8 (emphasis added).  This provision is also located in Section 508 of the 2016 Notes Indenture:

> Unconditional Right of Holders to Receive Principal, Premium and Interest
>
> Notwithstanding any other provision in this Indenture, the Holder of any Security shall have **the right, which is absolute and unconditional, to receive payment of the principal of and any premium and (subject to Section 307) interest** on such Security on the respective Stated Maturities expressed in such Security (or, in the case of redemption, on the Redemption Date) **and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder**.

Ex. E, 2016 Notes Indenture, § 508 (emphasis added).  Collectively, Section 6.8 of the 2017

Notes Indenture and Section 508 of the 2016 Notes Indenture constitute an unconditional right to

receive principal and interest on the Notes, which right shall not be impaired without the holders'

consent.

31.     The provisions concerning CEC's irrevocable and unconditional guarantee of the

Notes are found at Article XII of to the 2017 Notes Indenture and the Notation of Guarantee, the

form of which is Exhibit B to the 2017 Notes Indenture, and Article XV of the 2016 Notes

Indenture and the Notation of Guarantee, the form of which is Exhibit A to the 2016 Notes

Indenture.  Section 12.1.1 of the 2017 Notes Indenture states:

> The Guarantor hereby agrees that its obligations hereunder shall be
> **unconditional, irrespective of** the validity, regularity or
> enforceability of the Notes or this Indenture, the absence of any
> action to enforce the same, **any waiver or consent by any Holder
> of the Notes with respect to any provisions hereof or thereof**,
> the recovery of any judgment against the Company, any action to
> enforce the same or any other circumstance which might otherwise
> constitute a legal or equitable discharge or defense of a guarantor.

Ex. D, 2017 Notes Indenture, § 12.1.1 (emphasis added).  Similarly, and Section 1501(1) of the

2016 Notes Indenture state:

> The Guarantor hereby agrees that its obligations hereunder shall be
> **unconditional, irrespective of** the validity, regularity or
> enforceability of the Securities of any series or this Indenture, the
> absence of any action to enforce the same, **any waiver or consent
> by any Holder of such Securities with respect to any provisions
> hereof or thereof**, the recovery of any judgment against the
> Corporation, any action to enforce the same or any other
> circumstance which might otherwise constitute a legal or equitable
> discharge or defense of a guarantor.

Ex. E, 2016 Notes Indenture, § 1501(1) (emphasis added).

32.     Section 5.1 of the 2017 Notes Indenture and Section 801 of the 2016 Notes

Indenture (hereinafter, the "Covenants Against Fundamental Changes") provide that CEOC shall

not consolidate or merge with another company, or transfer "all or substantially all of its assets" to another company, and may not permit another company to transfer all or substantially all its assets to CEOC, "whether in a single transaction or a series of related transactions," unless (i) the entity resulting from that transaction (if it does not continue to be CEOC) expressly assumes all obligations of CEOC under the Indentures, (ii) no default or event of default would occur, and (iii) CEOC delivers an appropriate officers certificate and opinion of counsel.  *See* Ex. D, 2017 Notes Indenture, § 5.1; Ex. E, 2016 Notes Indenture, § 801.  The Covenants Against Fundamental Changes are intended to ensure that any legal entity that succeeds to the business and assets of CEOC shall remain liable for the obligations of CEOC under the Notes and Indentures, and that mergers, consolidations and asset sales do not obviate the rights of holders thereunder.

33.     Another provision of the Indentures protecting noteholders' rights pertains to the consent required for CEOC and the Trustee to enter into a supplemental indenture.  Section 9.2 of the 2017 Notes Indenture includes a fundamental term requiring the consent of at least a majority of the outstanding Notes to amend or eliminate any provisions of the Indenture or to modify the rights of the holders:

> With Consent of Holders
>
> The Company and the Trustee may enter into a supplemental indenture with the written consent of the Holders of at least a majority in principal amount of the outstanding Notes affected by such supplemental indenture (including consents obtained in connection with a tender offer or exchange offer for the Notes), for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of any supplemental indenture or of modifying in any manner the rights of the Noteholders.

Ex. D, 2017 Notes Indenture, § 9.2.  Similarly, Section 902 of the 2016 Notes Indenture states:

<u>Supplemental Indentures With Consent of Holders</u>

> The Corporation, the Guarantor and the Trustee may enter into a
> supplemental indenture with the written consent of the Holders of
> at least a majority in principal amount of the Outstanding
> Securities of each series affected by such supplemental indenture
> (including consents obtained in connection with a tender offer or
> exchange offer for the Securities of such series), for the purpose of
> adding any provisions to or changing in any manner or eliminating
> any of the provisions of this Indenture or of any supplemental
> indenture or of modifying in any manner the rights of the Holders
> of the Securities of such series . . . .

Ex. E, 2016 Notes Indenture, § 902.

34.     Both Indentures specify that consents obtained in connection with a tender offer

or exchange offer shall be included in determining whether holders of a majority in principal

amount of the Notes have approved a supplemental indenture.  Importantly, the consents

obtained through the Agreement were not obtained in connection with a tender offer or exchange

offer for the Notes, because the offer was made in secret and was not made available to any

holders other than the Favored Noteholders.

35.     Under both Indentures, Notes owned by CEOC or an Affiliate cannot be counted

for determining whether the required majority consented to an amendment or supplemental

indenture.  Section 2.9 of the 2017 Notes Indenture provides:

> In determining whether the Holders of the required principal
> amount of Notes have concurred in any request, demand,
> authorization, direction, notice, consent or waiver Notes owned by
> the Company or an Affiliate shall be disregarded . . . .

Ex. D, 2017 Notes Indenture, § 2.9.  Correspondingly, the definition of "Outstanding" under the

2016 Notes Indenture states:

> [I]n determining whether the Holders of the requisite principal
> amount of the Outstanding Securities have given, made or taken
> any request, demand, authorization, direction, notice, consent,
> waiver or action hereunder as of any date, . . . (D) Securities

13

> owned by the Corporation or any other obligor upon the Securities or any Affiliate of the Corporation or of any such other obligor, whether of record or beneficially, shall be disregarded and deemed not to be Outstanding . . . ."

Ex. E, 2016 Notes Indenture, § 101.

36.    The term "Affiliate" is broadly defined under both Indentures.  Under the 2017

Notes Indenture, "Affiliate" is defined as follows:

> "<u>Affiliate</u>" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities or by agreement or otherwise.

Ex. D, 2017 Notes Indenture, § 1.1.  Almost identically, "Affiliate" is defined by the 2016 Notes

Indenture as:

> "<u>Affiliate</u>" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

Ex. E, 2016 Notes Indenture, § 101.

37.    Other sections of the Indentures mandate specific procedures to ensure holders are

treated fairly and equally.

38.     By way of example, the processes for redeeming less than all of the outstanding

Notes prioritize fair treatment of all holders.  Section 3.3 of the 2017 Notes Indenture states:

> Selection of Notes to be Redeemed.
>
> If less than all the Notes are to be redeemed, the Trustee shall
> select the Notes to be redeemed in any manner that the Trustee
> deems **fair and appropriate**.  The Trustee shall make the selection
> from Notes outstanding not previously called for redemption.

Ex. D, 2017 Notes Indenture, § 3.3 (emphasis added).  The corresponding section of the 2016

Notes Indenture, Section 1103, states:

> Selection by Trustee of Securities to Be Redeemed
>
> If less than all the Securities of any series are to be redeemed
> (unless all the Securities of such series and of a specific tenor are
> to be redeemed or unless such redemption affects only a single
> Security), the particular Securities to be redeemed shall be selected
> not more than 60 days prior to the Redemption Date by the
> Trustee, from the Outstanding Securities of such series not
> previously called for redemption, by such method as the Trustee
> shall deem **fair and appropriate** and which may provide for the
> selection for redemption of a portion of the principal amount of
> any Security of such series . . . .

Ex. E, 2016 Notes Indenture, § 1103 (emphasis added).

39.     Similarly, the Indentures emphasize the importance of equal treatment of holders:

> [I]t being understood and intended that no one or more of such
> Holders shall have any right in any manner whatever by virtue of,
> or by availing of, any provision of this Indenture to affect, disturb
> or prejudice the rights of any other of such Holders, or to obtain or
> to seek to obtain priority or preference over any other of such
> Holders or to enforce any right under this Indenture, except in the
> manner herein provided and for the equal and ratable benefit of all
> such Holders.

Ex. D, 2017 Notes Indenture, § 6.7; Ex. E, 2016 Notes Indenture, § 507.

40.     The Notation of Guarantee of Caesars Entertainment Inc. states that CEC "has unconditionally guaranteed, to the extent set forth in the Indenture" the obligations under the Notes.

41.     Unfortunately, in violation of the bondholder protections provided by the Indenture provisions above, the Guarantee provisions above, and the TIA, as well as Caesars's duty of good faith and fair dealing to its noteholders (including Plaintiffs), Caesars has engaged in a series of transactions to circumvent its obligations under the Notes, Indentures and Guarantees and to effectively eviscerate Plaintiffs' unconditional right to receive principal and interest.

**Caesars's Scheme to Remove Assets from CEOC as It Sinks Into Bankruptcy**

42.     The Agreement is not an isolated incident of self-dealing by Caesars and its affiliates in restructuring CEOC's debt, but rather represents a capstone on a long history of collusive transactions.

43.     Upon information and belief, at issuance in 2005 and 2006, the 2016 Notes and 2017 Notes were investment grade and each was issued in the principal face amount of $750 million.  At that time, as an investment grade issuer, Caesars had access to broad distribution of its debt securities including distribution to individual investors.

44.     In January 2008, investment funds managed by affiliates of two private equity firms, Apollo Global Management, Inc. ("Apollo") and TPG Capital, LP ("TPG"), along with co-investors, acquired Caesars in a highly-leveraged $30 billion buyout.  Apollo and TPG continue to own most of CEC's stock and control all aspects of CEC's (and thus CEOC's) governance and operations.

45.     Upon information and belief, Apollo, TPG and certain co-investors paid only $6 billion of the purchase price in cash.  The rest of the consideration was funded by new indebtedness issued by Caesars.  Prior to the buyout, Caesars had a total of $12.4 billion of debt outstanding, including $750 million of 2017 Notes and $750 million of 2016 Notes.  After the Apollo buyout, Caesars had a total of $23.2 billion of debt outstanding.  CEOC incurred most of the debt used to fund the buyout.

46.     At the time of the buyout, the Notes were senior unsecured obligations of CEOC, which were absolutely and unconditionally guaranteed by CEC, and the Indentures for the Notes provided for negative pledge covenants (with certain exceptions) and the Covenants Against Fundamental Changes.  Accordingly, while the Notes had few express covenants (consistent with market practice for investment grade notes), a holder of Notes could reasonably expect that the business and assets of Caesars would be available for the payment of principal and interest on the Notes as they came due.

47.     Soon after the buyout, Caesars suffered devastating effects from the global financial crisis and ensuing recession, particularly with respect to revenues at the casinos upon which CEOC relied to service its debt.

48.     In response, in the summer of 2010, Apollo and TPG began to implement a "solution" to CEOC's debt crisis by engaging in a series of self-dealing and collusive transactions which stripped CEOC of valuable assets and moved them to other CEC subsidiaries that would not be liable for CEOC's debt.

49.     First, in August 2010, trademarks with a book value of $45.3 million were moved from CEOC to CEC subsidiaries for, upon information and belief, little or no consideration.

50. Next, in 2011, CEOC transferred its interactive gaming operations to CEC for, upon information and belief, little or no consideration.  Just two years later, CEC ascribed a value of $779 million to these assets.

51. On February 8, 2012, CEC conducted a public offering of its stock, which currently trades on NASDAQ with an indicated market capitalization in excess of $1.9 billion.

52. In 2013, CEC and CEOC embarked on a further series of related-party asset sales with other entities owned or controlled by CEC and/or its affiliates.

53. In September 2013, CEOC transferred significant Las Vegas properties, (1) Project Linq, a new completely shopping, dining and entertainment district and (2) Octavius Tower, a luxury tower that is a part of CEOC's current last remaining Las Vegas property, Caesars Palace, to Caesars Entertainment Resort Properties, LLC ("CERP"), a wholly owned subsidiary of CEC for $150.2 million.

54. A month later, CEOC transferred Planet Hollywood in Las Vegas and a new casino project in Baltimore, along with 50% of the management fees payable to CEOC from those properties, to Caesars Growth Partners, LLC ("CGP") an entity controlled by Apollo and TPG which is 5% owned by CEC for $360 million.

55. In March 2014, CEOC sold four of its most important properties to CGP, including three in Las Vegas (The Cromwell, The Quad and Bally's Las Vegas) and Harrah's New Orleans for $2 billion minus assumed debt and other customary closing adjustments. Caesars also announced its intention to transfer ownership of CEOC's Total Rewards Program— an industry-leading customer loyalty program—to a separate entity jointly owned by CEOC, CGP and CERP.

56.     These self-dealing transactions effectively divided Caesars into two segments:  (i) a "Healthy Caesars," consisting of CGP and CERP, which own the prime assets formerly belonging to CEOC, and (ii) an "Insolvent Caesars," consisting of a CEOC still burdened by substantial debt but, on information and belief, holding only assets (primarily regional casinos) that are unprofitable or far less profitable than those taken from CEOC.  These changes affect the nature of the businesses owned and operated by CEOC in a manner that fundamentally changes the benefit of the bargain between CEOC and its noteholders—changes that could not have been anticipated by a reasonable noteholder.

57.     The foregoing transactions took place as CEOC plunged further into insolvency. In its Form 10-K filed on March 17, 2014, CEC (which consolidates CEOC's results with those of its other subsidiaries) admitted:

> We do not expect that cash flow from operations will be sufficient to repay CEOC's indebtedness in the long-term and we will have to ultimately seek a restructuring, amendment or refinancing of our debt, or if necessary, pursue additional debt or equity offerings.

CEC Form 10-K, filed March 17, 2014, at 46.

58.     Further, far from their investment grade at issuance, Standard & Poor's lowered the Notes' credit ratings to C in April 2014 and, as quoted in an August 12, 2014 Financial Times article, analysts have stated, "[t]he capital structure is unsustainable and a restructuring of some form is increasingly likely over the near term.  The company will continue to burn cash to fund capital expenditures and interest payments, and we expect Caesars will need additional liquidity in 2015."

59.     Caesars knew or should have known that the self-dealing transactions to restructure Caesars would seriously weaken the business and financial condition of CEOC, leave CEOC with insufficient operating cash flow to pay or refinance its substantial remaining

indebtedness as it became due, and impair the fundamental rights of all holders of the 2016 Notes and 2017 Notes.

60.     The 2016 Notes and 2017 Notes are effectively junior to $17.3 billion of debt secured by liens at CEOC, representing sixteen times CEOC's proforma adjusted earnings before interest, taxes, depreciation, and amortization (EBITDA).  In an imminent restructuring, the Notes will be unable to look to CEOC for recovery due to the abundance of debt secured by the assets.  The guarantor, CEC, is the only source for repayment of principal on the Notes.

61.     The Agreement, discussed further below, is the most recent iteration of Caesars's plan to extract value out of CEOC at the expense of CEOC's creditors.  The Amendments to the Indentures, tied to the Agreement, purport to remove CEC's Guarantees of the Notes— critical credit support for Plaintiffs and the other noteholders—particularly in light of the scheme to move assets from CEOC to CEC and its other subsidiaries and affiliates.

62.     CEC similarly attempted to deny and disaffirm its payment guarantee of certain CEOC indebtedness on May 6, 2014 when CEC and CEOC announced they had entered into a transaction refinancing certain of CEOC's debt.  That transaction, and those relating to CEOC's sale of valuable assets for artificially low prices, are the subject of a complaint filed on August 4, 2014 by the trustee of 10% Second-Priority Senior Secured Notes due 2018 against CEC and CEOC in Delaware Chancery Court, captioned *Wilmington Savings Fund Society, FSB v. Caesars Entertainment Corporation*, No. 10004 (Del. Ch.).

63.     Caesars has responded to the *Wilmington Savings* suit with a countersuit in New York State Supreme Court, captioned *Caesars Entertainment Operating Company, Inc. v. Appaloosa Investment Limited Partnership I*, No. 652392-2014 (N.Y. Sup. Ct.), alleging that

several funds have sought to undermine and impede CEC and CEOC's efforts to de-lever CEOC and to drive CEOC into default.

64.     In its complaint, Caesars again conceded the risk of bankruptcy for CEOC prior to the scheduled principal repayment date of the Notes is material:  "[w]ith approximately $2 billion of cash, no near-term maturities, and minimal risk of covenant default, the way was clear for CEOC to continue to operate and service its debt through 2014, 2015, **and potentially into 2016.**"  (*See* Complaint, Index No. 652392/2014, dated Aug. 5, 2014 in *Caesars Entertainment Operating Company, Inc. and Caesars Entertainment Corporation v. Appaloosa Investment Limited Partnership I, et al.*, at ¶ 91.) (emphasis added.)

65.     Caesars's complaint also alleges that the second lien noteholders named as defendants in that action stated that they have issued notices of default against CEOC and "'intend to exercise all of [their] rights and remedies that are available under applicable law.'" (*Id.* at ¶ 141.)

66.     Caesars also announced in an August 14, 2014 Form 8-K that it executed a waiver agreement on August 12 with its first lien noteholders requiring, among other things, that CEOC will only have ten days to cure any notices of default on or after September 19, 2014.

67.     CEOC's August 12, 2014 Form 8-K announcing the Agreement with the Favored Noteholders contemplates a near term restructuring, as it states the Favored Noteholders will "consent or approve a restructuring of the Notes" until the earlier of "the 181st day after the closing date" or the "occurrence of a 'credit event'" including bankruptcy or failure to pay CEOC's indebtedness.  *See* Ex. A.

68.     Gary Loveman, chief executive officer and president of CEC, admitted the same in an August 12, 2014 <u>Financial Times</u> article:  "We have indicated that the company requires

deleveraging and that a restructuring is appropriate.  A bankruptcy is a different thing.  It is one option."

69.    In sum, the foregoing course of conduct, including the Agreement at issue in this Complaint, represent an aggregate plan or scheme by CEC and CEOC to restructure CEOC's $19.8 billion debt to stack the deck against certain creditors, such as Plaintiffs and the Disenfranchised Noteholders, in advance of a bankruptcy and restructuring that will favor CEC and other stakeholders and insiders, and allow CEC to evade its irrevocable guarantee of the Notes.

70.    Upon further information and belief, Sullivan & Cromwell represented the Favored Noteholders in negotiations with Caesars, during which the Favored Noteholders, through counsel, expressed the view that the Guarantees remain in place.

**Caesars's Preferential Treatment of Certain Holders and Attempt to Eviscerate Protections for Remaining Holders**

71.    In a Form 8-K filed with the SEC on August 12, 2014, CEC and CEOC announced the Agreement with the Favored Noteholders to purchase approximately $89.4 million of the 2016 Notes and approximately $66 million of the 2017 Notes at par, representing 36% of the 2016 Notes and 45% of the 2017 Notes.  *See* Ex. A.

72.    The par purchase price for Favored Noteholders' Notes represented more than a 100% premium over market.  By way of reference, prior to the Agreement, the 2016 Notes were trading at approximately 48 cents on the dollar.

73.    The 100 cents on the dollar paid to Favored Noteholders represented substantially all of their economic interests.  Upon information and belief, a holder sold 2016 Notes to one or more Favored Noteholder(s) at 69.866% of par just before the closing of the Agreement.  The Favored Noteholder(s) simultaneously sold 68.7% of the Notes to CEOC/CEC at 100% of par.

The remaining Notes held by the Favored Noteholders (the "Amended Notes"), the terms of which have been amended through the Agreement and now are, in substance if not in form, a new series of Notes, represent less than 2% of the purchase price paid to the holder.

74.     In addition, Schedule A to the Agreement, attached to CEOC's August 14, 2014 Form 10-Q, stated that, as a condition to selling their Notes at such a premium, the Favored Noteholders were required to consent to the Amendments to the terms of the Indentures that would impair the rights of the Disenfranchised Noteholders, including (1) "the removal and acknowledgement of the termination of the CEC guarantee of the Securities" and (2) "modif[ication of] the covenant restricting disposition of 'substantially all' of CEOC's assets to measure future asset sales based on CEOC's assets as of the date of the amendment."  Ex. B.

75.     The negotiation and execution of the Agreement itself was non-public.  Caesars did not offer to purchase Plaintiffs' or other Disenfranchised Noteholders' (including what Plaintiffs understand to be the extensive number of individual investors noteholders') Notes, excluding Plaintiffs and the other Disenfranchised Noteholders from participation in the Agreement.

76.     Further, Caesars did not solicit Plaintiffs' or the Disenfranchised Noteholders' consent to the Amendments.

77.     Indeed, Plaintiffs first learned of the Agreement and the Amendments from the August 12, 2014 CEOC Form 8-K, filed with the SEC only ten days prior to when the transaction closed (and without all material information and exhibits).

78.     On August 22, 2014, CEOC, CEC and the Favored Noteholders purported to consummate the transaction contemplated by the Agreement and filed a Form 8-K to that effect. *See* CEOC Form 8-K, filed Aug. 22, 2014, attached hereto as Exhibit "F."

23

79.     On August 25, 2014, CEOC and CEC filed an amendment to their Form 8-K announcing the consummation of the transaction, attaching as exhibits the Supplemental Indentures; i.e., certain amended Indentures which purported to govern the Notes as of that date. *See* Ex. C.

## COUNT ONE
### (Declaratory Judgment That Guarantees and Covenants
### Against Fundamental Changes Are in Full Force and Effect)

80.     Plaintiffs incorporate by reference Paragraphs 1 through 79 of the Complaint as if set forth fully herein.

81.     The Guarantees and the Covenants Against Fundamental Changes cannot be removed from the Indentures as reflected in the Supplemental Indentures because:

(a) CEC's obligations under the Guarantees and the provisions of the Indenture governing them are "unconditional, irrespective of . . . any waiver or consent by any Holder . . ." (see Indentures and Notations of Guarantee provisions cited at Paragraph 31 above);

(b) CEOC still constitutes a wholly owned subsidiary of CEC under Rule 1-02(z) of the Regulation S-X promulgated by that SEC, the Guarantees, and the Indentures; thus Caesars's attempts to disclaim the guarantee under Article XII of the 2017 Notes Indenture, Article XV of the 2016 Notes Indenture, and the Notations of Guarantee is without force and effect;

(c) Even if CEOC would not constitute a wholly owned subsidiary of CEC under Rule 1-02(z) and the Indentures based solely on CEC's equity ownership of CEOC, the transactions by which CEC transferred equity in CEOC to others was part of a scheme to circumvent the rights of the holders of the Notes in violation

of the TIA, the Indentures, the Guarantees, and the covenant of good faith and fair dealing;

(d) at the times the purported consents were granted, CEOC and CEC controlled or shared control over the power to vote the Favored Noteholders' Notes pursuant to the Agreement, and also controlled or shared control over the power to sell the Notes subject to the Agreement and, as a result, pursuant to the Indentures' provisions cited at Paragraphs 33 through 36 above, CEOC and CEC had beneficial ownership of the Notes at the times the purported consents were granted, thus, the voting of those Notes constituted "Affiliate" voting and their votes should not have been counted pursuant to Sections 1.1 and 2.9 of the 2017 Notes Indenture and Section 101 of the 2016 Notes Indenture, as well as Section 316(a) of the TIA;

(e) the Favored Noteholders constituted Affiliates at the time of the Transaction, and their votes should not have been counted pursuant to Sections 1.1 and 2.9 of the 2017 Notes Indenture and Section 101 of the 2016 Notes Indenture, as well as Section 316(a) of the TIA, for purposes of determining whether the Holders had consented to the Amendments and Supplemental Indentures;

(f) the removal and acknowledgement of termination of the Guarantee and modification of the Covenants Against Fundamental Changes, and subsequent "approval" of the Supplemental Indentures, were effectuated without Plaintiffs' and the other Disenfranchised Noteholders' (including the extensive number of individual investors who are noteholders) consent in violation of the Indentures,

Guarantees, and the TIA,15 U.S.C. §§ 77aaa, *et seq*., and pursuant to a course of dealing by Caesars that constituted bad faith.

82.    There is a substantial and continuing controversy between Caesars and Plaintiffs, and a declaration of rights under the Notes, Indentures, and Guarantees is both necessary and appropriate to establish that Plaintiffs are not bound by the removal of the Guarantees and/or the Covenants Against Fundamental Changes from the Notes, or any other invalidation of the same, and that such Guarantees and Covenants Against Fundamental Changes remain in full force and effect as between CEOC, CEC and Plaintiffs and the remaining Disenfranchised Noteholders.

83.    But for Caesars's violation of the Indentures, Guarantees, and the TIA, and their collusive conduct and bad faith, Plaintiffs' and the Disenfranchised Noteholders' rights under the Guarantees and Covenants Against Fundamental Changes would not have been stripped by the Amendments.  Plaintiffs are being injured by the elimination of both provisions without their consent, depriving them of the guarantee of payment of principal and interest by CEC (the only mechanism by which, given Caesars's scheme to deplete CEOC of valuable assets and watch it slip into bankruptcy, Plaintiffs can reasonably expect to be paid under the Notes), as well as the value of and benefit of the Indentures' protections for noteholders, generally.

84.    Plaintiffs' injury can be redressed by the requested relief:  a declaratory judgment that the Guarantees are in full force and effect as between CEOC, CEC and Plaintiffs (and the other Disenfranchised Noteholders, including individual investor holders).  If the Amendments are effectuated against Plaintiffs, Plaintiffs will be monetarily damaged, because the Notes will become worthless and Plaintiffs will lose any ability to collect principal and interest against CEC in the event of a default by CEOC, an event seen as likely in the eyes of CEOC and CEC as evidenced by their own statements.

85.     Accordingly, Plaintiffs are entitled to a declaration that the Guarantees and Covenants Against Fundamental Changes in the Indentures are still in full force and effect.

**COUNT TWO**
**(Declaratory Judgment That the Supplemental**
**Indentures are Invalid and Void *Ab Initio*)**

86.     Plaintiffs incorporate by reference Paragraphs 1 through 85 of the Complaint as if set forth fully herein.

87.     Because the Favored Noteholders' purported "vote" to consent to the Supplemental Indentures was invalid as to Plaintiffs and the Disenfranchised Noteholders (including, as Plaintiffs understand, the numerous individual investors holders), the Supplemental Indentures are void *ab initio* as to Plaintiffs and the Disenfranchised Noteholders. Specifically, at the times the purported consents were granted, CEOC and CEC controlled or shared control over the power to vote the Favored Noteholders' Notes pursuant to the Agreement, and also controlled or shared control over the power to sell the Notes subject to the Agreement. As a result, pursuant to the Indentures' provisions cited at Paragraphs 33 through 36 above, CEOC and CEC had beneficial ownership of the Notes at the times the purported consents were granted, thus, the voting of those Notes constituted "Affiliate" voting. Thus, Sections 1.1 and 2.9 of the 2017 Notes Indenture and Section 101 of the 2016 Notes Indenture, as well as the TIA, such consents may not be counted in determining whether the Supplemental Indentures were approved by a majority of the Notes outstanding.

88.     In addition, the Favored Noteholders constituted Affiliates at the time of the Transaction, and their votes should not have been counted for purposes of determining whether the Holders had consented to the Amendments and Supplemental Indentures.

89.     Both the TIA and the express terms of the Indentures prohibit CEOC, CEC and their affiliates from voting any Notes beneficially owned by them in connection with any proposed amendment to the Indentures.  This prohibition reflects the direct conflict of interest between the obligors under the Notes and the holders.  To permit CEOC and CEC to do indirectly what they could not do directly, through what amounts to naked vote-buying, would be contrary to public policy and would clear a dangerous path for future abuses of the rights of noteholders, particularly individual investors in broadly distributed bond deals who have no practical means of engaging in separate discussions or transactions on a one-off basis, for the benefit of large and highly sophisticated bond issuers such as Caesars.

90.     The Favored Noteholders had no economic interest in the Notes that Caesars agreed to purchase under the Agreement.  Such "empty voting" violates public policy by effectively disenfranchising the Plaintiffs and other Disenfranchised Noteholders (including individual investor noteholders), who were not given an opportunity to evaluate or even consider the terms of the offers made privately to the Favored Noteholders.

91.     Accordingly, the Supplemental Indentures are invalid because Caesars did not truly obtain a majority vote consenting to the Amendments and Supplemental Indentures, and because their course of conduct violated the TIA, the Indenture, and public policy.  As a result, Plaintiffs' rights were and continue to be violated.

92.     There is a substantial and continuing controversy between Caesars and Plaintiffs, and a declaration of rights is both necessary and appropriate to establish that Plaintiffs are not bound by the Supplemental Indentures, which were procured by vote-buying, "empty votes" and collusive tactics that violate the TIA, the terms of the Indentures, and public policy, and constitute bad faith by Caesars.

93.     But for Caesars's conduct in, *inter alia*, obtaining the Supplemental Indentures through vote-buying and empty votes from those Favored Noteholders, who then exited all or substantially all of their economic stake in the Notes, Plaintiffs' and the Disenfranchised Noteholders' rights under former Indentures would not be impaired.  Plaintiffs are being injured by the deprivation of the protections of the Indentures, including Article XII of the 2017 Notes Indenture, Article XV of the 2016 Notes Indenture, the Notations of Guarantee, and the Covenants Against Fundamental Changes, depriving them of the guarantee of payment of principal and interest by CEC and the protection against Caesars's course of conduct stripping CEOC of its valuable assets to Plaintiffs' detriment.

94.     Plaintiffs' injury can be redressed by the requested relief:  a declaratory judgment that the Supplemental Indentures are invalid and void *ab initio*.  If Plaintiffs are bound by the Supplemental Indentures, Plaintiffs will be monetarily damaged, as they will no longer have the right or ability to collect principal and interest against CEC and, effectively, CEOC, rendering their Notes worthless.

95.     Accordingly, Plaintiffs are entitled to a declaration that the vote in favor of the Amendments was invalid, and that the Supplemental Indentures void *ab initio*.

<u>**COUNT THREE**</u>
**(Violations of the Trust Indenture Act,**
**15 U.S.C. §§ 77aaa, *et seq.*)**

96.     Plaintiffs incorporate by reference Paragraphs 1 through 95 of the Complaint as if set forth fully herein.

97.     The TIA regulates corporate debt securities offered for sale and which have been qualified by the SEC, including the 2016 and 2017 Notes.  In order to qualify under the TIA, the

relevant indenture must contain specific provisions designed to protect the bondholder.  See 15 U.S.C. 77 ggg.

98.     Section 316(b) of the TIA requires that Plaintiffs and the Disenfranchised Noteholders have an absolute right to receive payment of the principal of and interest under the Indentures, on or after the respective due dates expressed in those Indentures, and further provides that Plaintiff and the Disenfranchised Noteholders' right to institute suit for the enforcement of any such payment shall not be impaired or affected without their consent.  *See* 15 U.S.C. § 77ppp(b).

99.     Caesars has impaired the rights of Plaintiffs and the Disenfranchised Noteholders to payment, as well as their right to institute suit for payment of such rights, without securing their consent, in violation of the TIA.

100.    The elimination of the Guarantees and the modifications to the Covenants Against Fundamental Changes impair the rights of the Plaintiffs and Disenfranchised Noteholders to receive payment of principal and interest, as well as their ability to file suit for enforcement of those rights.

101.    Thus, because Caesars negotiated the Agreement with only the Favored Noteholders (who then also exited all or substantially all of their economic stake in the Notes), any assertion that the changes bind Plaintiffs and the Disenfranchised holders is a violations of the TIA.

102.    Further, the collusive and self-dealing transactions detailed above constitute an aggregate course of conduct of which the Agreement and Amendments were a part, and, upon information and belief, (1) the removal of CEC's guarantees of CEOC's debt, governed by Article XII of the 2017 Notes Indenture, Article XV of the 2016 Notes Indenture, and the

Notations of Guarantee, and (2) the modification of the Covenants Against Fundamental Changes, prohibiting CEOC from transferring "all or substantially all of its assets," located in Section 5.1 of the 2017 Notes Indenture and Section 801 of the 2016 Notes Indenture, effectuated through the Amendments are part of a larger scheme by Caesars to remove any remaining limitations on Caesars's strategy to restructure CEOC's debt at the expense of CEOC's noteholders, and highlight the damage Plaintiffs will continue to suffer as a result of the continued transfer of valuable assets out of CEOC in the shadow of an impending bankruptcy and restructuring.

103.    Also, as discussed above, at the times the purported consents were granted, CEOC and CEC controlled or shared control over the power to vote the Favored Noteholders' Notes pursuant to the Agreement, and also controlled or shared control over the power to sell the Notes subject to the Agreement and, as a result, pursuant to the Indentures' provisions cited at Paragraphs 33 through 36 above, CEOC and CEC had beneficial ownership of the Notes at the times the purported consents were granted, thus, the voting of those Notes constituted "Affiliate" voting and their votes should not have been counted pursuant to Sections 1.1 and 2.9 of the 2017 Notes Indenture and Section 101 of the 2016 Notes Indenture, as well as Section 316(a) of the TIA.

104.    In addition, the Favored Noteholders constituted Affiliates at the time of the Transaction, and their votes should not have been counted pursuant to Sections 1.1 and 2.9 of the 2017 Notes Indenture and Section 101 of the 2016 Notes Indenture, as well as Section 316(a) of the TIA, for purposes of determining whether the Holders had consented to the Amendments and Supplemental Indentures.

105.    Accordingly, Plaintiffs are entitled to a declaration that their rights under Section 316(a) and (b) of the TIA have been violated, and to the declaratory relief pled in Counts One and Two.

106.    As a result of Caesars's violations of the TIA, Plaintiffs have also suffered substantial actual and prospective damages in an amount to be proven at the time of trial.

### COUNT FOUR
### (Breach of Contract, 2017 Notes
### Indenture § 6.8, 2016 Notes Indenture § 508)

107.    Plaintiffs incorporate by reference Paragraphs 1 through 106 of the Complaint as if set forth fully herein.

108.    The terms of the Notes and Indentures were at all times herein valid and enforceable contract obligations of CEC and CEOC to Plaintiffs.

109.    Under Section 6.8 of the 2017 Notes Indenture and Section 508 of the 2016 Notes Indenture (both of which are provisions mandated by Section 316(b) of the TIA), Plaintiffs and the other Disenfranchised Noteholders (including the extensive number of individual investor holders) are entitled to the unconditional right to receive principal and interest payments from Caesars and such rights shall not be impaired without the consent of each individual holder.

110.    Caesars has impaired the rights of Plaintiffs and the Disenfranchised Noteholders to payment under the Notes and to institute suit for the enforcement of any such payment on or after June 1, 2016 and October 1, 2017, without securing their consent.

111.    Specifically, the Agreement involves only the Favored Noteholders of the 2016 and 2017 Notes, but, through an empty vote of the Favored Noteholders, who then exited all or substantially all of their economic stake in the Notes, purports to bind Plaintiffs and the remaining holders including the extensive number of individual investor noteholders to the

Amendments, including:  (1) consent to the removal and acknowledgement of the termination of the CEC guarantee within the Indentures governing the Notes, and (2) consent to a modification of the Covenants Against Fundamental Changes.  These Amendments, purportedly effectuated without Plaintiffs' consent, violate Plaintiffs' federal rights under Section 6.8 of the 2017 Notes Indenture and Section 508 of the 2016 Notes Indenture, and such rights will continue to be violated.

112.    Due to Caesars's buying the votes of the Favored Noteholders, without making the same compensation equally and ratably available to all holders, including the numerous individual investor noteholders who possess no practical means of engaging in separate discussions or transactions on a one-off basis, Caesars had direct or indirect control of the Favored Noteholders, rendering them "Affiliates" of Caesars, and the Favored Noteholders' votes in favor of the Agreement and Amendments invalid pursuant to Sections 1.1 and 2.9 of the 2017 Notes Indenture and Section 101 of the 2016 Notes Indenture.

113.    In addition, the Favored Noteholders constituted Affiliates at the time of the Transaction, and their votes should not have been counted for purposes of determining whether the Holders had consented to the Amendments and Supplemental Indentures.

114.    Further, the collusive and self-dealing transactions detailed above constitute an aggregate course of conduct of which the Agreement and Amendments were a part, and, upon information and belief, (1) the removal of CEC's guarantees of CEOC's debt, governed by Article XII of the 2017 Notes Indenture, Article XV of the 2016 Notes Indenture, and the Notations of Guarantee, and (2) the modification of the Covenants Against Fundamental Changes, located in Section 5.1 of the 2017 Notes Indenture and Section 801 of the 2016 Notes Indenture, effectuated through the Amendments are part of a larger scheme by Caesars to remove

any remaining limitations on Caesars's strategy to restructure CEOC's debt at the expense of

CEOC's noteholders, and highlight the damage Plaintiffs will continue to suffer as a result of the

continued transfer of valuable assets out of CEOC in the shadow of an impending bankruptcy

and restructuring.

115.    Accordingly, Plaintiffs are entitled to the declaratory relief pled in Counts One

and Two, above.

116.    In addition, as a result of Caesars's breach, Plaintiffs have suffered substantial

actual and prospective damages in an amount to be proven at the time of trial.

### COUNT FIVE
**(Breach of Contract, 2017 Notes Indenture
Article III, 2016 Notes Indenture Article IX)**

117.    Plaintiffs incorporate by reference Paragraphs 1 through 116 of the Complaint as

if set forth fully herein.

118.    The terms of the Notes and Indentures were at all times herein valid and

enforceable contract obligations of CEC and CEOC to Plaintiffs.

119.    Article III of the 2017 Notes Indenture and Article IX of the 2016 Notes Indenture

describe the processes which must be followed for Caesars to redeem some, but not all, of the

outstanding Notes.  Of critical importance, Section 3.3 of the 2017 Notes Indenture states:  "If

less than all the Notes are to be redeemed, the Trustee shall select the Notes to be redeemed in

any manner that the Trustee deems <u>fair and appropriate</u>."  Ex. D, 2017 Notes Indenture, § 3.3

(emphasis added.)  Section 1103 of the 2016 Notes Indenture contains substantially the same

language.  *See* Ex. E, 2016 Notes Indenture, § 1103.

120.    By offering the Favored Noteholders payment at more than a 100% premium over

market to purchase a majority of the outstanding Notes via the Agreement—a  premium so

substantial that it constituted a self-effecting offer—Caesars was able to effectuate a constructive redemption, the value of which is apparent by the exorbitant price paid.  However, Caesars did not follow the proper redemption processes when seeking to purchase the Favored Noteholders' interest pursuant to the Agreement, which further constitutes a breach of Caesars's obligations under the Notes, Indentures and Guarantees.  In particular, the Notes selected for redemption were not determined by a "fair and appropriate" process.

121.    Accordingly, Plaintiffs are entitled to the declaratory relief pled in Counts One and Two, above.

122.    As a result of Caesars's breach, Plaintiffs have suffered substantial actual and prospective damages in an amount to be proven at the time of trial.

## COUNT SIX
### (Breach of Contract, Guarantees)

123.    Plaintiffs incorporate by reference Paragraphs 1 through 122 of the Complaint as if set forth fully herein.

124.    The Guarantees were at all times herein valid and enforceable contract obligations of CEC and CEOC to Plaintiffs.

125.    Pursuant to the terms of the Guarantees, CEC agreed to provide an unconditional guarantee of principal, interest and other amounts due and owing under the Notes.  *See* Ex. D, 2017 Notes Indenture, Article XII and Ex. B thereto; Ex. E, 2016 Notes Indenture, Article XV and Ex. A thereto.

126.    There are no provisions in the Guarantees that provide for the release of the Guarantees pursuant to consent of a limited number of holders.  Rather, the Guarantees provide, *inter alia*, that Guarantor hereby agrees that its obligations hereunder shall be unconditional,

35

irrespective of any waiver or consent by any Holder of such Securities with respect to any provisions hereof or thereof.

127.    Therefore, the purported release of the Guarantee pursuant to the purported "vote" and consent of the Favored Noteholders is a breach of the terms of the Guarantees.

128.    As a result of Caesars's breach, Plaintiffs are entitled to the declaratory relief pled at Count one.

129.    Additionally, Plaintiffs have suffered substantial actual and prospective damages in an amount to be proven at the time of trial.

**COUNT SEVEN**
**(Breach of Contract, 2017 Notes**
**Indenture § 6.7 and 2016 Notes Indenture § 507)**

130.    Plaintiffs incorporate by reference Paragraphs 1 through 129 of the Complaint as if set forth fully herein.

131.    The terms of the Notes and Indentures were at all times herein valid and enforceable contract obligations of CEC and CEOC to Plaintiffs.

132.    At the times the purported consents to the Amendments were granted, CEOC and CEC effectively controlled or shared control over the power to vote the Favored Noteholders' Notes pursuant to the Agreement, and also effectively controlled or shared control over the power to sell the Notes subject to the Agreement at the time the consents were delivered.  As a result, pursuant to the Indentures' provisions cited at Paragraphs 33 through 36 above, CEOC and CEC had beneficial ownership of the Notes at the times the purported consents were granted.

133.    In addition, the Favored Noteholders constituted Affiliates at the time of the Transaction, and their votes should not have been counted for purposes of determining whether the Holders had consented to the Amendments and Supplemental Indentures.

134.    Section 6.7 of the 2017 Notes Indenture and Section 507 of the 2016 Notes Indenture mandate that no one or more bondholder shall affect, disturb or prejudice the rights of any other bondholder, nor obtain a priority or preference over any other bondholder.  *See* Ex. D, 2017 Notes Indenture, § 6.7; Ex. E, 2016 Notes Indenture, § 507.

135.    Caesars violated these provisions both in its role as a noteholder, constructive noteholder and as obligor by giving preferential treatment to the Favored Noteholders via the Agreement in exchange for the Favored Noteholders' consent to the Amendments, which constitutes a breach of Caesars's obligations under the Notes and Indentures.

136.    Caesars itself has made clear that even informal efforts to obtain preferential treatment will violate this equal treatment requirement—having filed its own action in New York State Court on that very ground.  (*See* Complaint, Index No. 652392/2014, dated Aug. 5, 2014 in *Caesars Entertainment Operating Company, Inc. and Caesars Entertainment Corporation v. Appaloosa Investment Limited Partnership I, et al.*, at ¶¶ 116-118, 150-153.)

137.    As a result of Caesars's breach, Plaintiffs have suffered substantial actual and prospective damages in an amount to be proven at the time of trial.

### COUNT EIGHT
### (Breach of Duty of Good Faith and Fair Dealing)

138.    Plaintiffs incorporate by reference Paragraphs 1 through 137 of the Complaint as if set forth fully herein.

139.    The terms of the Notes and Indentures were at all times herein valid and enforceable contract obligations of CEC and CEOC to Plaintiffs.

140.    New York law implies in every contract a covenant requiring each party to deal fairly and in good faith with the other and to refrain from taking any actions that would deprive the other party of the benefit of their respective bargain.

141.    Caesars breached the covenant of good faith and fair dealing by engaging in a course of conduct outside of performance of the contract, including entry into the Agreement and Amendments that sought to accomplish certain outcomes Caesars would never have been able to achieve had it followed the terms of the Notes, Indentures, and Guarantees, as well as the provisions of the TIA.

142.    Specifically, Caesars violated the implied covenant of good faith and fair dealing by the following:

(a) By entering into a non-public offering (the Agreement) with certain Favored Noteholders to purchase their Notes at an exorbitant premium, on the condition that they vote their Notes to approve the Amendments prior to exiting all or substantially all of their economic stake in the Notes, thus impermissibly binding and disenfranchising the remaining noteholders without making the same compensation equally and ratably available to all holders, including as Plaintiffs understand the numerous individual investor noteholders who possess no practical means of engaging in separate discussions or transactions on a one-off basis;

(b) By attempting to disclaim its guarantee under Article XII of the 2017 Notes Indenture, Article XV of the 2016 Notes Indenture, and the Notations of Guarantee, despite the fact that CEOC still constitutes a wholly owned subsidiary under Rule 1-02(z) and the Indentures and, even if CEOC would not constitute a wholly owned subsidiary of CEC under Rule 1-02(z) of the Regulation S-X promulgated by the SEC and the Indentures based solely on CEC's equity ownership of CEOC, the transactions by which CEC transferred equity in CEOC to others was part of a scheme to circumvent the rights of the holders of the Notes

in violation of the TIA, the Notes, the Indentures, the Guarantees, and the covenant of good faith and fair dealing;

(c) By seeking to avoid the Covenants Against Fundamental Changes located in Section 5.1 of the 2017 Notes Indenture and Section 801 of the 2016 Notes Indenture by purchasing the Favored Noteholders' consents to the Amendments so that it could continue with its strategy of moving valuable assets from CEOC to other Caesars entities and their affiliates, in order to insulate Healthy Caesars (CEC and other of its affiliates) from the debt of Insolvent Caesars (CEOC);

(d) By thwarting the redemption provisions in the Indentures requiring the Trustee to select shares for redemption using a "fair and appropriate" process, under which Caesars would not have been able to vote such shares, once redeemed, to enact the Amendments; and

(e) By thwarting the provisions that mandate that no one or more bondholder shall affect, disturb or prejudice the rights of any other bondholder, nor obtain a priority or preference over any other bondholder.

143.    Caesars course of conduct violated the implied covenant of good faith and fair dealing and public policy because:

(a) Caesars completely disregarded Section 9.2 of the 2017 Notes Indenture and Section 902 of the 2016 Notes Indenture, which permit amendment to the Indentures with a simple majority, but implies that all holders must have the opportunity to vote on the proposed amendment.  Instead of presenting the Amendments to all holders of the Notes, including Plaintiffs, Caesars circumvented the Indentures and purchased a simple majority of votes from the

Favored Noteholders, without making the same compensation equally and ratably available to all holders, including the numerous individual investor noteholders who possess no practical means of engaging in separate discussions or transactions on a one-off basis;

(b) The "vote" on the Amendments was mere empty voting, because the Favored Noteholders voted Notes for which they no longer had an economic interest because they sold such Notes at par plus interest, and had no interest in protecting the rights of the Disenfranchised Noteholders;

(c) Caesars directed the voting of the Favored Noteholders' Notes, even though they had a direct conflict of interest with the noteholders, and would have been unable to vote the Notes directly under the Indentures; and

(d) Plaintiffs were disenfranchised because Caesars simply "bought" the consent of the Favored Noteholders without public engagement or Plaintiffs' involvement, rendering Plaintiffs' voting rights under the Indentures illusory.

144.    Caesars's foregoing aggregate course of dealing outside of the provisions and protections of the Indentures, and actions to strip Plaintiffs and the Disenfranchised Noteholders of such protections through a course of conduct constituting bad faith, deprived Plaintiffs of the benefit of their bargain under the Indentures.

145.    Further, at the time of the original issuance of the Notes—each in the aggregate principal face amount of $750 million—no reasonable person would have anticipated Caesars's current and past course of conduct at the time of contracting, nor that 51% of holders could approve amendments to the Indentures without broad solicitation.

146.    Accordingly, Plaintiffs are entitled to the declaratory relief claimed in Counts One and Two, above.

147.    Additionally, Plaintiffs have suffered substantial actual and prospective damages in an amount to be proven at the time of trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants CEC and CEOC and enter an order:

(a) Declaring that the Guarantees and Covenants Against Fundamental Changes are in full force and effect;

(b) Declaring that the Supplemental Indentures are invalid and void *ab initio*;

(c) Awarding Plaintiffs damages in an amount to be determined at trial;

(d) Awarding Plaintiffs their attorneys' fees, costs and expenses incurred in bringing this action; and

(e) Awarding such other and further relief as the Court may deem proper.

Plaintiffs hereby demand a trial by jury.

Dated: September 3, 2014                        Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: _James H. Millar_
    James H. Millar
    Kristin K. Going
    Clay J. Pierce
    Tracy S. Combs
    1177 Avenue of the Americas
    41st Floor
    New York, New York 10036
    Telephone:  (212) 248-3140
    Fax:        (212) 248-3141

    james.millar@dbr.com
    kristin.going@dbr.com
    clay.pierce@dbr.com
    tracy.combs@dbr.com

    *Attorneys for Plaintiffs*