UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| MEEHANCOMBS GLOBAL CREDIT OPPORTUNITIES MASTER FUND, LP, RELATIVE VALUE-LONG/SHORT DEBT, A SERIES OF UNDERLYING FUNDS TRUST, SB 4 CF LLC, CFIP ULTRA MASTER FUND, LTD., and TRILOGY PORTFOLIO COMPANY, LLC, | : : : : : : : : : | CIVIL ACTION NO.: 14-CV-7091-SAS |
| Plaintiffs, | : : | |
| v. | : : | |
| CAESARS ENTERTAINMENT CORPORATION and CAESARS ENTERTAINMENT OPERATING COMPANY, INC., | : : : : : | |
| Defendants. | : : | |

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

DRINKER BIDDLE & REATH LLP

1177 Avenue of the Americas
41st Floor
New York, New York  10036
(212) 248-3140

*Attorneys for Plaintiffs MeehanCombs Global
Credit Opportunities Master Fund, LP,
Relative Value-Long/Short Debt, A Series of
Underlying Funds Trust, SB 4 CF LLC, CFIP
Ultra Master Fund, Ltd., and Trilogy Portfolio
Company, LLC*

### TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS ....................................................................................... 3

    A.    The Notes and Guarantees ................................................................ 3

    B.    The August 2014 Transaction ........................................................... 4

ARGUMENT ........................................................................................................... 5

I.    THE COMPLAINT STATES BREACHES OF THE TRUST INDENTURE ACT ......... 6

    A.    Defendants Breached Section 316(a) of the TIA .................................. 6

    B.    Defendants Breached Section 316(b) of the TIA .................................. 9

II.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE NO-ACTION CLAUSES .............................................................................. 13

    A.    The No-Action Clauses Only Apply to Claims Under the Indentures and Thus Do Not Apply to Counts One, Two, Three, Six, and Eight ........................ 13

    B.    The No-Action Clauses Do Not Bar Plaintiffs' Claims To Enforce Their Right to Receive Principal And Interest Stated in Count Four ............................ 14

    C.    The No-Action Clauses Do Not Bar Plaintiffs' Claim Arising from the Redemption Stated in Count Five ...................................................... 15

    D.    The No-Action Clauses Do Not Apply to Plaintiffs' Claims for Declaratory Relief in Counts One and Two ...................................................... 16

    E.    Caesars's Material Breach of the Indentures Excuses Compliance with the No-Action Clauses with Respect to Count Seven ................................. 17

III.    THE COMPLAINT STATES BREACHES OF THE GUARANTEES, NOTES AND INDENTURES .................................................................. 17

    A.    Plaintiffs State Violations of the Indentures' Prohibitions of Impairment of Plaintiffs' Right to Sue for Principal and Interest and of Affiliate Voting .......... 18

    B.    Defendants Breached the Redemption Provisions of the Indentures ................... 19

    C.    CEC May Not Revoke Its Guarantee .................................................. 21

D.     Defendants Violated the Sections of the Indentures Prohibiting Preferential Treatment..........................................................................................22

E.     Plaintiffs' Damages Allegations Are Sufficient ..................................................23

IV.     THE COMPLAINT STATES A BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING...............................................................................................24

CONCLUSION...............................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012), *cert. denied*, __ U.S. __, 133 S. Ct. 846 (2013) ......................... 5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................... 5

*Bank of N.Y. v. First Millennium, Inc.*,
607 F.3d 905 (2d Cir. 2010) ............................................................................................. 22

*In re Bd. of Dirs. of Multicanal S.A.*,
307 B.R. 384 ..................................................................................................................... 12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................................................................................... 5, 6

*Borg v. N.Y. Majestic Corp.*,
139 N.Y.S.2d 72 (Sup. Ct. 1954) ...................................................................................... 16

*Carvel Corp. v. Diversified Mgmt. Grp., Inc.*,
930 F.2d 228 (2d Cir. 1991) ............................................................................................. 24

*Chase Manhattan Bank, N.A. v. Keystone Distribs.*,
873 F. Supp. 808 (S.D.N.Y. 1994) ............................................................................... 24, 25

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*,
__ F.3d __, 2014 WL 6650873 (2d Cir. Nov. 25, 2014) ..................................................... 19

*Concord Real Estate CDO 2006-1 v. Bank of Am. N.A.*,
996 A.2d 324 (Del. Ch. 2010), *aff'd*, 15 A.3d 216 (Del. 2011) ........................................ 20

*Cont'l Cas. Co. v. State of N.Y. Mortg. Agency*,
No. 94-8408, 1998 WL 513054 (S.D.N.Y. Aug. 18, 1998) ................................................ 15

*Cruden v. Bank of N.Y.*,
957 F.2d 961 (2d Cir. 1992) ............................................................................................. 15

*Dalton v. Educ. Testing Serv.*,
639 N.Y.S.2d 977 (1995) ................................................................................................. 24

*Emmet & Co. v. Catholic Health E., Inc.*,
951 N.Y.S.2d 846 (Sup. Ct. 2012) ................................................................................... 15

*ESPN, Inc. v. Office of the Comm'r of Baseball*,
76 F. Supp. 2d 416 (S.D.N.Y. 1999) ................................................................................ 24

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
  375 F.3d 168 (2d Cir. 2004) ............................................................................ 6, 18, 21, 23

*Fed. Ins. Co. v. Home Assurance Co.*,
  639 F.3d 557 (2d Cir. 2011) ........................................................................................19

*Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.*,
  No. 99-civ-10517 (HB), 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999)............................*passim*

*Feldbaum v. McCrory Corp.*,
  Civ. A. Nos. 11866, 11920, 12006, 1992 WL 11905 (Del. Ch. June 2, 1992)......................14

*Fort Howard Paper Co. v. William D. Witter, Inc.*,
  787 F.2d 784 (2d Cir. 1986) .......................................................................................23

*Greylock Global Opportunity Master Fund Ltd. v. Province of Mendoza*,
  No. 04-civ-7643, 2005 WL 289723 (S.D.N.Y. Feb. 8, 2005) ..............................................11

*Gulf Ins. Co. v. First Bank*,
  400 F. App'x 188 (9th Cir. 2010) ..............................................................................21, 1

*IRS v. WorldCom, Inc. (In re Worldcom, Inc.)*,
  723 F.3d 346 (2d Cir. 2013) .......................................................................................11

*Kass v. E. Air Lines*,
  12 Del. J. Corp. L. 1074 (Del. Ch. 1986) .........................................................................25

*Katz v. Oak Indus.*,
  508 A.2d 873 (Del. Ch. 1986).........................................................................................25

*Kelley v. Prudence Co.*,
  259 N.Y.S. 59 (Sup. Ct. 1932)........................................................................................16

*Kerr-McGee Chem. Corp. v. United States*,
  739 F. Supp. 613 (Ct. Int'l Trade 1990) ...........................................................................21

*Kidder, Peabody & Co. v. Maxus Energy Corp.*,
  925 F.2d 556 (2d Cir. 1991) .......................................................................................23

*Kronos, Inc. v. AVX Corp.*,
  595 N.Y.S.2d 931 (1993).................................................................................................24

*In re Lehman Bros. Holdings, Inc.*,
  513 F. App'x 75 (2d Cir. 2013) .................................................................................6, 23

*Magten Asset Mgmt. Corp. v. Nw. Corp. (In re Nw. Corp.)*,
  313 B.R. 595 (Bankr. D. Del. 2004) ...............................................................................12

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
  859 F. Supp. 743 (S.D.N.Y. 1994), *aff'd in part and rev'd in part,* 65 F.3d 1044 (2d
  Cir. 1995) ...................................................................................................................15

*Nicholas A. Cutaia, Inc. v. Buyer's Bazaar, Inc.*,
  637 N.Y.S.2d 857 (App. Div. 4th Dep't 1996) ....................................................14

*Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*,
  291 F.R.D. 47 (S.D.N.Y. 2013) ....................................................................... 24, 3

*Olin Corp. v. Am. Home Assurance Co.*,
  704 F.3d 89 (2d Cir. 2012) ...................................................................................18

*Quadrant Structured Prods. Co., Ltd. v. Vertin*,
  992 N.Y.S.2d 687 (N.Y. 2014) ............................................................ 13, 14, 16

*In re Quebecor World (USA) Inc.*,
  719 F.3d 94 (2d Cir. 2013) ...................................................................................19

*Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*,
  914 F. Supp. 2d 422 (S.D.N.Y. 2012) ................................................................12

*Rus, Inc. v. Bay Indus., Inc.*,
  322 F. Supp. 2d 302 (S.D.N.Y. 2003) ................................................................25

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
  691 F.2d 1039 (2d Cir. 1982) ...............................................................................17

*Spagnola v. Chubb Corp.*,
  574 F.3d 64 (2d Cir. 2009) ................................................................................5, 6

*Special Situations Fund III, L.P. v. Versus Tech., Inc.*,
  642 N.Y.S.2d 894 (App. Div. 1st Dep't 1996) ....................................................17

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010) ...................................................................................6

*Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.*,
  522 N.Y.S.2d 292 (App. Div. 3d Dep't 1987) ....................................................17

*UPIC & Co. v. Kinder-Care Learning Ctrs., Inc.*,
  793 F. Supp. 448 (S.D.N.Y. 1992) ................................................................ 12, 16

*Waldman v. Riedinger*,
  423 F.3d 145 (2d Cir. 2005) .....................................................................................9

*YRC Worldwide Inc. v. Deutsche Bank Trust Co. Amers.*,
  No. 10-2106 (JWL), 2010 WL 2680336 (D. Kan. July 1, 2010) ....................11, 12

## STATUTES, RULES & REGULATIONS

15 U.S.C. § 77ppp ........................................................................................ 6, 7, 8, 10

28 U.S.C. § 1331 .................................................................................................. 13

Fed. R. Civ. P. 8 ................................................................................................... 5

17 C.F.R. § 201.1-02 ............................................................................................ 21

17 C.F.R. § 230.405 .............................................................................................. 9

17 C.F.R. § 240.12b-2 ........................................................................................... 9

17 C.F.R. § 240.13d-3 ........................................................................................... 8

## OTHER AUTHORITIES

36 N.Y. Jur. Damages § 6 (2014) ........................................................................ 24

*Barron's Dictionary of Finance & Investment Terms* (8th ed. 2010) ................................... 19

Laura J. Keller, *Caesars, Creditors Said to Have Deal on Unit's Bankruptcy*, Bloomberg
    News (Nov. 11, 2014), *available at* www.bloomberg.com/news/2014-11-11/caesars-
    said-lining-up-creditors-for-january-bankruptcy.html ............................................... 4

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) .................................. 11, 20

Plaintiffs MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt, A Series Of Underlying Funds Trust, SB 4 CF LLC, CFIP Ultra Master Fund, Ltd., and Trilogy Portfolio Company, LLC (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to the motion to dismiss of defendants Caesars Entertainment Corporation ("CEC") and Caesars Entertainment Operating Company, Inc. ("CEOC") (together, "Defendants" or "Caesars").

## PRELIMINARY STATEMENT

Defendants do not dispute that, in a calculated attempt to shield assets from a soon-to-be-filed bankruptcy, they paid the Favored Noteholders[1] one hundred cents on the dollar for their Notes, plus interest, transactional fees and costs, in exchange for a promise to support Amendments to the Indentures that made the Notes of all other noteholders effectively worthless (the "August 2014 Transaction" or the "Transaction").  Nor do Defendants dispute that they reached this deal in secret and failed to offer the terms to any other noteholders.  According to Defendants, this backroom deal poses no issue at all under the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa, *et seq*. (the "TIA"), or the governing agreements.  Not surprisingly, the plain meaning of the statute, the relevant contracts, and longstanding precedent in this District shows that Defendants' arguments are entirely without merit.

*First*, the Transaction breached two key provisions of the TIA.  Section 316(a) of the TIA prohibits an indenture trustee from exercising its powers pursuant to the noteholders' direction where notes "owned" by the issuer or by entities "controlled" by the issuer make up part of the requisite majority.  That is precisely what happened here, when the trustee, Law Debenture (the "Trustee"), executed the Supplemental Indentures pursuant to the consents provided by the

---

[1]  All capitalized terms used herein shall have the meaning ascribed in the Complaint in the above-captioned matter unless otherwise specified.  Exhibit letters shall refer to exhibits attached to the Complaint.

Favored Noteholders, whose Notes undisputedly were controlled by Defendants under the terms of the parties' Note Purchase and Support Agreement (the "Agreement"). Compl., Ex. B. The Transaction also breached Section 316(b) of the TIA, which prohibits any impairment of the noteholders' right to be paid principal and interest on their securities. Although Defendants repeatedly argue that impairments affecting the Defendants' ability to pay are not actionable absent an express default, they admit (as they must) that their position is directly contrary to *Federated Strategic Income Fund v. Mechala Group Jamaica Ltd.*,[2] in which Judge Harold Baer granted a preliminary injunction based on facts strikingly similar to those at issue here.

*Second*, in arguing that Plaintiffs' common law claims are barred by the Indentures' "no-action" clauses, Defendants ignore well settled law and language in the Indentures specifically prohibiting application of such provisions where: (i) Plaintiffs' claims are based on obligations arising outside of the Indentures; (ii) Plaintiffs' claims seek the payment of principal and interest under the Notes; (iii) Plaintiffs allege a redemption of the Notes in contravention of the Indentures, (iv) Plaintiffs seek declaratory relief inuring to the benefit of all noteholders, and (v) Defendants have specifically breached the very provisions of the Indentures that they seek to enforce.

*Third*, Plaintiffs state multiple violations of the Indentures, the related Guarantees, and the Notes. Indeed, the Transaction violated provisions specifically barring "affiliate" voting, the impairment of Plaintiffs' "absolute and unconditional" right to the payment of principal and interest, selective redemption of Notes by the Issuer, and multiple other provisions. In arguing the contrary, Defendants at best raise issues of contractual interpretation that cannot be resolved at the motion to dismiss stage.

---

[2] No. 99-civ-10517 (HB), 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999).

2

***Finally***, Plaintiffs' claim for breach of the duty of good faith and fair dealing is properly based on an array of bad faith conduct by Defendants—all of which was aimed at thwarting any recovery on the Notes by the Disenfranchised Noteholders.  Defendants' argument for dismissal—in effect, that they may do anything not specifically barred by the Indentures—is contrary to New York law.

For the reasons set forth below, the Court should deny Defendants' motion in all respects.

## STATEMENT OF FACTS

### A.     The Notes and Guarantees

CEC (formerly known as Harrah's Entertainment, Inc.) owns, manages, and operates dozens of casinos throughout the United States.  Compl. ¶ 17.  CEOC is a direct operating subsidiary of CEC.  *Id.* ¶ 18.  On September 28, 2005 and June 9, 2006, respectively, CEOC issued $750 million of 5.75% 2017 Notes and $750 million of 6.50% 2016 Notes pursuant to Indentures among CEOC, CEC as guarantor, and U.S. Bank National Association ("U.S. Bank") as Trustee.  *Id.* ¶¶ 22–23.  Plaintiffs are beneficial holders of approximately $15,318,000 of the 2016 Notes and $5,632,000 of the 2017 Notes.  *Id.* ¶¶ 1, 12–16.  The vast majority of outstanding Notes (approximately $137 million) are held by individual investors.  *Id.* ¶¶ 2, 28.

When issued, the 2017 Notes and 2016 Notes were investment grade.  *Id.* ¶ 43.  Critical to this case, the governing Indentures each included provisions that together provided substantial assurance that the noteholders would receive all principal and interest owed by Caesars even in the face of future financial difficulties.  These included unconditional Guarantees by CEC and provisions prohibiting CEOC from divesting its assets (the "Covenants Against Fundamental Changes").  *Id.* ¶¶ 31–32.

3

B.     **The August 2014 Transaction**

Caesars was acquired by two private equity funds, Apollo Global Management, Inc.

("Apollo") and TPG Capital, LP ("TPG"), in a January 2008 leveraged buyout. *Id.* ¶ 44.

Struggling under the weight of a massively-increased debt load, *see id.* ¶¶ 44–45, Caesars

subsequently embarked on a series of transactions aimed at transferring assets away from CEOC

while leaving only CEOC responsible for company debt. *See id.* ¶¶ 49–55. These transactions

have effectively divided Caesars into an "Insolvent Caesars" (*i.e.*, CEOC) and a "Healthy

Caesars" (CEOC's affiliates). *Id.* ¶ 56. As detailed in Paragraphs 57–68 of the Complaint,

Defendants' ultimate plan is to push CEOC into bankruptcy while protecting Apollo and TPG

from CEOC's creditors.[3]  *See id.* ¶¶ 57–68.

Two key obstacles to the above scheme were CEC's Guarantees of the Notes and

CEOC's Covenants Against Fundamental Changes. Defendants' solution was the Agreement: a

collusive, non-public transaction in which Defendants paid par plus accrued interest, transaction

---

[3]  In its Form 10-K filed on March 17, 2014, Caesars stated that "[w]e do not expect that cash
flow from operations will be sufficient to repay CEOC's indebtedness in the long-term and we
will have to ultimately seek a restructuring, amendment or refinancing of our debt, or if
necessary, pursue additional debt or equity offerings." Compl. ¶ 57 (citing CEC Form 10-K at
46). Recently, Bloomberg News reported on a leak of eight weeks of negotiations with key
senior creditors on the outline of a debt restructuring plan that includes a prearranged bankruptcy
for CEOC as soon as January 14, 2015. (Laura J. Keller, *Caesars, Creditors Said to Have Deal
on Unit's Bankruptcy*, Bloomberg News (Nov. 11, 2014), *available at*
www.bloomberg.com/news/2014-11-11/caesars-said-lining-up-creditors-for-january-
bankruptcy.html.) And in its Form 10-Q for the fiscal quarter ending on September 30, 2014,
Caesars announced that it had "substantial doubt as to our ability to continue as a going concern
beyond the fourth quarter of 2015." CEOC Form 10-Q at 10. The filing further stated that
CEOC expects to have negative operating cash flows "for the foreseeable future" and that cash
flow is not currently expected to be sufficient to repay debt. *Id.* at 9, 64-65. Accordingly,
Caesars said it "will need to pursue additional debt or equity offerings or seek a refinancing,
amendment, private restructuring or a reorganization under Chapter 11 of the Bankruptcy Code."
*Id.* at 10, 65. According to a Form 8-K filed November 19, 2014, CEOC and CEC made a
restructuring proposal to certain first lien creditors on October 28, 2014, whereby the 2016 Notes
and 2017 Notes would receive a "de minimis amount of equity; provided, however, that if they
voted as a class in favor of the restructuring they would receive an additional amount of equity to
be determined." CEC Form 8-K, Ex. 99.1.

fees and costs to the Favored Noteholders in exchange for the their consent to Supplemental Indentures that stripped away CEC's Guarantees and substantially weakened the Covenants Against Fundamental Changes.  The Amendments effectively left CEC free to transfer CEOC's assets without any obligation to back CEOC's debts.[4]  *See id.*  ¶¶ 4–5, 7; Ex. B (Agreement).

The purchase price paid to the Favored Noteholders for their Notes (par plus accrued interest, and transactional fees and costs) represented an extraordinary one hundred percent premium over market.  In exchange for receiving all amounts owed under their Notes, the Favored Noteholders promised to:  (i) support any future restructuring proposed by Caesars; (ii) consent to "the removal and acknowledgement of the termination of the CEC guarantee of the Securities"; and (iii) consent to the "modif[ication of] the covenant restricting disposition of 'substantially all' of CEOC's assets to measure future asset sales based on CEOC's assets as of the date of the amendment."  Compl. ¶¶ 5, 8, 72, 74; Ex. F (Form 8-K, Aug. 22, 2014).

## ARGUMENT

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief; and a demand for the relief sought."  Fed. R. Civ. P. 8(a)(2)-(3).  When considering a motion to dismiss, the Court should take "all well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor to decide whether the plaintiff has pled a plausible claim for relief."  *See Spagnola v. Chubb Corp.*, 574 F.3d 64, 67 (2d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (further citation omitted)).  Plaintiffs are required to allege only "enough facts to state a claim to relief that is plausible on its face."  *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012), *cert. denied*, __ U.S. __, 133 S. Ct. 846 (2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007));

---

[4]  An August 22, 2014 article in Bloomberg News described the Transaction as "one of the most egregious things [Caesars has] done so far" in effectuating its strategy to deal with Caesars's billions in debt.  Compl. ¶ 10.

*Spagnola*, 574 F.3d at 72 (citation omitted).  The plausibility requirement does not impose a "probability requirement at the pleading stage; it simply calls for enough facts[sic] to raise a reasonable expectation that discovery will reveal evidence" of the conduct alleged.  *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 322, 323 n.3 (2d Cir. 2010) (citing *Twombly*, 555 U.S. at 556).  In addition, "a claim predicated on a materially ambiguous contract term is not dismissible on the pleadings."  *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004); *see also In re Lehman Bros. Holdings, Inc.*, 513 F. App'x 75, 77 (2d Cir. 2013).

## I.   THE COMPLAINT STATES BREACHES OF THE TRUST INDENTURE ACT

### A.   Defendants Breached Section 316(a) of the TIA

Section 316(a) of the TIA provides that the holders of a majority of the principal amount of any series of notes governed by the statute (including the Notes at issue in this case) may "direct the time, method, and place of . . . exercising any trust or power conferred upon such trustee" under the indenture, *provided that* notes controlled by any obligor—directly or indirectly—not be counted towards the requisite majority.  *See* 15 U.S.C. § 77ppp(a) ("[I]n determining whether the holders of the required principal amount of indenture securities have concurred in any such direction or consent, indenture securities owned by any obligor upon the indenture securities, or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with any such obligor, shall be disregarded . . . .").  Here, Defendants breached Section 316(a) by causing the Indentures to be amended based on the consents of the Favored Noteholders—consents that Caesars "controlled" pursuant to the terms of the Agreement.  *See* Compl. ¶¶ 35–36, 81(d)-(e), 87, 103–104, 107–116; Ex. B (Agreement).

In their motion, Defendants contend that Plaintiffs fail to state a cause of action because: (i) no part of the August 2014 Transaction triggered the operative language of Section 316(a);

and (ii) that even if the statute applied, Defendants did not "own" the Notes or "control" the Favored Noteholders, as required for a violation.  Defs.' Mem. at 11–12.  Neither argument is correct.

First, the Transaction is clearly subject to Section 316(a).  By its terms, the statute applies to any "direct[ion]" by the noteholders to the Trustee concerning the Trustee's "exercising any trust or power conferred upon such trustee."  15 U.S.C. § 77ppp(a)(1)(A).  Here, the Transaction resulted in the Trustee's execution of the Supplemental Indentures—an undisputable exercise of the Trustee's powers under the Indentures.  *See* Ex. B (Agreement), §§ 2.2(c), (e); Ex. C (Form 8-K, Aug. 25, 2014) at 6, 10–11, 15–16, 20, 29, 33 of 42.  Further, Caesars's August 25, 2014 Form 8-K makes clear that the Trustee's execution of the Supplement Indentures occurred pursuant to the consents that the Favored Noteholders agreed to deliver to Caesars in the Agreement.  *See* Ex. C (Form 8-K, Aug. 25, 2014); Ex. B (Agreement), § 2.2(c); *see also* Compl. at ¶¶ 4, 79.  The consents thus constitute a direction by the Favored Noteholders that is subject to Section 316(a).  Although Defendants argue the contrary, their efforts to obtain consents from a purported majority of the outstanding Notes prior to executing the Supplemental Indentures belie their argument.

Second, Defendants violated Section 316(a) by counting the Notes held by and/or purchased from the Favored Noteholders towards the majority outstanding principal amount required for the Amendments.  This is the case for at least two reasons.  First, based on the sequence of the transactions set forth in the Agreement, at the time the Favored Noteholders consents became effective, they were actually owned by Caesars, *not* by the Favored Noteholders.  Under Section 5.1 of the Agreement, the consents did not "become effective until the consummation of the Closing."  *See* Ex. B (Agreement), § 5.1.  "Closing" is defined as "[t]he

closing of the purchase and sale of the Notes and the Proposed Consent contemplated by this Agreement . . . ."  *See id.* § 2.1.  By definition, at the time the consents became effective, Caesars's purchase of the Notes from the Favored Noteholders had already "closed."  Thus, Caesars owned the Notes at the time of the relevant vote.[5]

Moreover, even if Defendants did not "own" the Notes at the time the consents became effective (and they did), the Transaction still violated Section 316(a) because Caesars had "control" over the Favored Noteholders by virtue of the Agreement.  When they signed the Agreement, the Favored Noteholders bound themselves to provide consents to the Amendments challenged by this lawsuit—*i.e.*, removal of the CEC guarantee and changes to the prohibition on transferring CEOC's assets to its affiliates.  *See id.* § 2.2(a) (requiring each Favored Noteholder

---

[5]  Even if the consents had become effective prior to the purchase of the Notes by Caesars, Caesars still must be regarded as the "beneficial owner" of the Notes under the terms of the Agreement.  A party has beneficial ownership of securities when it has the power to vote the securities or the power to dispose of the securities.  *See* Rule 13d-3 under the Securities Exchange Act of 1934, 17 C.F.R. § 240.13d-3(a) ("For the purposes of sections 13(d) and 13(g) of the Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:  (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.").  Here, the Favored Noteholders agreed in Section 5.1 of the Agreement "not [to] transfer[] any interest in the Notes (including any right to exercise voting power with respect thereto or delivering any proxy with respect to such Notes or entering into any voting agreement relating to the Notes) from the date hereof to the earlier of (i) the effective time of the Proposed Consents and (ii) the valid termination of this Agreement . . . ."  Ex. B (Agreement), § 5.1.  In addition, the Favored Noteholders agreed in Section 5.4 of the Agreement "(i) to consent to any Qualified Solicitation . . . and (ii) not to sell, transfer or assign any beneficial ownership of the Amended CEOC Notes except to a transferee that agrees in writing to be bound by the same covenant."  *Id.* § 5.4.  These provisions effectively vested Caesars with sole or shared authority to dispose of and to vote the Notes.  Thus, for this reason as well, Caesars had beneficial ownership of the Notes from the moment the Agreement went into effect.  Yet another reason the Favored Noteholders' Notes should not have been counted is because they were no longer "outstanding" when the consents became effective.  Under Section 2.2(e) of the Agreement, the purchased Notes were canceled immediately upon receipt by CEOC.  *Id.* § 2.2(e).  Accordingly, as soon as the closing was consummated, the Notes that Defendants purchased from the Favored Noteholders were canceled and could no longer be considered in connection with any direction to the Trustee.  *See* 15 U.S.C. § 77ppp(a).

to "deliver [at the Closing] all documentation reasonably necessary to give effect to the Proposed Consent"); *id.*, Schedule A (defining the terms of the consent).  Because the Favored Noteholders were contractually bound to deliver consents drafted by the Defendants, Defendants exercised "control" over the Favored Noteholders in violation of Section 316(a).

Caesars' reliance on *Waldman v. Riedinger,* 423 F.3d 145 (2d Cir. 2005), is misplaced. In that case, the Second Circuit held that a trustee was not an "affiliate" of the defendants because the trustee lacked control over the defendants' "management and policies."  *Waldman*, 423 F.3d at 152 (citing 17 C.F.R. § 230.405; 17 C.F.R. § 240.12b-2).  However, the key factor relied upon by the *Waldman* court was that Riedinger did not have the power to direct the voting or disposition of the securities in question.[6]  Here, Caesars clearly had control over the Favored Noteholders with respect to the voting and/or disposition of the Notes, which is the only "management or policy" relevant to the purpose of Section 316(a):  to protect persons who buy bonds from self-dealing on the part of the issuer and any guarantor.  *See* Ex. B (Agreement), § 5.1.  In light of this fact, Defendants' analysis of various other aspects of the relationship between Caesars and the Favored Noteholders is irrelevant.  *See* Defs.' Br. at 12.

### B.   Defendants Breached Section 316(b) of the TIA

Section 316(b) of the TIA provides that:

[T]he right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due

---

[6]  The key question was if Riedinger had power to direct the management and policies of a defendant through his position as a trustee of family trusts.  423 F.3d at 151.  Although the District Court found Riedinger had requisite control by virtue of his trustee relationship with certain defendants, *id.* at 152, the Second Circuit found that Riedinger lacked control over any defendant because of  a "single critical provision" of the will establishing the trusts, which gave testator's wife discretion over any matter relating to the defendant corporation, including disposition or voting of stock of the corporation held by the trust.  Neither court even considered if Riedinger's powers as trustee allowed him to control the management and policies of a defendant in general.  Rather, the only form of control that mattered was control over voting and/or disposition of the stock held by the trusts.  *Id.*

> dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder.

15 U.S.C. § 77ppp(b).  Here, the elimination of the Guarantees and the modifications to the Covenants Against Fundamental Changes "impair[ed]" the rights of the Plaintiffs and Disenfranchised Noteholders to receive payment of principal and interest, as well as their ability to file suit for enforcement of those rights.  Compl. ¶ 100.  Because the Disenfranchised Noteholders did not consent to the Amendments, their enactment breached Section 316(b).

In their motion, Defendants argue that Section 316(b) does not protect against any reductions in Defendants' "ability to make future payments when due," but instead protects only Plaintiffs' "legal right to receive payment when due."  Defs.' Mem. at 14.  Defendants' argument is contrary to the law of this District.  Indeed, as Defendants acknowledge, Judge Harold Baer enjoined a transaction functionally identical to the one here based on Section 316(b)'s prohibition against "impairments" of a noteholder's right to the payment of principal and interest.  *See Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.*, No. 99-civ-10517 (HB), 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999).  In *Federated*, the plaintiffs filed suit based on the defendant's attempt to amend an indenture to permit the transfer of assets away from the issuer and the removal of guarantee obligations agreed to by the issuer's parent company.  *Id.* at *1-4, 6.  Based on these facts, Judge Baer found that, even though the noteholders in that case technically retained the "legal right" to pursue the issuer for payment of principal and interest, "defendant's elimination of the guarantors and the simultaneous disposition of all meaningful assets . . . effectively eliminate[d] plaintiffs' ability to recover and [] remove[d] a holder's "safety net" of a guarantor," and that "[t]aken together, these proposed amendments could materially impair or affect a holder's right to sue.  A holder who chooses to sue for payment at the date of

10

maturity will no longer, as a practical matter, be able to seek recourse from either the assetless defendant or from the discharged guarantors." *Id.* at *7.[7]

Defendants admit their Motion cannot survive *Federated*. Defs.' Mem. at 14 n. 2. Nor do Defendants offer any statutory basis to reach a different result. When interpreting a statute (here, the TIA) courts "start with its text, giving the language its ordinary meaning," by reference to a dictionary. *IRS v. WorldCom, Inc. (In re Worldcom, Inc.)*, 723 F.3d 346, 352–54 (2d Cir. 2013) (citations omitted). Here, "impair" is defined to mean "to damage or make worse by or as if by diminishing in some material respect," and "affect" means "to produce a material influence upon or alteration in." *Merriam-Webster's Collegiate Dictionary* 21, 622 (11th ed. 2003). Based on these definitions, the statute on its face prohibits acts by the Defendants that "diminish", "make worse", or "alter" "in some material respect" Plaintiffs' ability to recover on the Notes. The statute's use of both terms together—"impaired or affected"—suggests a broad scope that is, to state the obvious, entirely inconsistent with Plaintiffs' narrow interpretation.

Attempting to justify their reading of Section 316(b), Defendants rely heavily on a decision from the District of Kansas, *YRC Worldwide Inc. v. Deutsche Bank Trust Company Americas*, No. 10-2106 (JWL), 2010 WL 2680336 (D. Kan. Jul. 1, 2010). Although Defendants are correct that the court in that case found that no impairment had occurred, they fail to mention that the court's decision was premised on its finding that—unlike in *Federated* and this matter— the noteholders were not impaired because: (i) as a practical matter, they could still recover from

---

[7] In *Greylock Global Opportunity Master Fund Ltd. v. Province of Mendoza*, No. 04-civ-7643, 2005 WL 289723 (S.D.N.Y. Feb. 8, 2005), Judge Baer had the opportunity to define some of the boundaries of impairment under Section 316(b). In that case, the Court found that while the defendants sought to amend and delete some of the covenants in the indenture, the obligation to pay interest and principal had not been sufficiently impaired because the noteholders retained their rights as against the guarantor. *Id.* at *1-4. Here, where Caesars seeks to terminate CEC's guarantee obligation, an "impairment" under Section 316(b) has clearly occurred.

the issuer; and (ii) in any event, the guarantee was still in place.  *Id*. at *7 ("Thus, there is no

basis to conclude in this case, as the *Federated* court did in its case, that the amendments

necessarily leave the holders with no practical ability to receive payments due under the notes.").

The part of *YRC Worldwide* that Defendants do cite is dicta based on a Delaware bankruptcy

court opinion that includes no analysis at all as to why Section 316(b)'s scope should be limited

to purely "legal rights."  Defs.' Mem. at 14.  *See Magten Asset Mgmt. Corp. v. Nw. Corp. (In re

Nw. Corp*.), 313 B.R. 595, 600 (Bankr. D. Del. 2004).[8]  Neither of these decisions warrant the

statutory interpretation advocated by Defendants.

       Defendants' related argument that Plaintiffs' right to sue for payment does not accrue

until on or after a missed payment date also is defective.  Defs.' Mem. at 15.  In fact, and

contrary to Defendants' argument, the stripping of the Guarantee from the Indentures impairs

Plaintiffs' rights to sue for payment when due.  Simply put, the moment the Guarantee is

removed, Plaintiffs lose the right to sue the guarantors for payment.

       Congress passed the TIA to put a stop to collusive agreements between issuers and

majority noteholders that harmed the rights of minority noteholders.  *See In re Bd. of Dirs. of

Multicanal S.A.*, 307 B.R. 384 at 388; *see also UPIC & Co. v. Kinder-Care Learning Ctrs., Inc*.,

793 F. Supp. 448, 452–53 (S.D.N.Y. 1992) ("Enactment of Section 316(b) is attributable to the

Securities Exchange Commission's concern about the motivation of insiders and quasi-insiders

to destroy a bond issue through insider control . . . .").  In moving to dismiss Plaintiffs' Section

---

[8]  Defendants cite a case from this Court, *Retirement Board of the Policemen's Annuity & Benefit
Fund of Chicago v. Bank of N.Y. Mellon*, 914 F. Supp. 2d 422 (S.D.N.Y. 2012), as further
authority for their "legal impairment" argument.  Defs.' Mem. at 14.  In that case, however, the
Court simply restated a party's argument—not the Court's conclusion—that relied upon in *In re
Northwestern Corporation.  See Ret. Bd. of the Policemen's Annuity*, 914 F. Supp. 2d at 432.
Since the other party did not respond on that point, the Court deemed the argument abandoned
and never considered the issue further or reached a conclusion of any sort.  *Id*.  Again, this
decision provides no basis for Defendants' argument.

316(b) claim, Caesars is attempting to revive precisely the kind of transaction that Congress sought to eliminate through the statute. Accordingly, based on both the TIA's letter and spirit, the Court should deny Defendants' motion.[9]

## II.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE NO-ACTION CLAUSES

Defendants' argument that the "no-action" clauses set forth in Section 507 of the 2016 Notes Indenture and Section 6.7 of the 2017 Notes Indenture (the "No-Action Clauses") represent an absolute bar to Plaintiffs' state law claims, *see* Defs.' Mem. at 18, ignores a host of applicable case law, as well as the language in the Indentures themselves, which must be strictly construed against the issuer and read narrowly. *See Quadrant Structured Prods. Co., Ltd. v. Vertin*, 992 N.Y.S.2d 687, 694 (N.Y. 2014) ("[W]e read a no-action clause to give effect to the precise words and language used, for the clause must be strictly construed." (internal quotations and citations omitted)). Taken together, the law exempts each Count of the Complaint from the No-Action Clauses.

### A.   The No-Action Clauses Only Apply to Claims Under the Indentures and Thus Do Not Apply to Counts One, Two, Three, Six, and Eight

By their terms, the No-Action Clauses are limited to "any proceeding, judicial or otherwise, with *respect to this Indenture*." Ex. D (2017 Notes Indenture), § 6.7; Ex. E (2016 Notes Indenture), § 507 (emphasis added). Under this definition, the clauses apply only to Plaintiffs' claims for breach of the Indentures, and not to claims arising from legal obligations outside of the Indentures. *See Quadrant*, 992 N.Y.S.2d at 697 ("[W]hen strictly construed and afforded its plain meaning," a no-action clause "applies to indenture contract claims only," and

---

[9]  Because Plaintiffs have adequately stated causes of action under the TIA that give rise to federal question jurisdiction, *see* 28 U.S.C. § 1331, the Court need not reach Defendants' argument that this Court does not have supplemental jurisdiction over Plaintiffs' common law causes of action.

thus "does not apply to claims arising outside the scope of the indenture."). [10]   In their

Complaint, Plaintiffs assert claims arising from the TIA (Counts One through Three), the

Guarantees[11] (Counts One and Six), and the Notes (Count Eight).  Because these claims arise

from obligations outside of the Indentures, they are outside of the No-Action Clauses'

application.

> **B.    The No-Action Clauses Do Not Bar Plaintiffs' Claims To Enforce Their Right to Receive Principal And Interest Stated in Count Four**

The Indentures state that Plaintiffs may sue to enforce their absolute and unconditional

right to receive payments of principal and interest "[n]otwithstanding any other provision in this

Indenture," Ex. D (2017 Notes Indenture), § 6.8; Ex. E (2016 Notes Indenture), § 508

(substantially similar), including the No-Action Clauses.  Defendants argue that this exception

does not apply to Plaintiffs' action because it is limited to suits following a default in the

payment of principal or interest.  *See* Defs.' Mem. at 19.  Defendants misstate the law and ask

this Court to read terms into the No-Action Clauses that are not there.

First, and as discussed above, a missed payment under the Notes is not a prerequisite to a

claim under Section 316(b) of the TIA or the corresponding provisions of the Indentures.  *See*

*Federated*, 1999 WL 993648, at *8 n.7 (finding the defendant's argument that the plaintiff's

claims were barred by a no-action clause to be "without merit").  Moreover, the No-Action

Clauses here do not contain any language that limits Plaintiffs to suits for *unpaid* principal and

---

[10]   In *Quadrant*, the New York Court of Appeals distinguished no-action clauses limited to the scope of the indenture from the more broadly-worded clauses at issue in *Feldbaum v. McCrory Corp.*, Civ. A. Nos. 11866, 11920, 12006, 1992 WL 11905 (Del. Ch. June 2, 1992)—cited by Defendants—which barred a securityholder's action "with respect to this Indenture *or the Securities* unless [specified conditions are met]."  992 N.Y.S.2d at 695 (emphasis in original).

[11]   A guarantee is a separate, independent contract between the guarantor and the creditor-obligee and is collateral to the contractual obligation between the creditor-obligee and the principal-obligor.  *See, e.g.*, *Nicholas A. Cutaia, Inc. v. Buyer's Bazaar, Inc.*, 637 N.Y.S.2d 857 (App. Div. 4th Dep't 1996).

interest. As a result, the Clauses do not bar claims for principal and interest that have not yet come due. *See Cont'l Cas. Co. v. State of N.Y. Mortg. Agency*, No. 94-8408, 1998 WL 513054, at *4 (S.D.N.Y. Aug. 18, 1998) (finding that, pursuant to indentures with language substantially similar to those here, a suit for interest that had not yet accrued was not barred by the no-action clause, which lacked express language limiting its application to suits for *unpaid* principal and interest). The lack of such limiting language distinguishes the Indentures here from those at issue in *all* of the cases Defendants cite on this point.[12] Accordingly, Defendants are incorrect that Plaintiffs' claim based on their rights to unpaid principal and interest (Count Four) is barred by the No-Action Clauses. *See Cont'l*, 1998 WL 513054, at *4.

## C. The No-Action Clauses Do Not Bar Plaintiffs' Claim Arising from the Redemption Stated in Count Five

The Indentures grant Plaintiffs the unfettered right to receive payment of principal and interest "in the case of redemption, on the Redemption Date." Ex. D (2017 Notes Indenture), § 6.8; Ex. E (2016 Notes Indenture), § 508. As set forth in Count Five, Caesars failed to follow the Indentures' rules regarding redemption when buying the Favored Noteholders' Notes, particularly the requirement that the redeemed Notes must be selected in a "fair and appropriate" manner. Ex. D (2017 Notes Indenture), § 3.3; Ex. E (2016 Notes Indenture), § 1103. Where, as here, Defendants failed to redeem the Notes as required by the Indentures, the No-Action

---

[12] *See Cruden v. Bank of N.Y.*, 957 F.2d 961, 968 (2d Cir. 1992) (indenture limited right to sue to enforce payment "on or after" the due date); *Emmet & Co. v. Catholic Health E., Inc.*, 951 N.Y.S.2d 846, 849 (Sup. Ct. 2012) (indentures limited right to institute to suit to time period "on or after [the due date for payment of principal and interest]" or "at the time and place expressed herein [for payment of principal and interest]."). Defendants also cite *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 859 F. Supp. 743, 748 (S.D.N.Y. 1994), *aff'd in part and rev'd in part,* 65 F.3d 1044 (2d Cir. 1995), but the cited portion of that decision concerned the scope of the portion of Section 316(b) of the TIA that overrides any no-action clause that impairs the right to commence litigation "on or after the respective due dates expressed in [the debenture]." *Id*. at 748 (citation omitted). As discussed above, the No-Action Clauses here do not limit Plaintiffs to suits for unpaid principal and interest.

Clauses have "no applicability" to Plaintiffs' claims for amounts owed as of the redemption date

(the date of the Agreement). *See UPIC & Co.*, 793 F. Supp. at 454–55 (holding that no-action

clause did not apply to noteholder's claim for principal based upon issuer's failure to repurchase

the notes under a repurchase obligation "akin to payment on principal redemption").

### D.  The No-Action Clauses Do Not Apply to Plaintiffs' Claims for Declaratory Relief in Counts One and Two

Counts One and Two of the Complaint are exempt from the No-Action Clauses because

they seek declaratory relief that will equally benefit all noteholders. *See Kelley v. Prudence Co.*,

259 N.Y.S. 59, 62 (Sup. Ct. 1932) (finding that a no-action clause did not bar action for

declaratory judgment where stated purpose of clause was "to promote and protect the equal

ratable rights of every holder of the bonds . . . ."); *see also Borg v. N.Y. Majestic Corp.*, 139

N.Y.S.2d 72, 77 (Sup. Ct. 1954) (finding that a bondholder may seek a declaration as to the

proper interpretation of an indenture provision despite failure to comply with no-action clause).

One of the primary purposes of a no-action clause is to ensure that the proceeds of any litigation

will be shared ratably by all noteholders. *See Quadrant*, 992 N.Y.S.2d 687, 698.  But that

concern does not apply to claims for declaratory relief as to all noteholders.[13]  *See* American Bar

Foundation, 1971 Commentaries on Model Indenture Provisions § 5–7 (no-action clauses'

additional purpose is "the expression of the principle of law that would otherwise be implied that

all rights and remedies of the indenture are for the equal and ratable benefit of all the holders.")

(Defs.' Mem., attached to Hurwitz Decl.).  Here, a declaration that CEC's Guarantee of the

Notes is still in effect and that the Supplemental Indentures are invalid and void *ab initio* would

---

[13]  This objective is reflected in the language of the Indentures:  "[I]t being understood and intended that no one or more of such Holders shall have any right in any manner . . . to obtain or to seek to obtain priority or preference over any other of such Holders or to enforce any right under this Indenture, except . . . for the equal and ratable benefit of all such Holders."  Ex. D. (2017 Notes Indenture), § 6.7; Ex. E (2016 Notes Indenture), § 507.

inure to the benefit of all noteholders.  Accordingly, Counts One and Two are not barred by the No-Action Clauses.

### E. Caesars's Material Breach of the Indentures Excuses Compliance with the No-Action Clauses with Respect to Count Seven

"[W]here it becomes clear that one party will not live up to a contract, the aggrieved party is relieved from the performance of futile acts or conditions precedent." *Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc*., 522 N.Y.S.2d 292, 293 (App. Div. 3d Dep't 1987); *see also Special Situations Fund III, L.P. v. Versus Tech., Inc*., 642 N.Y.S.2d 894 (App. Div. 1st Dep't 1996) (where issuer materially breached contract's antidilution provisions by failing to adjust warrant price after arrangement for private placement of shares at less than current fair market value, warrantholder was excused from contractual requirement that it exercise warrant and tender payment for shares before filing lawsuit for breach of contract).  Here, the No-Action Clauses prohibit any noteholder (and Caesars working on behalf of such noteholder) from "obtain[ing] or [] seek[ing] to obtain priority or preference over any other of such Holders[.]" Ex. D (2017 Notes Indenture), § 6.7; Ex. E (2016 Notes Indenture), § 507.  Caesars's sponsorship of the Transaction breached this provision, since it resulted in the Favored Noteholders being paid in full at the expense of the Disenfranchised Noteholders.  Under the foregoing decisions, Defendants' own breach of the No-Action Clauses should excuse Plaintiffs' obligation to perform under that same provision.

## III. THE COMPLAINT STATES BREACHES OF THE GUARANTEES, NOTES AND INDENTURES

Interpretation of indenture provisions is a matter of basic contract law.  *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A*., 691 F.2d 1039, 1049 (2d Cir. 1982).  To state a viable claim for breach of contract, a complaint need only allege:  (i) the existence of an agreement, (ii) adequate performance of the contract by the plaintiff, (iii) breach of contract by the defendant,

and (iv) damages.  *See, e.g., Eternity Global Master Fund*, 375 F.3d at 177.  Here, all of

Defendants' arguments are premised on interpretations of the Indentures' provisions that are

contrary to those advanced in the Complaint.  Critically, Defendants cannot prevail on these

arguments at the motion to dismiss stage unless their interpretations are supported by clear and

unambiguous contract terms "concerning which there is no reasonable basis for a difference of

opinion."  *See Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (citation

omitted).  None of Defendants' arguments come close to meeting this standard.

### A.   Plaintiffs State Violations of the Indentures' Prohibitions of Impairment of Plaintiffs' Right to Sue for Principal and Interest and of Affiliate Voting

Defendants argue that they have not breached Section 6.8 of the 2017 Notes Indenture

and Section 508 of the 2016 Notes Indenture—both of which mirror Section 316(b) of the TIA—

because to date Plaintiffs "have received all payments under the Notes when due."  Defs.' Mem.

at 20.  This argument fails for the same reasons discussed in connection with Defendants'

Section 316(b) argument.  *See Federated*, 1999 WL 993648, at *7.

Defendants also argue that Plaintiffs have not alleged breaches of the Indentures'

prohibitions against "affiliate" voting.  Under the Indentures, Notes may not be counted towards

any majority vote when the noteholders are "affiliates" of Defendants or under Defendants'

"control."  *See* Compl. ¶¶ 33–36 (citing Ex. D (2017 Notes Indenture), §§ 1.1, 2.9, 9.2; Ex. E

(2016 Notes Indenture), §§ 101, 902).  Defendants argue in conclusory fashion that Plaintiffs fail

to adequately allege that the Favored Noteholders were either "affiliates" or under Defendants'

"control."  *See* Defs.' Mem. at 20–21.  As discussed above, the Agreement unquestionably

provided Defendants with "control" over the Favored Noteholders' consent to the Supplemental

Indentures.  Based on this fact, as well as the Indentures' defining "affiliate" to include persons

"directly or indirectly controlling or controlled by" other persons pursuant to a contract or

agreement, *see* Ex. D (2017 Notes Indenture), § 1.1; Ex. E (2016 Notes Indenture), § 101, the

Trustee's execution of the Supplemental Indentures based on the Favored Noteholders' consents

violated both Indentures.  (*See supra* at Part I.A.)

       **B.**     **Defendants Breached the Redemption Provisions of the Indentures**

      In Count Five, the Complaint states that Defendants breached the Indentures by

redeeming outstanding Notes without following the Indentures' requirement that the Notes be

selected for redemption by a "fair and appropriate" process.  *See* Compl. ¶¶ 117–22.  Predictably,

Defendants argue that their purchase of the Favored Noteholders' securities was not a

redemption but rather was a mere "repurchase" of outstanding Notes, and thus was not subject to

the relevant restrictions.  More specifically, Defendants argue that the Transaction did not

constitute a redemption because:  (i) a privately negotiated transaction cannot be a redemption

and (ii) relying on a 1977 case, a redemption must involve a contractual right by the issuer to

compel the noteholders to return their notes.  Defendants are wrong on both points.

      The term "redemption" is not defined in the Indentures.  In the absence of an agreed

definition, the Court must interpret the term according to its ordinary and customary definition

and usage.  *See Fed. Ins. Co. v.  Home Assurance Co.*, 639 F.3d 557, 568 (2d Cir. 2011) (giving

an undefined contract term its ordinary meaning).  As recently held by the Second Circuit,

"'redemption' . . . refers to '[t]he reacquisition of a security by the issuer.'"  *Chesapeake Energy

Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*, __ F.3d __, 13-1893-cv, 2014 WL 6650873, at *5

(2d Cir. Nov. 25, 2014) (citing various definitions of "redeem" and "redemption").  "Generally,

'[t]o redeem is defined as to purchase back; to regain possession by payment of a stipulated

price; to repurchase; to regain, as mortgage property, by paying what is due; to receive back by

paying the obligation.'"  *In re Quebecor World (USA) Inc.*, 719 F.3d 94, 99 (2d Cir. 2013)

(citation omitted); *see also Barron's Dictionary of Finance & Investment Terms* 587 (8th ed.

2010) (defining of "redemption" to mean the "repayment of a debt security or preferred stock issue, at or before maturity"); *see also Merriam-Webster's Collegiate Dictionary* 1042 (11th ed. 2003) (defining "redeem" as "to remove the obligation of payment," or "to buy back" or "repurchase"). None of these definitions exclude privately negotiated transactions, or require that redemptions force noteholders to return their securities to the issuer.

Defendants' argument that the Transaction was something other than a redemption collapses when one considers the terms of the repurchase. As set forth in the Complaint, the Notes were being traded at values substantially below par immediately prior to the Transaction. Despite this fact, Defendants agreed to pay the Favored Noteholders par plus accrued interest— as they would pursuant to a formal redemption. *See* Compl ¶¶ 71-73; Ex. B (Agreement), § 2.2(b); Ex. D (2017 Notes Indenture), § 2.1.

Further, Defendants' reference to provisions of the Indentures allowing the cancelation of securities "acquired in any manner whatsoever" does not answer the question of whether this particular acquisition constituted a redemption. Defs.' Mem. at 21-22 (emphasis omitted). Defendants cite to the ABA Commentaries for the proposition that the issuer may acquire notes "on the market." *Id*. at 22 (emphasis omitted). But Defendants admit that this Transaction was *not* a market purchase—which would take place anonymously through a broker dealer—but rather a privately negotiated transaction with specific counterparties at a price far above market. Thus, because the Transaction was clearly not "on the market," this argument fails as well.[14] At

---

[14] Defendants' citation to *Concord Real Estate CDO 2006-1 v. Bank of America N.A.*, 996 A.2d 324, 334-36 (Del. Ch. 2010), *aff'd*, 15 A.3d 216 (Del. 2011), also misses the mark. In that case, certain affiliates of the issuer voluntarily delivered their notes to the issuer for no consideration with the intent that the notes be cancelled so that the issuer would not fail a coverage test in the indenture. *Id.* at 325. The court had to determine if the notes remained outstanding as that term was used in the coverage test. *Id.* The case had nothing whatsoever to do with a redemption by the issuer.

best, Defendants have raised a factual question regarding the proper interpretation of "redemption" under the Indentures, and thus dismissal would be improper. *See Eternity Global Master Fund Ltd.*, 375 F.3d at 177.

### C.     CEC May Not Revoke Its Guarantee

Defendants contend that they were entitled to terminate CEC's Guarantee of the Notes because the noteholders of a majority amount of the Notes consented to such termination.[15] Defs.' Mem. at 22.  In making this argument, Defendants specifically contend that their right to amend is not subject to any "carve out" applicable to the Guarantees.  This argument is contrary to the express terms of the Indentures, in which Defendants agreed that CEC's Guarantee was both "irrevocable" and "unconditional," "irrespective of . . . any waiver or consent by any Holder of the Notes." *See* Ex. D (2017 Notes Indenture), § 12.1.1; *id*. at B-1 (Form of Notation of Guarantee); Ex. E (2016 Notes Indenture), § 1501; *id*. at 48 (Form of Notation of Guarantee). On its face, this language precludes Defendants' taking back (*i.e.*, "revoking") CEC's guarantee obligations based on "consents" from the Favored Noteholders. *See, e.g.*, *Gulf Ins. Co. v. First Bank*, 400 F. App'x 188, 189 (9th Cir. 2010) ("The contract was irrevocable, meaning that [defendant] had no ability to pass on its obligation . . . ."); *Kerr-McGee Chem. Corp. v. United States*, 739 F. Supp. 613, 623–24 (Ct. Int'l Trade 1990) ("[T]o use the term 'irrevocable' and then to state that it does not always mean 'irrevocable' in the ordinary contract sense is misleading . . . .").

---

[15]  Contrary to Defendants' statement, Defs.' Mem. at 5, CEC's Guarantees were not terminated in May 2014 when CEC sold a 5% stake in CEOC not only for the reasons set forth above, but also because, as used in the SEC regulations, "a wholly owned subsidiary" refers to "a subsidiary *substantially all* of whose outstanding voting shares are owned by its parent and/or the parent's other wholly owned subsidiaries."  17 C.F.R. § 201.1-02(aa) (emphasis added).  Here, CEC and its affiliates continue to own substantially all of CEOC's voting shares and thus CEOC remains a "wholly owned subsidiary" of CEC.

Defendants' argument also ignores the fact that CEC's obligation to pay principal and interest is "absolute and unconditional" and exists "notwithstanding any other provision in th[e] Indenture[s]." Ex. D (2017 Notes Indenture), § 6.8; Ex. E (2016 Notes Indenture), § 508. In *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 917 (2d Cir. 2010), the Second Circuit held that an essentially identical provision that likewise used the phrase "absolute and unconditional" trumped provisions of the indenture that purported to restrict the bondholders' right of recovery to only certain assets of the trust. The same result should apply here. CEC's guarantee cannot be released with respect to any Noteholder that does not consent to the release.[16]

### D.   Defendants Violated the Sections of the Indentures Prohibiting Preferential Treatment

In Count Seven of the Complaint, Plaintiffs state that, by agreeing to pay the Favored Noteholders all principal and interest due to them in exchange for their consents to the Amendments (as well as transactional fees and costs), Defendants breached a provision of the Indentures specifically prohibiting any act "to obtain or to seek to obtain priority or preference over any other of such Holders[.]" Ex. D (2017 Notes Indenture), § 6.7; Ex. E (2016 Notes Indenture), § 507. Defendants do not dispute that the Transaction resulted in preferential treatment of one set of noteholders over another, thus breaching the Indentures. Rather, Defendants argue that *they* cannot be liable for any breach of this provision because they acted as issuers rather than noteholders. Defs.' Mem. at 23. This argument fails for multiple reasons. First, as discussed above, Caesars had both actual and beneficial ownership of the Favored Noteholders' bonds at the time the consents became effective. As such, Defendants did indeed

---

[16]   Defendants refer to provisions in another indenture in the Caesars corporate structure, presumably for the proposition that, at trial, they will contrast those provisions with the ones at issue here should extrinsic evidence of the drafter's intent become necessary. Defs.' Mem. at 23 n.3. Plaintiffs note that the indenture cited by Defendants *omits* the critical "absolute and unconditional" language found here, making the point that, as the Second Circuit has recognized, the drafter here intended to provide broader protections to the noteholders.

act as noteholders when effectuating the Amendments to the Indentures.  Second, the disparate treatment was orchestrated by Defendants, for the primary benefit of Defendants, in violation of the rights of the Disenfranchised Noteholders under contract—the Indentures—to which Defendants are parties.  Moreover, both Defendants and the Favored Noteholders knew well that their backroom deal violated the Indentures, which is why the Agreement expressly requires the Defendants to indemnify the Favored Noteholders from liability or litigation "alleging misconduct … on account of any [Favored Noteholder] entering into [the] Agreement."  *See* Ex. B (Agreement), § 9.1.  Defendants' suggestion that they can engineer a breach of the contract by one set of noteholders against another without incurring liability themselves is inconsistent with both the TIA and common sense.  Defs.' Mem. at 23.  At best, Defendants have raised a contractual interpretation issue that cannot be resolved at the motion to dismiss stage.  *See Eternity Global Master Fund Ltd.*, 375 F.3d at 177; *In re Lehman Bros.*, 513 F. App'x at 77.

### E.      Plaintiffs' Damages Allegations Are Sufficient

Defendants argue that Plaintiffs' allegations of "'substantial actual and prospective damages'" are "inadequate," which requires dismissal of their breach of contract claims.  *See* Defs.' Mem. at 23–24.  Defendants are wrong, for at least two reasons.  First, Defendants ignore the fact that Plaintiffs request a declaration of their rights under the Guarantees, Indentures and Notes—all of which were breached—which is an adequate and independent request for relief based on Defendants' breaches of the Indentures.  *See, e.g.*, Compl. ¶¶ 105, 116, 122; *Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir. 1991) (stating that, to survive a motion to dismiss, a request for declaratory judgment requires only a substantial controversy between parties having adverse interests of sufficient immediacy); *Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 790 (2d Cir. 1986) (stating that declaratory judgment is appropriate "when the judgment will serve a useful purpose in clarifying and settling the legal

relations in issue"). In this context, Defendants ignore Plaintiffs' requests for declaratory relief entirely. Second, Defendants ignore the fact, "[u]nder New York Law," "'[t]hat damages are uncertain, or may not even exist, is an insufficient reason' to grant a motion to dismiss." *Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*, 291 F.R.D. 47, 71 (S.D.N.Y. 2013) (citation omitted). Moreover, even where damages are not ascertainable, Plaintiffs may still collect nominal damages. *See ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 416, 421 (S.D.N.Y. 1999) (allowing action to proceed solely on the basis of entitlement to nominal damages); *Kronos, Inc. v. AVX Corp.*, 595 N.Y.S.2d 931, 934 (1993) ("Nominal damages are always available in breach of contract actions."); 36 N.Y. Jur. Damages § 6 (2014) ("The right to nominal damages as vindication exists immediately on the breach of a contract, and although the plaintiff fails to prove damages, it is error to dismiss his or her complaint, as nominal damages should be awarded." (citations omitted)).[17]

## IV.   THE COMPLAINT STATES A BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

Every contract governed by New York law—including the Indentures—contains an implied covenant of good faith and fair dealing, which prohibits a party to a contract from taking actions to "destroy or injure the right of another party to receive the benefits of the contract." *See Chase Manhattan Bank, N.A. v. Keystone Distribs.*, 873 F. Supp. 808, 816 (S.D.N.Y. 1994) (citing *Carvel Corp. v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228, 230 (2d Cir. 1991)). The implied duty of good faith and fair dealing applies when a party to a contract acts in a way that is intended to deprive the other party of the benefit of its bargain. *Dalton v. Educ. Testing Serv.*, 639 N.Y.S.2d 977, 979 (1995).

---

[17]   Defendants' damages argument is further belied by *Federated*, which—as set forth above— confirms that Plaintiffs right to seek relief based on the fact that they "will not be able to recover the principal due under the notes at the time of maturity" in light of a planned insolvency. *See* 1999 WL 993648, at *7.

Although Defendants argue that their conduct cannot be actionable so long as it is not expressly barred by the Indentures, that is not the applicable standard under New York law. Rather, the issue is whether Defendants acted "in a way that is inconsistent with the justified expectations of the other party." *See Rus, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 2d 302, 315 (S.D.N.Y. 2003). Here, Plaintiffs could not have reasonably anticipated that Defendants would negotiate in secret to pay off one set of noteholders in exchange for consents that effectively destroyed the remaining noteholders' investments. *See, e.g.*, Compl. ¶¶ 42–61, 69, 142. Indeed, the Transaction orchestrated by Defendants is wildly at odds with custom and practice in the bond markets, where exit consents are typically offered to *all* noteholders, not just those that the issuer picks for selective redemption. *See, e.g.*, *Kass v. E. Air Lines*, 12 Del. J. Corp. L. 1074, 1080 (Del. Ch. 1986) ("The fact that the offer in this case is one made publicly to all voters on the same terms—that each bondholder is free to accept or reject it—precludes, in my opinion, a conclusion that it disenfranchises any voter or group of voters (although the same could not perhaps be said were the offer of consideration in exchange for a bondholder's vote not made to all bondholders on the same terms)."); *Katz v. Oak Indus.*, 508 A.2d 873, 881 (Del. Ch. 1986) (permitting exit consents because "the incentive to consent is equally available to all members of each class of bondholders"). Defendants structured the Transaction in this fashion with one goal in mind: to deprive Plaintiffs of their ability to recover on their Notes. On these facts, Defendants' motion should be denied. *Chase Manhattan Bank*, 873 F. Supp. at 816.

## <u>CONCLUSION</u>

For all the foregoing reasons, the Court should deny Defendants' Motion to Dismiss in its entirety. Plaintiffs respectfully request oral argument.

Dated:  December 3, 2014
New York, New York

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ James H. Millar
      James H. Millar
      Kristin K. Going
      Clay J. Pierce
      Tracy S. Combs

1177 Avenue of the Americas
41st Floor
New York, New York  10036
Telephone:  (212) 248-3140

*Attorneys for Plaintiffs MeehanCombs Global
Credit Opportunities Master Fund, LP,
Relative Value-Long/Short Debt, A Series of
Underlying Funds Trust, SB 4 CF LLC, CFIP
Ultra Master Fund, Ltd., and Trilogy Portfolio
Company, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MEEHANCOMBS GLOBAL CREDIT OPPORTUNITIES MASTER FUND, LP, RELATIVE VALUE-LONG/SHORT DEBT, A SERIES OF UNDERLYING FUNDS TRUST, SB 4 CF LLC, CFIP ULTRA MASTER FUND, LTD., and TRILOGY PORTFOLIO COMPANY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>CAESARS ENTERTAINMENT CORPORATION and CAESARS ENTERTAINMENT OPERATING COMPANY, INC.,<br><br>Defendants. | CIVIL ACTION NO.: 14-CV-7091-SAS |

## CERTIFICATE OF SERVICE

I, James H. Millar, hereby certify that on this day a true and correct copy of the foregoing

Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss was filed

electronically with the Case Management/Electronic Case Filing System ("CM/ECF") for the

Federal Judiciary.  Notice of this filing will be sent to all parties by operation of the Notice of

Electronic Filing system, and the parties to this action may access this filing through CM/ECF.

/s/ James H. Millar
James H. Millar