USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1 15 15

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------X

**MEEHANCOMBS GLOBAL CREDIT**
**OPPORTUNITIES FUNDS, LP, RELATIVE**
**VALUE-LONG/SHORT DEBT, A SERIES OF**
**UNDERLYING FUNDS TRUST, SB 4 CF LLC,**
**CFIP ULTRA MASTER FUND, LTD., and**
**TRILOGY PORTFOLIO COMPANY, LLC,**

        **Plaintiffs,**

        **v.**

**CAESARS ENTERTAINMENT CORP. and**
**CAESARS ENTERTAINMENT OPERATING**
**CO., INC.,**

        **Defendants.**

**OPINION AND ORDER**

**14-cv-7091(SAS)**

-------------------------------------------------------X

**FREDERICK BARTON DANNER, individually**
**and on behalf of all others similarly situated,**

        **Plaintiffs,**

        **v.**

**CAESARS ENTERTAINMENT CORP. and**
**CAESARS ENTERTAINMENT OPERATING**
**CO., INC.,**

        **Defendants.**

**14-cv-7973(SAS)**

-------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

1

## I.    INTRODUCTION

The plaintiffs[1] in these related actions are holders of Notes issued by Caesars Entertainment Operating Company, Inc. ("CEOC") pursuant to indentures, and — until the issuance of supplemental indentures in August 2014 (the "August 2014 Transaction" or the "Amendments") — guaranteed by Caesars Entertainment Corporation ("CEC"; together with CEOC, "Caesars").  Plaintiffs allege that the August 2014 Transaction violated the Trust Indenture Act of 1939 ("TIA")[2] and breached the governing Indentures as well as the implied covenant of good faith and fair dealing.

Plaintiffs contend that the August 2014 Transaction removed the Guarantees given by the asset-rich parent company, CEC, leaving plaintiffs and the other bondholders with a worthless right to collect principal and interest from the issuer, CEOC, a company divesting itself of assets and holding  approximately $17 billion of senior secured debt.  The crux of plaintiffs' allegations is that the release of the Guarantees effected a non-consensual change to plaintiffs' payment rights

---

[1]    Plaintiffs MeehanCombs Global Credit Opportunities Funds, LP, Relative Value-Long/Short Debt, A Series of Underlying Funds Trust, SB 4 CF LLC, CFIP Ultra Master Fund, Ltd., and Trilogy Portfolio Company, LLC will be referred to as "MeehanCombs."  Plaintiff Frederick Barton Danner, who brings his action on behalf of himself and a putative class, will be referred to as "Danner."

[2]    15 U.S.C. §§ 77aaa to 77bbbb.

and affected plaintiffs' practical ability to recover payment in violation of section 316 of the TIA and the governing Indentures.

Both defendants moved to dismiss the Complaint[3] for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  On January 13, 2015, holders of Second Lien Notes issued by CEOC filed an involuntary chapter 11 petition against CEOC in the United States Bankruptcy Court for the District of Delaware.[4]  As a result, this action is stayed as to CEOC pursuant to section 362(a) of the Bankruptcy Code.  However, this action is not stayed as to non-debtor defendant CEC,[5] and for the following reasons CEC's motion to dismiss the Danner Complaint is DENIED in its entirety, and its motion to dismiss the MeehanCombs Complaint is GRANTED in part and DENIED in part.

---

[3]      I refer to the complaint filed in No. 14-cv-7091 as the "MeehanCombs Complaint" and the complaint filed in No. 14-cv-7973 as the "Danner Complaint." I refer to them together as the "Complaint."

[4]      On January 15, 2015, CEOC filed a voluntary chapter 11 petition in the United States Bankruptcy Court for the Northern District of Illinois.

[5]      *See In re South Side House, LLC*, 470 B.R. 659, 676 (Bankr. E.D.N.Y. 2012) ("[T]he automatic stay does not prevent a creditor from proceeding against a non-debtor guarantor.").

## II.    FACTS[6]

### A.    The Notes and Indentures

CEC, formerly known as Harrah's Entertainment, Inc., owns, manages, and operates dozens of casinos throughout the United States.  CEOC is a direct operating subsidiary of CEC.[7]

Pursuant to Indentures dated September 28, 2005 and June 9, 2006, CEOC issued $750 million of 2017 Notes and $750 million of 2016 Notes.[8] MeehanCombs is the beneficial holder of approximately $15,318,000 of the 2016 Notes and $5,632,000 of the 2017 Notes.[9]  Danner is the beneficial holder of 2016 Notes.[10]  Holders of the 2016 Notes are entitled to receive interest payments each year on June 1 and December 1; holders of the 2017 Notes are entitled to receive

---

[6]    Unless otherwise indicated, the facts are drawn from the Complaint. Well-pleaded factual allegations are presumed true for the purposes of this motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  However, allegations in the Complaint that consist of conclusory statements or threadbare recitals of causes of action are not entitled to the presumption of truth.  *See Kirkendall v. Halliburton*, 707 F.3d 173, 175 n.1 (2d Cir. 2013); *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 173 (2d Cir. 2012) (citing *Iqbal*, 556 U.S. at 678).

[7]    *See* MeehanCombs Compl. ¶¶ 17-18.

[8]    *See* Danner Compl. ¶ 19.

[9]    *See* MeehanCombs Compl. ¶¶ 1, 12-16.  Only plaintiffs SB 4 CF LLC and CFIP Ultra Master Fund, Ltd. own the 2017 Notes.

[10]    *See* Danner Compl. ¶ 16.

interest payments on April 1 and October 1 annually.[11]  The vast majority of

outstanding Notes — approximately $137 million — are held by individual

investors.[12]

When issued, the 2017 and 2016 Notes were investment grade.[13]  The

governing Indentures each included unconditional Guarantees by CEC and

provisions prohibiting CEOC from divesting its assets.[14]

**B.**     **The August 2014 Transaction**

In January 2008, Caesars was acquired in a leveraged buyout by two

private equity funds, Apollo Global Management, Inc. and TPG Capital, LP.[15]

Caesars subsequently entered into a series of transactions aimed at transferring

assets away from CEOC to affiliates, and leaving it (CEOC) holding company

debt.[16]

CEC's ultimate plan is to push CEOC into bankruptcy while

---

[11]     *See* MeehanCombs Compl. ¶¶ 22-23, 25-26.

[12]     *See id.* ¶¶ 2, 28.

[13]     *See id.* ¶ 43.

[14]     *See id.* ¶¶ 31-32.

[15]     *See id.* ¶ 44.

[16]     *See id.* ¶¶ 49-55.

protecting Apollo and TPG from CEOC's creditors.[17]  The Amendments effectively left CEC free to transfer CEOC's assets without any obligation to back CEOC's debts.[18]  Furthermore, the purchase price paid for the Notes of the noteholders who approved the August 2014 Transaction (the "Favored Noteholders") — par plus accrued interest and transactional fees and costs — represented an extraordinary one hundred percent premium over market.  In exchange for receiving all amounts owed under their Notes, the Favored Noteholders promised to: (1) support any future restructuring proposed by Caesars; (2) consent to "the removal and acknowledgment of the termination of the CEC guarantee of the Securities"; and (iii) consent to the "modif[ication of] the covenant restricting disposition of 'substantially all' of CEOC's assets to measure future asset sales based on CEOC's assets as of the date of the amendment."[19]

## III.   STANDARD OF REVIEW

### A.   Rule 12(b)(6) Motion to Dismiss

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court

---

[17]     *See id.* ¶¶ 57-58.  As noted, an involuntary petition was filed by second-lien creditors against CEOC on January 13, 2015, and a voluntary petition was filed on January 15, 2015.

[18]     *See* MeehanCombs Compl. ¶¶ 4-5, 7.

[19]     *Id.* ¶¶ 5, 8, 72, 74.

6

"must accept all non-conclusory factual allegations as true and draw all reasonable inferences in the plaintiff's favor."[20]  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[21]  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[22]  Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[23]

When deciding a motion to dismiss, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."[24]  A court may also consider a document that is not incorporated by reference "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral'

---

[20]      *Simms v. City of New York*, No. 11 Civ. 4568, 2012 WL 1701356, at *1 (2d Cir. May 16, 2012) (citing *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008)).

[21]      *Iqbal*, 556 U.S. at 679.  *Accord Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

[22]      *Iqbal*, 556 U.S. at 678 (quotation marks omitted).

[23]      *Id.* (quotation marks omitted).

[24]      *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

to the complaint."[25]  In an action under the TIA, a court may refer to the Indenture and its exhibits.[26]

## IV.   APPLICABLE LAW

### A.   The Trust Indenture Act

The TIA provides that instruments to which it applies must be issued under an indenture that has been qualified by the Securities and Exchange Commission ("SEC").[27]  The requirements of such indentures are "designed to vindicate a federal policy of protecting investors."[28]

Section 316 of the TIA relates to collective action clauses.  For example, it is permissible for a majority of noteholders to direct the trustee to exercise its powers under the indenture or for not less than seventy-five percent of

_____

[25]   *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

[26]   *See Field v. Trump*, 850 F.2d 938, 949 (2d Cir. 1988).

[27]   *See generally* 15 U.S.C. §§ 77eee-77ggg.  "A 'trust indenture' is a contract entered into between a corporation issuing bonds or debentures and a trustee for the holders of the bonds or debentures, which, in general, delineates the rights of the holders and the issuer."  *Upic & Co. v. Kinder-Care Learning Ctrs., Inc.*, 793 F. Supp. 448, 450 (S.D.N.Y. 1992).

[28]   *Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*, 85 F.3d 970, 974 (2d Cir. 1996) (explaining that the law was "enacted because previous abuses by indenture trustees had adversely affected 'the national public interest and the interest of investors in notes, bonds[, and] debentures . . . .'") (quoting 15 U.S.C. § 77bbb(a)).

noteholders "to consent on behalf of the holders of all such indenture securities to the postponement of any interest payment for a period not exceeding three years from its due date."[29]  Section 316(a)'s terms are permissive — meaning an indenture can expressly exclude such majority action.

However, section 316(b) is mandatory.  It states that:

> Notwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder, except as to a postponement of an interest payment consented to as provided in paragraph (2) of subsection (a) of this section, and except that such indenture may contain provisions limiting or denying the right of any such holder to institute any such suit, if and to the extent that the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in the surrender, impairment, waiver, or loss of the lien of such indenture upon any property subject to such lien.[30]

Thus, section 316(b) acts to protect a bondholder's right to receive payment of both principal and interest.

---

[29]     15 U.S.C. § 77ppp(a).

[30]     *Id.* § 77ppp(b).  An indenture may also provide bondholders with rights in excess of those guaranteed by section 316(b).  *See id.* § 77rrr(b) ("The indenture to be qualified may contain, in addition to provisions specifically authorized under this subchapter to be included therein, any other provisions the inclusion of which is not in contravention of any provision of this subchapter.").

Section 316(b) addressed prior practice whereby majority bondholders — often controlled by insiders — used collective or majority action clauses to change the terms of an indenture, to the detriment of minority bondholders.[31]   As result of section 316(b), a company cannot — outside of bankruptcy[32] – alter its

---

[31]   *See Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 917 (2d Cir. 2010) (describing section 316(b) as "a statutory provision requiring that bond indentures protect minority bondholders by prohibiting majority bondholders from collusively agreeing to modify the bond's payment terms"); *In re Board of Directors of Telecom Argentina, S.A.*, 528 F.3d 162, 172 (2d Cir. 2008) (stating that section 316 "protects the holder of a bond issued under a qualified indenture from majority-imposed impairment of its rights."); *Upic & Co.*, 793 F. Supp. at 452 (noting that section 316(b) was motived by the SEC's concerns "about the motivation of insiders and quasi-insiders to destroy a bond issue through insider control"); *YRC Worldwide Inc. v. Deutsche Bank Trust Co. Americas*, No. 10 Civ. 2106, 2010 WL 2680336, at *4-5 (D. Kan. July 1, 2010) (holding on summary judgment that the attempt of a supermajority of holders to amend a trust over the opposition of a minority was barred by the Act); *In re Board of Directors of Multicanal S.A.*, 307 B.R. 384, 388, 391-92 (Bankr. S.D.N.Y. 2004) ("One purpose of the statute was to regulate and reform prior practice whereby indentures contained provisions that permitted a group of bondholders, often controlled by insiders, to agree to amendments to the indenture that affected the rights of other holders – so-called 'majority' or 'collective' action clauses.") (citing SEC, Report on the Study and Investigation of Protective and Reorganization Committees, Parts I-VIII (1937-1940)); Mark J. Roe, *The Voting Prohibition in Bond Workouts*, 97 Yale L.J. 232, 251 (1987) ("Why did Congress enact this prohibition?  Although the Trust Indenture Act's legislative history is sparse, the Securities and Exchange Commission's approximately 5000-page study of corporate reorganization, which provided the impetus for the Act, is not.  Begun pursuant to the Securities and Exchange Act in 1934 under William O. Douglas' tutelage and completed in 1939, this study reflected the SEC's fear of insider control of bond issues and its concern about the poor quality of information that flowed to bondholders.").

[32]   *See, e.g.*, *Board of Directors of Telecom Argentina*, 528 F.3d at 172 ("'[I]t is self-evident that Section 316(b) could not have been intended to impair

obligation to pay bonds without the consent of each bondholder.[33]  In this way,

section "316(b) was designed to provide judicial scrutiny of debt readjustment

plans to ensure their equity."[34]

### B.     No-Action Clauses

No-action clauses generally require individual bondholders to satisfy

conditions precedent before initiating suit.  A "no-action clause . . . protect[s]

---

the capacity of a debtor and its creditors to restructure debt in the context of
bankruptcy,' and '[t]he cases have uniformly recognized that reorganization
proceedings in Chapter 11 are not within the purview of TIA Section 316(b).'")
(quoting *In re Delta Air Lines, Inc.*, 370 B.R. 537, 550 (Bankr. S.D.N.Y. 2007),
*aff'd*, 374 B.R. 516 (S.D.N.Y. 2007)).

[33]     *See Multicanal S.A.*, 307 B.R. at 388-89; Roe, *The Voting Prohibition*,
97 Yale L.J. at 251 ("Only two events should change a company's obligation to
pay its bonds.  Either *each* affected bondholder would consent to the alteration of
the bond's terms, or a judge would value the company to determine that the firm
was insolvent, eliminate the stockholders, and then reduce the express obligation to
the bondholders.") (emphasis in original).

[34]     *Brady v. UBS Financial Services, Inc.*, 538 F.3d 1319, 1325 (10th Cir.
2008) (citing S. Rep. No. 76-248, at 26 (1939)); *see also id.* ("In practice, the
provision tends to force recapitalizations into bankruptcy court because of the
difficulty of completing a consensual workout."); George W. Shuster, Jr., *The
Trust Indenture Act and International Debt Restructurings*, 14 Am. Bankr. Inst. L.
Rev. 431, 433-37 (2006) ("Section 316(b) was adopted with a specific purpose in
mind — to prevent out-of-court debt restructurings from being forced upon
minority bondholders."); Roe, *The Voting Prohibition*, 97 Yale L.J. at 251
("Congress and the SEC were aware that the holdout problem would frustrate some
workouts, but the regulators wanted to impede workouts that took place outside of
regulatory and judicial control.  The SEC *wanted* trust indenture legislation that
would bring contractual recapitalizations under the jurisdiction of the federal
bankruptcy court.") (emphasis in original).

issuers from the expense involved in defending individual lawsuits that are either frivolous or otherwise not in the economic interest of the corporation and its creditors."[35]  This goal is generally achieved "by delegating the right to bring a suit enforcing rights of bondholders to the trustee, or to the holders of a substantial amount of bonds, and by delegating to the trustee the right to prosecute such a suit in the first instance."[36]

The terms of no-action clauses are strictly construed.[37]  They are regularly enforced by federal and state courts to preclude state law claims.[38]  However, when a claim is brought under the TIA, section 316(b) preempts

---

[35]    *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 565 (2014) (quotation marks, alterations, and citations omitted) (explaining that no-action clauses also protect against strike suits and individual bondholder suits that are unpopular with the majority).  *Accord RBC Capital Mkts., LLC v. Education Loan Trust IV*, No. 6297-CS, 2011 WL 6152282, at *5 (Del. Ch. Dec. 6, 2011) (explaining that under New York law, the "essential purpose" of no-action clauses is "to strike the right balance between enabling the effective enforcement of noteholder rights and the avoidance of capital-taxing suits that do not have the support of most noteholders").

[36]    *Quadrant Structured Prods. Co.*, 23 N.Y.3d at 565 (quotation marks omitted).

[37]    *See McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1050 (2d Cir. 1995), *affirming*, 859 F. Supp. 743, 748 (S.D.N.Y. 1994).

[38]    *See id.*

12

inconsistent indenture provisions, including no-action clauses.[39]  Thus, while a no-action clause may bar state law claims, it cannot bar claims under the TIA.

### C.     Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing

To state a breach of contract claim under New York law, a plaintiff must allege: (1) a valid contract; (2) plaintiff's performance; (3) defendant's failure to perform; and (4) damages resulting from the breach.[40]

"Under New York law, the implied covenant of good faith and fair dealing inheres in every contract."[41]  However, breach of this implied covenant is

---

[39]     *See id.* at 1051.  *See also Great Plains Trust Co. v. Union Pacific Railroad Co.*, 492 F.3d 986, 991 (8th Cir. 2007) (holding that under section 316 plaintiff trust company had absolute right to sue for unpaid interest without having to first comply with indenture's no-action clause) (citing *UPIC & Co.*, 793 F. Supp. at 454-55 & n.8; *In re Envirodyne Indus., Inc.*, 174 B.R. 986, 992-93 (Bankr. N.D. Ill. 1994)).  Another exception to compliance with the conditions precedent in a no-action clause is where the bondholders allege misconduct by the trustee.  *See* 15 U.S.C. § 77ooo(d) (stating that the "indenture . . . shall not contain any provisions relieving the indenture trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct"); *Cruden v. Bank of N.Y.*, 957 F.2d 961, 968 (2d Cir. 1992) (finding no-action clause inapplicable where plaintiffs alleged breach of the TIA and the underlying indentures against indenture trustees).

[40]     *See Diesel Props. S.r.l. v. Grestrone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).

[41]     *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994) (citing *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 30 N.Y.2d 34, 45 (1972)).

"merely a breach of the underlying contract," not a separate cause of action.[42]

"'[I]f the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.'"[43]

## V.   DISCUSSION

### A.   Plaintiffs' Claims Under TIA Section 316

#### 1.   Plaintiffs State a Claim Under TIA Section 316(b)

CEC argues that the Complaint fails to allege impairment of the legal right to payment under the Notes because CEOC is not in default of its obligation to make payments.  According to CEC, "the statute does not guarantee that the issuer will be able to meet its obligations.  Rather, it protects only a noteholder's *legal* right to receive payment when due."[44]

---

[42]    *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) (quotation marks omitted).

[43]    *District Lodge 26 v. United Techs. Corp.*, 610 F.3d 44, 54 (2d Cir.2010) (quoting *Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 508 (2d Cir. 2005)).

[44]    Memorandum of Law in Support of Defendants' Motion to Dismiss ("Def. Mem."), at 14 (emphasis in original) (citing *Retirement Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of New York Mellon*, 914 F. Supp. 2d 422, 432 (S.D.N.Y. 2012), *aff'd in part and rev'd in part*, --- F.3d ----, 2014 WL 7272269 (2d Cir. Dec. 23, 2014); *YRC Worldwide, Inc.*

"[T]he starting point in any case of [statutory] interpretation must always be the language itself, giving effect to the plain meaning thereof."[45]   Under section 316(b), a noteholder's right "to receive payment of the principal of and interest on [the] indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder[.]"

CEC's narrow reading is not mandated by the statutory text; it is possible for a right to receive payment to be impaired prior to the time payment is due.  Nor does CEC's narrow reading follow from the legislative history and purposes of the TIA.  Although there is scant case law on point, I find the reasoning of two decisions from this District persuasive, particularly in light of the conduct alleged in the Complaint.[46]   Specifically, "the Court finds [ ] unsatisfying the notion that Section 316(b) protects only against formal, explicit modification of

2010 WL 2680336, at *7; *Northwestern Corp.*, 313 B.R. at 600).

[45]     *Kuhne v. Cohen & Slamowitz, LLP*, 579 F.3d 189, 193 (2d Cir. 2009) (quotation marks omitted).

[46]     *See generally Marblegate Asset Mgmt. v. Education Mgmt. Corp.*, --- F. Supp. 3d ----, No. 14 Civ. 8584, 2014 WL 7399041 (S.D.N.Y. Dec. 30, 2014); *Federated Strategic Income Fund v. Mechala Grp. Jam. Ltd.*, No. 99 Civ. 10517, 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999).

the legal right to receive payment, and allows a sufficiently clever issuer to gut the

Act's protections through a transaction such as the one at issue here."[47]  As

explained in *Federated Strategic Income Fund*:

> By defendant's elimination of the guarantors and the simultaneous disposition of all meaningful assets, defendant will effectively eliminate plaintiffs' ability to recover and will remove a holder's "safety net" of a guarantor, which was obviously an investment consideration from the outset.  Taken together, these proposed amendments could materially impair or affect a holder's right to sue.  A holder who chooses to sue for payment at the date of maturity will no longer, as a practical matter, be able to seek recourse from either the assetless defendant or from the discharged guarantors.  It is beyond peradventure that when a company takes steps to preclude any recovery by noteholders for payment of principal coupled with the elimination of the guarantors for its debt, that such action . . . constitute[s] an "impairment" . . . [of] the right to sue for payment.[48]

Likewise, I find that the Complaint's plausible allegations that the August

2014 Transaction stripped plaintiffs of the valuable CEC Guarantees leaving them

with an empty right to assert a payment default from an insolvent issuer are

sufficient to state a claim under section 316(b).

For the same reason stated by the court in *Marblegate Asset

Management*, I reject the cases relied on by CEC because "[t]he language and logic

---

[47]     *Marblegate Asset Mgmt.*, 2014 WL 7399041, at *16.

[48]     *Federated Strategic Income Fund*, 1999 WL 993648, at *7.

16

of the *Northwestern Corp.* and *YRC Worldwide* decisions would suggest that

Plaintiffs have no claim" just because they may still be able to "assert[] a legal

claim [for] payment against the soon-to-be judgment-proof Education Management

LLC."[49]  CEC's attempt to distinguish the instant cases from *Marblegate Asset*

*Management* on the ground that CEOC will soon be filing for bankruptcy

protection and therefore "the transaction challenged here is not an out-of-court debt

restructuring that 'involuntarily disinherits a dissenting minority' of its right to

receive payment" is unavailing.[50]  CEOC is the putative debtor, not CEC.  Had the

---

[49]     *Marblegate Asset Mgmt.*, 2014 WL 7399041, at *17.

[50]     1/8/15 Letter to the Court from Defendants' Counsel at 3 (quoting
*Marblegate Asset Mgmt.*, 2014 WL 7399041, at *20).  As a general matter,
counsel's stridency has been remarkable.  For example, counsel declares that
"[p]laintiffs' claims under the TIA are a transparent ruse to create federal
jurisdiction where none exists."  Def. Mem. at 2.  Neither the conduct alleged in
the Complaint nor the statute's plain language or its legislative history and purpose
justify this statement.  Furthermore, there is no controlling precedent here.  To
support its reading of section 316(b), CEC relies on a case from this District in
which the court merely "deemed abandoned" a section 316(b) claim after the
plaintiff failed to respond to a motion to dismiss.  *Retirement Bd. of the
Policemen's Annuity and Benefit Fund of the City of Chicago*, 914 F. Supp. 2d at
432.  CEC further relies on an unreported decision from the District of Kansas and
a bankruptcy court decision from the Northern District of Illinois.  *See YRC
Worldwide, Inc.*, 2010 WL 2680336, at *7; *Northwestern Corp.*, 313 B.R. at 600.
*Northwestern Corp.* did not consider *Federated Strategic Income Fund*.  *YRC
Worldwide, Inc.*, a case involving *summary judgment*, distinguished *Federated
Strategic Income Fund* on factual grounds.  The court found that the trustee had
neither shown the issuer was divesting itself of its assets "[n]or . . . that holders
would no longer have any recourse against the notes' guarantors" and reasoned that

CEC Guarantees not been improperly removed, CEOC's filing would have had no impact on CEC's liability under the Guarantees.[51]  Thus, as alleged in the Complaint, removal of the Guarantees through the August 2014 Transaction is an impermissible out-of-court debt restructuring achieved through collective action. This is exactly what TIA section 316(b) is designed to prevent.

### 2. MeehanCombs Failed to Adequately Allege Ownership or Control Under Section 316(a)[52]

Section 316(a) permits the holders of a majority of the principal amount of any series of notes governed by the statute to direct the trustee to exercise any power conferred on the trustee by the indenture.  However, the statute provides that in determining whether a majority of holders of the securities "have concurred in any such direction or consent," securities held by the issuer "or by any person directly or indirectly controlling or controlled by or under direct or indirect common control" of the issuer shall be disregarded.

---

"there is no basis to conclude in this case, as the *Federated* court did in its case, that the amendments necessarily leave the holders with no practical ability to receive payments due under the notes."  2012 WL 2680336, at *7.

[51]     *See South Side House, LLC*, 470 B.R. at 673 ("While a bankruptcy case may result in the discharge of the debtor's obligations or impair the claim of a creditor, a non-debtor guarantor's liability is not modified by the bankruptcy process, and the creditor retains its rights against the non-debtor guarantor outside of the bankruptcy case.").

[52]     Danner does not assert a claim under section 316(a).

MeehanCombs alleges that Caesars either controlled the Favored Noteholders or owned the Favored Noteholders' notes and therefore those notes should not have been counted toward the required majority needed for approval of the August 2014 Transaction.[53]  Accordingly, MeehanCombs alleges that the Amendments are invalid.[54]

Because the August 2014 Transaction was structured so that the Favored Noteholders' consents were given *before* the notes were sold to Caesars, MeehanCombs does not allege *ownership*.  In addition, the *control* allegations, as pled, are insufficient.  The MeehanCombs Complaint "does not allege that the Participating Noteholders were anything other than unaffiliated, independent third parties that entered into an arm's length transaction to provide their consents."[55]  Accordingly, MeehanCombs' claim under TIA section 316(a) is dismissed without prejudice.[56]

---

[53]     *See* MeehanCombs Compl. ¶¶ 35-36, 81(d)-(e), 87, 103-104, 107-116.

[54]     I note that the parties have not cited to case law governing a claim brought under section 316(a).

[55]     Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss, at 4.

[56]     CEC's motion does not demonstrate that a claim based on beneficial ownership or control is impossible, and without the benefit of more extensive briefing, it would be difficult to foreclose the right to assert a claim under section 316(a).  I will therefore allow MeehanCombs the opportunity to amend its

## B.     The No-Action Clauses

CEC argues that plaintiffs' *state law* claims are barred by the Indentures' no-action clauses.[57]  There is no dispute that plaintiffs have not complied with the preconditions set forth in the Indentures' no-action clauses. But plaintiffs argue that under the Indentures they are excused from compliance with the no-action clauses because they are seeking to enforce their right to payment of principal and interest.[58]

CEC contends that the exception to the no-action clause — which tracks the language of section 316(b) — is only triggered after a payment default. Thus, CEC argues, "[f]or the same reasons that apply to the [s]ection 316(b) claim, this narrow exception [to the no-action clause] applies only to suits by Noteholders *after* a payment default, which has not occurred here."[59]

The starting point is the language of the Indentures.  Section 508 of

---

complaint to include allegations relating to beneficial ownership and control.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.").

[57]     The no-action clauses are sections 507 of the 2016 Indenture and 6.7 of the 2017 Indenture.

[58]     The exception clauses are sections 508 of the 2016 Indenture and 6.8 of the 2017 Indenture.

[59]     Def. Mem. at 19 (emphasis in original).

20

the 2016 Indenture provides:

> Unconditional Right of Holders to Receive Principal, Premium and Interest
>
> Notwithstanding any other provision in this Indenture, the Holder of any Security shall have the right, which is absolute and unconditional, to receive payment of the principal of and any premium and (subject to Section 307) interest on such Security on the respective Stated Maturities expressed in such Security (or, in the case of redemption, on the Redemption Date) and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

Likewise, section 6.8 of the 2017 Indenture states:

> Unconditional Right of Holders to Receive Principal and Interest
>
> Notwithstanding any other provision in this Indenture, the Holder of any Notes shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest, if any, on the Notes on the Stated Maturity (or, in the case of redemption, on the Redemption Date) and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

In other words, both provisions grant an absolute and unconditional right to bring an action to enforce the payment obligations agreed to under the Indentures.  This plain language does not limit the applicability of these provisions to suits for past due amounts.[60]

---

[60]    *See, e.g.*, *Continental Cas. Co. v. State of N.Y. Mortg. Agency*, No. 94 Civ. 8408, 1998 WL 513054, at *4 (S.D.N.Y. Aug. 18, 1998) (construing the following clause: "[N]othing in this Article VII shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on his Bond, or the obligation of the Agency to pay the principal of and interest on each

As discussed, the parties were obligated to include these provisions in the Indenture by section 316(b) of the TIA.  Section 316(b) states that the bondholder has the right "to institute suit for the enforcement of any [ ] payment *on or after [the] respective [due] dates . . . .*"  This modifying clause is the reason that courts have held that section 316(b) and similarly worded indenture provisions apply only to past due payments.[61]  However, the modifying clause has been omitted from the Indentures.  Under the doctrine of *expressio unius est exclusio alterius*, the omission of this language is deemed intentional, lending further support to the conclusion that these provisions are not limited to past due payments.[62]

---

Bond to the owner thereof at the time and place in said Bond expressed."); *In re Cendant Corp. Sec. Litig.*, Nos. 98 Civ. 1664, 98 Civ. 381, 98 Civ. 759, 2005 WL 3500037, at *9 (D.N.J. Dec. 21, 2005) (applying New York law when construing the following provision: "Notwithstanding any other provision in this Indenture, the Holder of any security shall have the right, which is absolute and unconditional, to receive payment, as provided herein . . . and in such Security, of the principal of (and premium, if any, on) and . . . interest on, such Security or payment of such coupon on the respective Stated Maturities expressed in such Security or coupon (or, in the case of redemption, on the Redemption Date) and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.").

[61]     *See, e.g.*, *Envirodyne Indus., Inc.*, 174 B.R. at 995-96.

[62]     *See Quadrant Structured Prods. Co.*, 23 N.Y.3d at 560 ("[I]f parties to a contract omit terms – particularly, terms that are readily found in other, similar contracts – the inescapable conclusion is that the parties intended the omission. The maxim *expressio unius est exclusio alterius*, as used in the interpretation of

For this reason, CEC's reliance on cases interpreting indenture provisions that simply repeat section 316(b) is unavailing.[63]  In its reply, CEC relies exclusively on *Emmet & Co., Inc. v. Catholic Health East*,[64] which considered a clause substantially similar to that in *Continental Casualty* and rejected the federal court's interpretation of New York law.[65]

The trial court explained:

It is true that in *Continental Casualty*, the district court found this

_____

contracts, supports precisely this conclusion.").

[63]     *See, e.g.*, *Cruden*, 957 F.2d at 968 ("Notwithstanding any other provisions of this Indenture, however, the right of any holder of any Debenture to receive payment of the principal of (and premium, if any) and interest on such Debenture, on or after the respective due dates expressed in such Debenture, or to institute suit for the enforcement of any such payment on or after such respective [due] dates, shall not be impaired or affected without the consent of such holder"). CEC also cites to *McMahan & Co.*, 859 F. Supp. at 748, which simply interprets section 316(b).

[64]     951 N.Y.S.2d 846 (Sup. Ct. N.Y. Co. 2012), *aff'd*, 114 A.D.3d 605 (1st Dep't 2014).  As noted in *Emmet & Co.*, "federal courts have held that, *under New York law*, in the absence of express language in the provision limiting it to 'unpaid' interest, the exception also allows suits for interest that has not yet accrued."  *Id.* at 850 (emphasis in original) (citing *Continental Cas. Co.*, 1998 WL 513054, at *4; *Cendant Corp. Sec. Litig.*, 2005 WL 3500037, at *10)).

[65]     The clause in *Emmet & Co.*, like that in *Continental Casualty Co.*, provided that: "Nothing in this Article contained shall, however, affect or impair the right of any [bondholder], which is absolute and unconditional, to enforce the payment of the principal of and interest on such owner's [bond] out of the moneys provided for such payment, or the obligation of [the issuer] to pay the same out of the sources pledged hereto, at the time and place expressed herein."  *Id.* at 849.

very language to be lacking an express limitation on suits for unpaid interest, though it did not explain the basis for its interpretation.  Nevertheless, we find this reading unpersuasive.  For one thing, it would be strange to preserve a bondholder's right to "enforce" a certain type of payment without similarly preserving the debtor's obligation to make such a payment.  Limiting the scope of the final modifier to apply only to the debtor's obligation produces this somewhat odd, asymmetrical result.  Moreover, policy considerations weigh against such a broad reading of the exception.  Simply put, allowing lawsuits for unaccrued payment obligations would essentially allow all claims relating to the value of the bond, and would let the payment exception swallow the no-action clause.[66]

The Appellate Division affirmed, writing only that plaintiffs were not "excused from compliance by the indentures' 'principal and interest' clauses, which only authorize actions for past due principal and interest."[67]

Even assuming the reasoning of the trial court could be attributed to the Appellate Division, *Emmet & Co.* is still neither persuasive nor controlling authority.  *First*, while similar, the provisions at issue here are materially different from the clauses in *Emmet & Co.* and *Continental Casualty Co.* because they are not susceptible to *Emmet & Co.'s* concern — the only concern based on the *language* of the clause — that "it would be strange to preserve a bondholder's right

---

[66]      *Id.* at 851.

[67]      114 A.D.3d at 606 (citing *Bank of New York v. Battery Park City Auth.*, 251 A.D.2d 211, 211 (1st Dep't 1998)).

to 'enforce' a certain type of payment without similarly preserving the debtor's obligation to make such a payment."[68]   The clauses here refer only to the rights of the bondholders, and the modifier occurs in the middle of the clauses, not at the end.   Notably, the clauses here are substantially similar to the one at issue in *Cendant Corporation Securities Litigation*, and *Emmet & Co.* does not directly address the language of *that* provision.   Moreover, *Emmet & Co.* involved municipal bond offerings, not TIA registered indentures.   Accordingly, the court had no reason to consider the relevance of the parties' modification of the language mandated under section 316(b) of the TIA.

Second, *Emmet & Co.'s* main disagreement with *Continental Casualty* was based on policy grounds.[69]   But *Emmet & Co.* arises in a vastly different context.   *Emmet & Co.* concerned municipal bond offerings not TIA qualified indentures.[70]   Whereas notice of the partial redemptions was duly given in that case, plaintiffs here allege that the August 2014 Transaction was consummated a mere ten days after the initial disclosure, and "well before Plaintiff could have even

---

[68]     951 N.Y.S.2d at 851.

[69]     *See id.* ("*Moreover*, policy considerations weigh against such a broad reading of the exception.") (emphasis added).

[70]     *See id.* at 847 ("This case involves three sets of tax-exempt municipal bonds . . . issued between 1993 and 1996 to finance certain hospital systems in Florida, Georgia, and Pennsylvania.").

complied with the 60 [day] requirement set forth in the" Indentures.[71]

Furthermore, accepting plaintiffs' allegations as true, the applicability of the policy concern articulated in *Emmet & Co.* — "preventing expensive lawsuits that do not have the support of a substantial portion of the creditors while also centralizing the prosecution of lawsuits whose benefits should properly accrue to all bondholders" — is questionable.[72]  This is so because of the nature of the conduct alleged and because plaintiffs represent millions of dollars of aggregate principal due on the Notes.

### C.     The Complaint Adequately Alleges Breach of the Indentures

Each of the enumerated breach of contract claims, along with the claim for breach of the implied covenant of good faith and fair dealing, are ultimately derivative of the claim that section 508 of the 2016 Indenture and section 6.8 of the 2017 Indenture were breached.  The Court therefore treats these claims as a single claim for purposes of this motion.

Based on the foregoing, the Complaint adequately alleges a breach in connection with these provisions.  The Complaint plausibly alleges that the actions

---

[71]     Plaintiff Frederick Barton Danner's Opposition to Defendants' Motion to Dismiss the Complaint at 18.

[72]     951 N.Y.S.2d at 851.

taken by CEC impaired plaintiffs' right to payment under the Notes and therefore plaintiffs' consent to the supplemental indentures was required.[73]

## VI.   CONCLUSION

For the foregoing reasons, CEC's motion to dismiss the Danner Complaint is DENIED in its entirety, and CEC's motion to dismiss the MeehanCombs Complaint is GRANTED with respect to the section 316(a) claim, without prejudice, and DENIED in all other respects.  MeehanCombs shall have until January 29, 2015 to file an amended complaint.  A conference is scheduled for February 3, 2015 at 4:30 p.m.  The Clerk of the Court is directed to close these motions [Dkt. No. 16 in No. 14-cv-7091 and Dkt. No. 8 in No. 14-cv-7973].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             January 15, 2015

---

[73]       The Court has considered and rejects CEC's remaining arguments.

27

**- Appearances -**

**For Plaintiffs MeehanCombs**
**Global Credit Opportunities**
**Funds, LP,**
**Relative Value-Long/Short Debt,**
**A Series of Underlying Funds**
**Trust, SB 4 CF LLC, CFIP Ultra**
**Master Fund, Ltd., and Trilogy**
**Portfolio Company, LLC:**

James H. Millar, Esq.
Kristin K. Going, Esq.
Clay J. Pierce, Esq.
Tracy S. Combs, Esq.
Drinker Biddle & Reath, LLP
1177 Ave. of the Americas, 41st
Floor
New York, NY 10036
(212) 248-3186

**For Plaintiff Frederick Barton Danner:**

Mark C. Gardy, Esq.
James S. Notis, Esq.
Meagan Farmer, Esq.
Gardy & Notis, LLP
Tower 56
126 East 56th Street, 8th Floor
New York, NY 10022
(212) 905-0509

Jay W. Eisenhofer, Esq.
Gordon Z. Novod, Esq.
Elizabeth Shofner, Esq.
Grant & Eisenhoffer P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
(646) 722-8500

**For Defendant Caesars**
**Entertainment Corporation:**

Lewis R. Clayton, Esq.
Jonathan Hurwitz, Esq.
Paul, Weiss, Rifkind, Wharton &
Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

**For Defendant Caesars Entertainment**
**Operating Company, Inc.:**

Eric Seiler, Esq.
Philippe Adler, Esq.
Emily A. Stubbs, Esq.
Friedman Kaplan Seiler & Adelman LLP
7 Times Square
New York, NY 10036
(212) 833-1100

28