UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| MEEHANCOMBS GLOBAL CREDIT OPPORTUNITIES MASTER FUND, LP, RELATIVE VALUE-LONG/SHORT DEBT, A SERIES OF UNDERLYING FUNDS TRUST, and TRILOGY PORTFOLIO COMPANY, LLC, | : : : : : : : : | Case No. 14-CV-07091(SAS) |
| Plaintiffs, | : : | |
| v. | : : | |
| CAESARS ENTERTAINMENT CORPORATION and CAESARS ENTERTAINMENT OPERATING COMPANY, INC., | : : : : : | |
| Defendants. | : : | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

DRINKER BIDDLE & REATH LLP
1177 Avenue of the Americas
41st Floor
New York, New York  10036
(212) 248-3140

*Attorneys for Plaintiffs MeehanCombs Global
Credit Opportunities Master Fund, LP,
Relative Value-Long/Short Debt, A Series of
Underlying Funds Trust, and Trilogy Portfolio
Company, LLC*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................... ii

PRELIMINARY STATEMENT .............................................................................. 1

ARGUMENT .......................................................................................................... 3

I.  THE AUGUST TRANSACTION VIOLATED PLAINTIFFS' RIGHTS UNDER
    BOTH THE TIA AND THE INDENTURE ................................................... 3

    A.  The Guarantee Is an "Indenture Security" for the Purposes of TIA Section
        316(b) ................................................................................................... 3

    B.  The Guarantee Is a "Security" for the Purposes of the Indenture .......... 7

    C.  The Guarantee Is a Core Term of the Indenture, the Removal of Which
        Violated Plaintiffs' Rights Under the TIA and the Indenture ................ 8

II. CEC HAS NO DEFENSE TO LIABILITY BASED ON THE MAY
    TRANSACTIONS ........................................................................................ 10

    A.  Under Section 508 of the Indenture, CEC Is Barred from Unilaterally
        Releasing Its Guarantee on the Unsecured Notes without Plaintiffs'
        Consent ................................................................................................ 10

    B.  Because CEC Continues to Own "Substantially All" of CEOC's Voting
        Shares, CEOC Remains a "Wholly Owned Subsidiary" Under SEC
        Regulation S-X ..................................................................................... 13

    C.  CEC's Defense Is Barred by the Doctrines of Judicial Estoppel and
        Judicial Admission .............................................................................. 17

III. CEC IS LIABLE FOR ALL PRINCIPAL AND INTEREST DUE ON THE
     NOTES AND GUARANTEE ....................................................................... 19

CONCLUSION ..................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re 785 Partners*,
470 B.R. 126 (Bankr. S.D.N.Y 2012) ......................................................................20

*Bank of N.Y. v. First Millennium*,
607 F.3d 905 (2d Cir. 2010) ...................................................................2, 11, 12

*BOKF, N.A. v. Caesars Entm't Corp.*,
No. 15-cv-01561 (SAS), 15-cv-04634 (SAS), 2015 WL 5076785
(S.D.N.Y. Aug. 27, 2015) ...............................................................................10, 12

*Caldor, Inc. v. Mattel, Inc.*,
817 F. Supp. 408 (S.D.N.Y. 1993) ........................................................................17

*Coan v. Bell Atl. Sys. Leasing Int'l, Inc.*,
813 F. Supp. 929 (D. Conn. 1990) ...........................................................................6

*Cont'l Can Co., Inc. v. Chi. Truck Drivers, Helpers and Warehouse Workers Unions
Pension Fund*,
916 F.2d 1154 (7th Cir. 1990) ...............................................................................15

*Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.*,
No. 99-cv-10517-HB, 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999)...........................9

*Gibson v. City of Kirkland*,
433 F. App'x 539 (9th Cir. 2011) ............................................................................7

*Great Rivers Coop. of Se. Iowa v. Farmland Indus., Inc.*,
198 F.3d 685 (8th Cir. 1999) ...................................................................................5

*Haberman v. Washington Pub. Power Supply Sys.*,
744 P.2d 1032 (Wash. 1987), *amended by, Haberman v. Washington Pub. Power
Supply Sys.*, 109 Wash. 2d 1077 (1988)..................................................................6

*Hinshaw v. M-C-M Props., LLC*,
450 S.W.3d 823 (Mo. Ct. App. 2014).......................................................................7

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
309 F.3d 76 (2d Cir. 2002).....................................................................................13

*James v. Meinke*,
778 F.2d 200 (5th Cir. 1985) ...................................................................................6

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
    424 F.3d 195 (2d Cir. 2005)...................................................................................7, 8

*Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*,
    75 F. Supp. 3d 592 (S.D.N.Y. 2014).......................................................5, 9, 11, 12

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*,
    67 F.3d 435 (2d Cir. 1995)........................................................................................13

*Neonex Int'l Ltd. v. Norris Grain Co.*,
    338 F. Supp. 845 (S.D.N.Y. 1972)...........................................................................17

*In re Nortel Networks, Inc.*,
    532 B.R. 494 (Bankr. Del. 2015)...............................................................................20

*Philips Lighting Co. v. Schneider*,
    No. 05 Civ. 4820 (SLT), 2008 WL 4527713 (E.D.N.Y. Sep. 30, 2008) ................12

*Republic of Ecuador v. Chevron Corp.*,
    638 F.3d 384 (2d Cir. 2011)......................................................................................18

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990)..................................................................................................5, 6

*Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*,
    No. 14-CV-10101 (SAS), 2015 WL 3466121 (S.D.N.Y. June 1, 2015) ................20

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
    88 F.R.D. 38 (S.D.N.Y. 1980) ..................................................................................17

*TR 39th St. Land Corp. v. Salsa Distr. USA, LLC*,
    No. 11 CV 7193 (DF), 2015 WL 1499173 (S.D.N.Y. Mar. 25, 2015)....................18

*Trans-United Indus., Inc. v. Cohn*,
    351 F.2d 605 (2d. Cir. 1965).....................................................................................20

*Union Ins. Soc'y of Canton, Ltd. v. William Gluckin & Co.*,
    353 F.2d 946 (2d Cir. 1965)......................................................................................17

*United Hous. Found., Inc. v. Forman*,
    421 U.S. 837 (1975).....................................................................................................5

*UPIC v. Kinder-Care Learning Ctrs.*,
    793 F. Supp. 448 (S.D.N.Y. 1992).............................................................................9

*Woods v. Homes & Structures of Pittsburg, Kan., Inc.*,
    489 F. Supp. 1270 (D. Kan. 1980) .............................................................................6

STATUTES, RULES & REGULATIONS

15 U.S.C. § 77b (The '33 Act) ................................................................................1, 3, 4

15 U.S.C. § 77ccc (TIA § 303) ...................................................................................3, 4

15 U.S.C. § 77ppp (TIA § 316) ............................................................... *passim*

15 U.S.C. § 77www (TIA § 323) ...............................................................................19

17 C.F.R. § 210.1-02(aa) .............................................................................................14

OTHER AUTHORITIES

FASB Emerging Issues Task Force Topic No. D-97: Push Down Accounting, Apr. 18-19,
    2001, http://www.fasb.org/pdf/appd-97.pdf ...................................................14, 16

Financial Statements and Periodic Reports for Related Issuers and Guarantors, SEC
    Release No. 33-7878 (effective Sept. 30, 2000), https://www.sec.gov/rules/final/33-
    7878.htm#P124_6773 ...............................................................................................4

S. Rep. No. 100-105 (1987) .........................................................................................4

SEC Staff Accounting Bulletin: Codification of Staff Accounting Bulletins,
    http://www.sec.gov/interps/account/sabcode.htm ...................................................16

SEC Staff Accounting Bulletin No. 112, 74 Fed. Reg. 27427 (June 10, 2009).......................14, 16

Securities and Exchange Commission Policy Statement: Reaffirming the Status of the
    FASB as a Designated Private-Sector Standard Setter, Apr. 25, 2003, Release No. 33-
    8221, https://www.sec.gov/rules/policy/33-8221.htm .............................................16

Selected Staff Accounting Bulletins, http://www.sec.gov/interps/account.shtml .........................16

Plaintiffs respectfully submit this reply memorandum of law in further support of their motion for partial summary judgment.[1]

## PRELIMINARY STATEMENT

CEC's opposition repeatedly misstates the law and raises non-existent fact issues—all in a calculated attempt to delay judgment on what the Court has recognized to be a "straightforward" legal claim.  CEC's efforts are unavailing.

First, the August Transaction plainly violated Plaintiffs' rights under both the TIA and the Indenture.  Although CEC contends that the removal of its Guarantee from the Indenture governing Plaintiffs' Notes was permissible because the Guarantee is not a "core term," that argument ignores the fact that CEC's Guarantee is, under the express language of the TIA and the Securities Act of 1933, an "indenture security" for the purposes of TIA Section 316(b).  For this reason, when CEC removed the Guarantee from the Indenture, it necessarily "impaired" Plaintiffs' legal right to recover principal and interest owed under an "indenture security" (*i.e.*, the Guarantee).  CEC's removal of the Guarantee also violated Section 508 of the Indenture, which states that Plaintiffs' right to principal and interest on any "Security" (a term specifically defined in the Indenture to include the Guarantee) is "absolute and unconditional" and may not be removed without Plaintiffs' consent.  As detailed below, CEC's argument that the Guarantee is not a "Security" or a "core term" is contrary to the statutes and the Indenture and has no support in the case law.

CEC's arguments regarding the May Transactions also fail as a matter of law.  First, Section 508 of the Indenture expressly provides that, "notwithstanding any other provision" of the Indenture, Plaintiffs' right to receive principal and interest on both the Notes and the

---

[1] Capitalized terms not defined herein have the same meaning as set forth in Plaintiffs' moving brief [ECF No. 70] ("Moving Br.").

Guarantee was "absolute and unconditional" and could not be "impaired" without Plaintiffs' consent.  Under the Second Circuit's decision in *Bank of N.Y. v. First Millennium*, 607 F.3d 905, 917-18 (2d Cir. 2010), this language confers rights <u>greater</u> than those afforded under the TIA and, critical here, overrides the Indenture provisions that CEC says should limit Plaintiffs' recovery rights.  CEC's attempts to circumvent Section 508—based principally on inapplicable decisions addressing "unconditional" guarantees—are all without merit.

CEC's release argument also fails because CEOC remains a "wholly owned subsidiary" of CEC as that term is defined in SEC Regulation S-X, which is specifically incorporated in the Indenture.  There is no dispute that a subsidiary is "wholly owned" under Regulation S-X where its parent owns "substantially all" of its voting shares.  Here, CEC's 89% ownership of CEOC's voting shares easily falls within the SEC's interpretation of "substantially all," as demonstrated by guidance from both the FASB and the SEC Staff.  CEC's argument that the Court should ignore these authorities, and that the Court is incapable of applying the "substantially all" standard on summary judgment, are without any basis in the law.

Finally, CEC's defense based on the May Transactions is contrary to representations (including a sworn statement) CEC made to this Court in the *BOKF* and *UMB* actions.  Although CEC argues that Plaintiffs are quoting CEC out of context, that is clearly not the case.  Nor can CEC defend itself based on contrary statements it made in this litigation.  Under both the doctrines of judicial estoppel and judicial admissions, CEC should be bound to the representations it made to this Court in its successful attempt to avoid summary judgment in these closely-related cases.

## ARGUMENT

**I.    THE AUGUST TRANSACTION VIOLATED PLAINTIFFS' RIGHTS UNDER BOTH THE TIA AND THE INDENTURE**

There is no dispute that CEC amended the Indenture governing Plaintiffs' Notes to remove its Guarantee without Plaintiffs' consent.  In so doing, CEC "impaired" Plaintiffs' right (both legal and practical) to receive principal and interest on both the Notes and the Guarantee under Section 316(b) of the TIA and Section 508 of the Indenture.  CEC's arguments on opposition—that the Guarantee is neither a "Security" nor a "core term" for the purposes of the TIA or the Indenture—are all without merit.[2]

### A.    The Guarantee Is an "Indenture Security" for the Purposes of TIA Section 316(b)

TIA Section 316(b) provides that a noteholder's right "to receive payment of the principal of and interest on" any "<u>indenture security</u>" may not be "impaired or affected" without the holder's consent.  15 U.S.C. § 77ppp(b) (emphasis added).  Under the TIA, an "indenture security" is "any security issued or issuable under the indenture to be qualified."  *See* 15 U.S.C. § 77ccc(11).  The TIA defines "security" by incorporating the definition included in Section 2 of the Securities Act of 1933, 15 U.S.C. § 77b (the "'33 Act").  *Id.* at § 77ccc(1) ("Any term defined in section 2 of [the '33 Act] and not otherwise defined in this section shall have the meaning assigned to such term in such section 2 [of the '33 Act]").  Critical here, Section 2's definition of "security" expressly includes bond guarantees:

> The term "security" means <u>any note</u>, stock, treasury stock, security future, security-based swap, <u>bond, debenture, evidence of indebtedness</u>, . . . or, in general, any interest or instrument commonly known as a "security", <u>or</u> any certificate of interest or participation in, temporary or interim certificate for,

---

[2] Although CEC suggests otherwise, Plaintiffs do not move for summary judgment based on the argument that any transaction constitutes an "out-of-court restructuring."  Plaintiffs reserve their right to pursue this theory at trial should the Court deny summary judgment.

receipt for, <u>guarantee of</u>, or warrant or right to subscribe to or purchase, <u>any of the foregoing</u>.

*Id.* at § 77b(a)(1) (emphasis added).[3]

CEC omits the '33 Act's definition of "security" from its opposition brief, and also ignores the fact that, in 1987, Congress specifically amended Section 303(12) of the TIA "to clarify that a guarantor is an obligor with respect to indenture securities under the [Trust Indenture] Act." S. Rep. No. 100-105 at 33 (1987). Congress enacted this amendment to "reflect[] current administrative practice" and "eliminat[e] the necessity to interpret the term 'obligor' to include a guarantor." *Id.* As amended, Section 303(12) reads as follows:

> The term "obligor", when used with respect to any such indenture security, means every person (including a guarantor) who is liable thereon . . . .

15 U.S.C. § 77ccc(12).

The foregoing provisions make clear that Congress intended to include both bond guarantees and guarantors within the purview of the TIA. This fact is further confirmed by SEC Final Rule 33-7878, which states that "[g]uarantees of Securities are securities themselves for purposes of the Securities Act of 1933." Financial Statements and Periodic Reports for Related Issuers and Guarantors, SEC Release No. 33-7878 (effective Sept. 30, 2000), https://www.sec.gov/rules/final/33-7878.htm#P124_6773. Because guarantees are "securities," the SEC requires that "the offering of both the guaranteed security <u>and the guarantee</u>" must either be registered or exempted from registration. *Id.* (emphasis added). Consistent with this requirement, CEC registered its Guarantee with the SEC at the time the Notes were issued and specifically "identified the Guarantee as a 'class of securities'" in its SEC Registration Statement. *See* Form S-3 Registration Statement filed by CEC on April 6, 2006 (the

---

[3] The TIA defines an "indenture to be qualified" as an "indenture under which there has been or is to be issued a security in respect of which a particular registration statement has been filed." 15 U.S.C. § 77ccc(9). CEC does not dispute that the Indenture here is a qualified indenture.

"Registration Statement"),

http://www.sec.gov/Archives/edgar/data/858339/000110465906023155/a06-8200_1s3asr.htm.

     In arguing that the Guarantee is not a security, CEC ignores the statutes and SEC rules and plays down its registration of the Guarantee as a "class of securities."[4]  Instead, CEC argues that the treatment of the Guarantee as a security would be "inconsistent" with the *Marblegate* decision and a handful of other cases that for the most part deal with securities fraud issues. None of these cases support CEC's position.  *Marblegate*, for example, involved no amendment of the indenture governing the plaintiffs' unsecured notes.  *Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592 (S.D.N.Y. 2014).  Rather, the plaintiffs challenged the release of a parent guarantee pursuant to terms already included in the indenture.  As such, neither the parties nor the Court had reason to address whether the removal of the guarantee from the indenture resulted in the impairment of the plaintiffs' legal right to the repayment of principal and interest under an "indenture security" (*i.e.*, the guarantee).

     The two Supreme Court decisions CEC cites do not deal with bond guarantees at all.  *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 840 (1975) ("shares of stock" in Co-op City are not "securities" within the purview of the '33 Act or the Securities Exchange Act of 1934 (the "'34 Act")); *Reves v. Ernst & Young*, 494 U.S. 56, 58-59 (1990) (demand notes issued by agricultural cooperative and marketed as an investment program are "securities" within the

---

[4] CEC tries to disavow its prior admission that the Guarantee is a security, based on the Eighth Circuit's decision in *Great Rivers Coop. of Se. Iowa v. Farmland Indus., Inc.*, 198 F.3d 685, 699 (8th Cir. 1999).  But *Great Rivers Coop.* has nothing to do with whether a guarantee of a security is a "security" under the '33 Act.  Rather, it stands for the uncontroversial proposition that registration with the SEC, standing alone, does not convert a membership in a farmers' cooperative into a "security."  Needless to say, the Notes and Guarantee at issue here are not reasonably comparable to memberships in a farmers' cooperative.

meaning of the '34 Act).[5]  As for the few cases CEC cites that do pertain to guarantees, they all

find that a guarantee should not be deemed a "security" where the underlying obligation does not

qualify as a "security" under the '33 Act or the '34 Act.  *See Coan v. Bell Atl. Sys. Leasing Int'l,*

*Inc.*, 813 F. Supp. 929 (D. Conn. 1990) (underlying sale/leaseback arrangement for computer

equipment was not a security); *James v. Meinke*, 778 F.2d 200 (5th Cir. 1985) (underlying

commercial loan was not a security); *Haberman v. Washington Pub. Power Supply Sys.*, 744

P.2d 1032 (Wash. 1987), *amended by*, *Haberman v. Washington Pub. Power Supply Sys.*, 109

Wash. 2d 1077 (1988) (underlying public bonds were exempted from '33 Act's definition of

security); *Woods v. Homes & Structures of Pittsburg, Kan., Inc.*, 489 F. Supp. 1270 (D. Kan.

1980) (underlying industrial development bonds were exempted from '33 Act's definition of

security).  These cases have no application here, where the Notes guaranteed by CEC were

issued pursuant to a qualified indenture and both the Notes and the Guarantee were registered as

"securities" with the SEC.  *See* Opp. Br. at 28; Registration Statement.  Moreover, and contrary

to CEC's argument, these cases specifically confirm that "a guarantee can be a security."

*Woods*, 489 F. Supp. at 1294 (emphasis added) ("The statutory definition of 'security' at Section

2(1) of the 1933 Act states a laundry list of items constituting securities and then specifically

includes 'any . . . guarantee of . . . any of the items listed.'").

For all of the above reasons, the Court should find that, as a matter of law, CEC's

Guarantee qualifies as an "indenture security" for the purposes of TIA Section 316(b).

---

[5] Notably, the *Reves* case—on which CEC places special emphasis—supports the treatment of an
instrument as a "security" so long as the instrument at issue was issued for "investment"
purposes.  *Reves*, 494 U.S. at 61 (quoting *Forman*) (acknowledging that Congress "did not
attempt precisely to cabin the scope of the Securities Acts.  Rather, it enacted a definition of
'security' sufficiently broad to encompass virtually any instrument that might be sold as an
investment[]" so as to best "achieve its goal of protecting investors").  Because both CEOC's
Notes and CEC's Guarantee of those Notes were indisputably issued for "investment purposes,"
*Reves* favors Plaintiffs, not CEC.

**B.     The Guarantee Is a "Security" for the Purposes of the Indenture**

CEC's argument that its Guarantee does not constitute a "Security" for the purposes of the Indenture also fails as a matter of law.  The Indenture defines the term "Securities" in two places—the recitals and Section 101.  The recitals state that CEOC and CEC "have duly authorized the execution and delivery of this Indenture to provide for the issuance from time to time of <u>unsecured debentures, notes or other evidences of indebtedness (together with the related</u> <u>guarantees provided by the Guarantor, the "Securities")</u>, to be issued in one or more series as provided for in this Indenture."  Ex. A to Pierce Decl., Recitals (emphasis added).  Section 101 of the Indenture states that "'<u>Securities' has the meaning stated in the first recital of this</u> <u>Indenture</u> and more particularly means any Securities authenticated and delivered under this Indenture."  Ex. F to Amended Compl., § 101 (emphasis added).

CEC argues that the Guarantee should not be deemed a security because the recital's use of the phrase "together with" is exclusionary rather than inclusionary.  Opp. Br. at 30.  This argument defies common sense and ignores the most basic rules of contract interpretation.  Indeed, the parties had no reason to include the word "Guarantee" in the relevant provision if not to make clear that CEC's Guarantee was a "Security."  Under New York's rules of contract interpretation, "words and phrases should be given their plain meaning and the contract should be construed so as to give full meaning and effect to all of its provisions."  *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (internal quotation marks and punctuation omitted).  Tellingly, CEC offers no explanation for why the recital includes the word "Guarantee," further belying its argument.[6]

---

[6] Neither *Gibson v. City of Kirkland*, 433 F. App'x 539, 541 (9th Cir. 2011) (analyzing permissible damages recoverable by a law enforcement officer who prevails on a malicious prosecution claim), nor *Hinshaw v. M-C-M Props., LLC*, 450 S.W.3d 823, 827 (Mo. Ct. App. 2014) (analyzing easements under a deed), provide any support for CEC's argument.  Each of

CEC's argument that the Guarantee is not a "Security" because it is not "authenticated" or "delivered" (as referenced in Section 101 of the Indenture) also is without merit.  Opp. Br. at 30-31.  First, Section 1502 of the Indenture (entitled "Execution and Delivery of the Guarantee") specifically required a formal Notation of the Guarantee to be "endorsed" on each Note authenticated and delivered by the Trustee.  Ex. A to Pierce Decl., § 1502.  Thus, under the terms of the Indenture, CEC's Guarantee was "authenticated" and "delivered" by the Trustee along with the Notes.  Even if that were not the case, Section 101 still could not be read to exclude the Guarantee from the definition of "Security."  Indeed, CEC's proposed interpretation of the Indenture would entirely negate Section 101's express incorporation of the definition of "Security" set forth in the "first recital of this Indenture."  Ex. F to Amended Compl., § 101.  For this reason, the Court should reject CEC's argument as a matter of law.[7]  *LaSalle*, 424 F.3d at 206 ("An interpretation . . . that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.") (internal quotation marks and punctuation omitted).

### C.   The Guarantee Is a Core Term of the Indenture, the Removal of Which Violated Plaintiffs' Rights Under the TIA and the Indenture

Because CEC's Guarantee constituted an "indenture security" under the TIA and a "Security" under the Indenture, CEC's removal of the Guarantee impaired Plaintiffs' legal right to receive principal and interest on a "security" in violation of both TIA Section 316(b) and

those decisions found that, as used in a statute and deed, respectively, "together with" made the connecting terms related rather than independent.  Here, there is no dispute that the Guarantee is related to the Note.  But that does not mean that the Guarantee can or should be excluded from the Indenture's definition of "Security."

[7] CEC's attempt to distinguish Section 902 of the Indenture is also meritless.  Contrary to CEC's arguments, the Guarantee "matures" at the same time as the Notes, and Plaintiffs' removal of the Guarantee necessarily impaired Plaintiffs' "right to institute suit" for the enforcement of the Guarantee.  Ex. A to Pierce Decl., § 1501.  For these reasons, CEC's conduct violated Section 902's restrictions on amendments to the Indenture absent the consent of all holders.  Moving Br. at 10.

Indenture Section 508.  However, even if the Guarantee were not a security (and it is), it would still clearly constitute a "core term" of the Indenture for the purposes of the TIA.  An indenture provision is a "core term" under the TIA when it "affect[s] a securityholder's right to receive payment of the principal of or interest on the indenture security on the due dates of such payment."  *UPIC v. Kinder-Care Learning Ctrs.*, 793 F. Supp. 448, 452 (S.D.N.Y. 1992).  Here, the elimination of the Guarantee directly and undisputedly "affected" the ability of Plaintiffs to receive payments of principal and interest when those amounts came due (*i.e.*, when CEOC filed for bankruptcy).

In its opposition, CEC argues that construing the Guarantee to be a "core term" of the Indenture would be contrary to the decisions in *Federated* and *Marblegate*.  Opp. Br. at 22-24.  Nothing could be further from the truth.  First, as a technical matter, neither of those cases involved the amendment of an indenture agreement.  Rather, *Federated* and *Marblegate* discuss when a violation of the TIA occurs in the <u>absence</u> of an amendment to the governing indenture. *Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.*, No. 99-cv-10517-HB, 1999 WL 993648, at *5-6 (S.D.N.Y. Nov. 2, 1999); *Marblegate*, 75 F. Supp. at 595.  More to the point, both the *Marblegate* and *Federated* decisions found violations of the TIA based in large part on the fact that the challenged transaction resulted in a release of a parent guarantee (in accordance with the terms of the governing indentures) that left the plaintiffs with no recourse against any company capable of paying a judgment.  *See Marblegate*, 75 F. Supp. at 616-17; *Federated*, 1999 WL 993648, at *7.  If the <u>release</u> of a guarantee in connection with an out-of-court restructuring can trigger a violation of the TIA, then the <u>removal</u> of the guarantee by an amendment to the Indenture must necessarily have the same result.

CEC's reliance on the Gadsden declaration is also misplaced.  As the Court held in *BOKF* and *UMB*, there is no need for the Court to consider expert testimony regarding "custom and usage" issues when (as here) the language of the indenture is clear and unambiguous. *BOKF, N.A. v. Caesars Entm't Corp.*, No. 15-cv-01561 (SAS), 15-cv-04634 (SAS), 2015 WL 5076785, at *8 (S.D.N.Y. Aug. 27, 2015).  Even if that were not the case, Mr. Gadsden's declaration ignores multiple provisions in the Indenture that restricted CEC's ability to "consolidate or merge" with another company, "sell, lease, or convey" its assets, or purchase, lease or accept the assets of another company, thereby ensuring that CEC met its Guarantee obligation.[8]

For all of the above reasons, CEC's Guarantee is a core term of the Indenture, the removal of which violated Plaintiffs' rights under the TIA and Section 508.

## II.   CEC HAS NO DEFENSE TO LIABILITY BASED ON THE MAY TRANSACTIONS

CEC urges the Court to deny summary judgment based on the argument that, even if the August Transaction violated Plaintiffs' rights, such violation is irrelevant because CEC's Guarantee was automatically released as a result of the May Transactions.  This argument fails as a matter of law based on multiple provisions of the Indenture, as well as representations CEC made to this Court when opposing summary judgment in the *BOKF* and *UMB* actions.

### A.   Under Section 508 of the Indenture, CEC Is Barred from Unilaterally Releasing Its Guarantee on the Unsecured Notes without Plaintiffs' Consent

First, CEC's defense based on the May Transactions fails because Plaintiffs' right to receive the payment of principal and interest pursuant to the Guarantee is, under Section 508 of

---

[8] *See* Ex. A to Pierce Decl., §§ 1503 (requiring CEC to find a substitute guarantor before the Guarantee can be released based on an asset transfer or liquidation) & 1504 (restricting CEC's ability to merge with, dispose of, or accept "substantially all" of its or another company's assets absent the assumption of CEC's Guarantee by another party).

the Indenture, "absolute and unconditional" "notwithstanding any other provision of this Indenture."  Ex. A to Pierce Decl., § 508.  Decisions from both the Second Circuit and the Southern District of New York confirm that an "absolute and unconditional" right to repayment exceeds those rights afforded under the TIA and, more specifically, Section 316(b).  *See First Millennium*, 607 F.3d at 917 ("Nothing in Section 316(b), or the TIA in general, requires that bondholders be afforded 'absolute and unconditional' rights to payment."); *accord*, *Marblegate*, 75 F. Supp. 3d at 612.

In *First Millennium*, the Second Circuit held that where (as here) a noteholder's right to receive principal and interest on a security is "absolute and unconditional" "notwithstanding any other provision of th[e] indenture," that right "overrides" any conflicting indenture provisions. *First Millennium*, 607 F.3d at 916-18.  The conflicting provision in *First Millennium* was a limited recourse clause that the FDIC (as receiver for the issuer) argued should limit the noteholder's right of recovery to assets categorized as "collateral" under the indenture.  *See id.* at 915-16.  The Second Circuit agreed with the FDIC's reading of the recourse provision, but nonetheless held that, because the noteholder's right to repayment was "absolute and unconditional," the noteholder's repayment rights "trumped" the provision limiting the noteholder's recovery rights to "collateral."  *Id.* at 917-18.

The facts here directly parallel those in *First Millennium*.  Like the FDIC, CEC is attempting to limit Plaintiffs' right to payment by arguing that, under the Guarantor release provision, Plaintiffs have recourse only against CEOC, not CEC.  Thus, under CEC's interpretation, the Guarantee release provision (Section 1503(3)) necessarily conflicts with Plaintiffs' "absolute and unconditional" right to payment (Section 508).  As CEC itself concedes, where two indenture provisions conflict, the provision containing the "notwithstanding" clause

trumps the other.  Opp. Br. at 10; *see also First Millennium*, 607 F.3d at 917 ("[The Second Circuit] has recognized many times that, under New York law, clauses similar to the phrase '[n]otwithstanding any other provision' trump conflicting contract terms.") (internal citations omitted).  Here, because the "notwithstanding" language appears in Section 508, the plain terms of the Indenture mandate that Section 508 control in the event of a conflict with Section 1503(3) or any other provision of the Indenture.

CEC is wrong in arguing that Plaintiffs' interpretation of Section 508 conflicts with this Court's summary judgment decision in *BOKF*, 2015 WL 5076785, as well as *Philips Lighting Co. v. Schneider*, No. 05 Civ. 4820 (SLT), 2008 WL 4527713 (E.D.N.Y. Sep. 30, 2008).  Neither of those decisions involved an indenture providing noteholders with an "absolute and unconditional" "right to receive principal . . . and interest."  Rather, those cases addressed the potential release (either under the terms of the indenture or pursuant to a common law affirmative defense) of a guarantee (<u>not</u> a right to receive principal and interest) described as either "unconditional" (in *BOKF*) or "absolute and unconditional" (in *Philips Lighting*).  *See BOKF*, 2015 WL 5076785, at *6-7; *Philips Lighting*, 2008 WL 4527713, at *3-4.  As confirmed in both *First Millennium* and *Marblegate*, an "absolute and unconditional" right to payment carries protections greater than those resulting from an "unconditional" guarantee.  *See First Millennium*, 607 F.3d at 917-18; *Marblegate*, 75 F. Supp. 3d at 611-12.  For this reason, CEC's reliance on *BOKF* and *Philips Lighting* is misplaced.

CEC's contention that Plaintiffs' Section 508 argument would write the Guarantor release provisions out of the Indenture is also incorrect.  Plaintiffs are <u>not</u> arguing that CEC's guarantee can never be released.  Plaintiffs' position is simply that, to the extent the release of CEC as guarantor under Section 1503 conflicts with Plaintiffs' right to receive payment of

principal and interest, Plaintiffs must consent to the release.  The Indenture provides for the release of CEC as guarantor in three limited circumstances.  *See* Ex. A to Pierce Decl., § 1503, titled "<u>Release of Guarantor</u>."  The first two clauses of the release provision—dealing with a sale or transfer of all of the assets of CEOC or CEC (Section 1503(1)), or a liquidation in which CEC's assets are bought by a single entity (Section 1503(2))—require that CEC's Guarantee be expressly assumed by a new guarantor before CEC is released.  Because these release provisions will (by definition) protect Plaintiffs' right to payment, Section 508 does not come into play.  It is only with respect to the third clause of the release provision—*i.e.*, where CEOC ceases to be a "wholly owned subsidiary" of CEC (Section 1503(3))—that Plaintiffs' consent is required, since under that provision CEC may be released even though a new guarantor may not have assumed the Guarantee obligation.

Finally, CEC's argument that the Court should deny summary judgment because the Indenture's terms are "ambiguous" is without merit.  Where two contractual provisions are inconsistent but one contains a "notwithstanding" clause, "[t]here is no ambiguity." *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 439 (2d Cir. 1995); *see also Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 90-91 (2d Cir. 2002) (holding that, based on "notwithstanding" clause, no "ambiguity" prevented the court from granting summary judgment).  Thus, based on the clear and unambiguous language of Section 508 of the Indenture, the Court should grant summary judgment against CEC on its release defense.

**B.     Because CEC Continues to Own "Substantially All" of CEOC's Voting Shares, CEOC Remains a "Wholly Owned Subsidiary" Under SEC Regulation S-X**

CEC's argument regarding the May Transactions also fails under the specific terms of the Guarantee release provision on which CEC relies (Section 1503(3)).  Unlike the CEOC indentures executed after the 2008 leveraged buyout by Apollo and TPG, the Indenture here

allows for the release of CEC's Guarantee only if CEOC is no longer a "wholly owned subsidiary" of CEC as defined in Regulation S-X.  Under Regulation S-X, a subsidiary is "wholly owned" if "substantially all of [its] outstanding voting shares are owned by its parent and/or the parent's other wholly owned subsidiaries."  17 C.F.R. § 210.1-02(aa).  Thus, so long as CEC owns "substantially all" of CEOC's voting shares, the Guarantee will not be released under the terms of the Indenture.

Both the FASB and SEC Staff have specifically addressed the meaning of "substantially all" as used in Regulation S-X.  In FASB Emerging Issues Task Force Topic No. D-97: Push Down Accounting, Apr. 18-19, 2001 ("EITF D-97"), http://www.fasb.org/pdf/appd-97.pdf, the FASB indicated that where a company owns over 80% of a subsidiary's voting shares, the parent may be considered to own "substantially all" of the subsidiary's shares for the purposes of Regulation S-X, as a result of which the parent may consolidate its financial reporting with that of its subsidiary in SEC filings.  Here, CEC undisputedly owns 89% of CEOC's shares following both the 5% Stock Sale and CEOC Performance Incentive Plan pursuant to which 6% CEOC's shares were distributed to CEC and CEOC employees.  SUMF & CounterSUMF, ¶ 70.  Thus, according to the FASB, CEC's holdings are sufficient to constitute "substantially all" of CEOC's voting shares.  *Id*.

In SEC Staff Accounting Bulletin No. 112, 74 Fed. Reg. 27427 (June 10, 2009) ("SAB 112"), the SEC Staff further explained that in applying the rule cited in the Indenture, the SEC distinguishes between a substantially wholly owned subsidiary where "the form of ownership is within the control of the parent," and a subsidiary with "a significant noncontrolling interest" which "might impact the parent's ability to control the form of ownership."  SAB 112.  Here, there is no dispute that the minority holders who received CEOC shares have had no impact

14

whatsoever on CEC's ability to control all aspects of CEOC's board, management, operations, or finances.  SUMF & CounterSUMF, ¶¶ 105, 107-09, and 112-15.  Thus, under this guidance as well, CEC continues to own "substantially all" of CEOC's voting shares.[9]

CEC argues that the issue of whether CEC owns "substantially all" of CEOC's voting shares cannot be resolved on summary judgment.  In support of this argument, CEC cites a series of cases that (according to CEC) hold that the issue of whether a business has conveyed substantially all of its assets is inherently fact-specific.  Opp. Br. at 12-13.  CEC is comparing apples to oranges.[10]  The issue here is not whether CEC holds "substantially all" of CEOC's assets, but rather whether CEC holds "substantially all" of CEOC's voting shares.  By their nature, different classes of assets will vary in importance with respect to a company's business operations.  In contrast, voting shares are fungible; *i.e.*, one share is by definition equal to another within each class of equity.  For this reason, the cases cited by CEC are inapposite.

CEC also urges the Court to ignore the guidance of the FASB and SEC Staff based on the argument that SEC's "push down" accounting rules are "irrelevant" and "defunct," and that neither FASB nor the Staff are sufficiently "authoritative."  All of these arguments are

---

[9] In connection with this issue, CEC points to the fact that, after the 5% Stock Sale and 6% Stock Transfer, CEC caused the board of directors of CEOC to be enlarged, and to include two non-employee directors.  Opp. Br. at 15.  CEC also contends that the non-employee directors served on a committee ████████████████████████████████████████  Even if true, none of these facts establish that the minority interest was "significant" enough to cause CEC not to own "substantially all" the outstanding voting shares of CEOC.  Indeed, CEC at no point suggests ████████████████████████████████████████████████████
████████████████████████████████████████████████

Even if cases addressing company assets were relevant (and they are not), CEC neglects to mention decisions finding "substantially all" to be a term of art.  As Judge Easterbrook explained in *Cont'l Can Co., Inc. v. Chi. Truck Drivers, Helpers and Warehouse Workers Unions Pension Fund*, in the context of federal tax law, the term "substantially all" almost always means 85%. 916 F.2d 1154, 1158 (7th Cir. 1990) ("'Substantially all' is one of those phrases with a special legal meaning.  Congress uses it all time in tax statutes, and the Internal Revenue Service decodes it as meaning 85%.").

disingenuous.  The rescission of Accounting Topic 5.J. (the SEC accounting series that includes

SAB 112) in 2014 is irrelevant since Topic 5.J. was in effect when the Indenture was drafted,

when the Notes were issued, when Plaintiffs purchased their Notes, when the May Transactions

were effected, when the August Transaction was effected, and when this action was filed.

Likewise, the SEC has specifically stated that the standards of the FASB are considered

"authoritative" by the SEC,[11] and the views of the SEC staff are published in Staff Accounting

Bulletins, and codified on the SEC website.[12]  Thus, both EITF D-97 (issued by the FASB) and

SAB 112 (issued by the SEC staff) can and should be treated by this Court as competent

authority regarding the proper interpretation of Regulation S-X's definition of "wholly owned

subsidiary."  Notably, although CEC argues that the Court should disregard EITF D-97 and SAB

112, it cites no alternative authority regarding how the Court should interpret the term

"substantially all."  In light of this failure, CEC's objections to FASB and SEC Staff guidance

are not credible.

Finally, CEC argues at length that the Court should deny summary judgment based on

outstanding factual issues relating to whether CEC's stock holdings should be aggregated with

those of CEC's minority shareholders on the grounds that all of these investors constitute a

"collaborative group" as set forth in EITF D-97.  This argument is a red herring.  Indeed, based

on CEC's undisputed ownership of 89% of CEOC's stock, the Court never need reach the

"collaborative group" issue in order to decide the "substantially all" question.  However, if the

Court chooses to address the issue, █████████████████████████████

---

[11] *See* Securities and Exchange Commission Policy Statement: Reaffirming the Status of the
FASB as a Designated Private-Sector Standard Setter, Apr. 25, 2003, Release No. 33-8221,
https://www.sec.gov/rules/policy/33-8221.htm.

[12] *See*, *e.g.*, Selected Staff Accounting Bulletins, http://www.sec.gov/interps/account.shtml (last
visited Dec. 1, 2015), and SEC Staff Accounting Bulletin: Codification of Staff Accounting
Bulletins, http://www.sec.gov/interps/account/sabcode.htm (last visited Dec. 1, 2015).

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ SUMF, ¶¶

52, 54, 56, 58-59, and 62.

In sum, CEC has demonstrated no reason for why the Court cannot resolve the "wholly

owned subsidiary" issue as a matter of law, an approach that would foster predictability for

issuers, trustees, investors and other market participants.[13]  Based on the undisputed facts and

FASB and SEC Staff guidance, the Court should rule that CEOC remains a "wholly owned

subsidiary" under Regulation S-X and CEC's Guarantee remains in place.

### C.     CEC's Defense Is Barred by the Doctrines of Judicial Estoppel and Judicial Admission

Finally, CEC's release argument fails because CEC unequivocally represented to this

Court in the *BOKF* and *UMB* actions that the Guarantee for Plaintiffs' Notes remained in place at

the time of the August Transactions.  Although CEC argues that Plaintiffs "misrepresent isolated

sentences" in CEC's legal filings, Opp. Br. at 17-18, that is clearly not the case.  In its brief

opposing the *BOKF* and *UMB* summary judgment motions, CEC specifically told this Court that:

> As a consequence of the August Unsecured Notes Transaction, the Guarantee was
> released under the last paragraph of Section 12.02(c) of the [Second Lien]
> Indenture.  That is because the transaction provided an independent basis for the
> release of CEC's guarantee of the 2016 and 2017 Notes [*i.e.*, Plaintiffs' Notes],
> <u>which were the last outstanding "Existing Notes" defined in the indenture, as</u>

---

[13] CEC cites no case finding that a court cannot determine on summary judgment whether a
company is a "wholly owned subsidiary" as defined in SEC Regulation S-X.  *Union Ins. Soc'y of
Canton, Ltd. v. William Gluckin & Co.*, 353 F.2d 946, 952 (2d Cir. 1965) relates to the scope of
coverage in an insurance policy.  *Caldor, Inc. v. Mattel, Inc.*, 817 F. Supp. 408, 411 (S.D.N.Y.
1993) does not address the meaning of the term "wholly owned subsidiary," but only whether the
term "wholly owned subsidiary" was meant to limit the guarantee or simply describe the party
whose obligations were guaranteed.  *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 88
F.R.D. 38, 43 (S.D.N.Y. 1980) is another asset case.  *Neonex Int'l Ltd. v. Norris Grain Co.*, 338
F. Supp. 845, 852 (S.D.N.Y. 1972) has nothing to do with indentures, guarantees, or the term
"substantially all."

CEC's guarantee of the other "Existing Notes" had already been discharged or released.[14]

Summ. Judg. Opp. at 13 (*BOKF* Action, ECF No. 44) (emphasis added).  CEC made this representation in support of its argument that the August Transaction released the parent guarantee for the UMB and BOKF notes under an indenture provision providing for the release of that guarantee if the guarantees on CEOC's other, "Existing Notes" were released.  In opposing summary judgment, CEC represented that because "CEC's guarantee of the other 'Existing Notes' had already been discharged or released," "the 2016 and 2017 notes . . . were the last outstanding 'Existing Notes' defined in the indenture . . . ."  Although CEC argues otherwise, nothing about this statement is unclear or equivocal.[15]

CEC's reliance on statements it made in this case suggesting that the May Transactions released the Guarantee is also without merit.  Indeed, these statements underscore the fundamental problem:  CEC is taking different positions in different cases before this Court.  It is precisely this kind of conduct that judicial estoppel is meant to address.  Although CEC argues that judicial estoppel is inapplicable because the Court did not "explicitly rely" on CEC's prior statements, explicit reliance is not required.  Rather, under the Second Circuit's decision in *Republic of Ecuador v. Chevron Corp.*, "[t]he court need only adopt the position 'in some manner, such as by rendering a favorable judgment.'" 638 F.3d 384, 389 n.4 (2d Cir. 2011)

---

[14] The declaration CEC submitted from Apollo partner David Sambur included a substantively identical statement.  BOKF Sambur Decl. (*BOKF* Action, ECF No. 40), ¶ 20 ("The 2016 and 2017 Notes were the last outstanding 'Existing Notes' defined in the Indentures, as CEC's guarantee of the other 'Existing Notes' had already been discharged or released." (emphasis added)).

[15] *TR 39th St. Land Corp. v. Salsa Distr. USA, LLC*, No. 11 CV 7193 (DF), 2015 WL 1499173, at *5 (S.D.N.Y. Mar. 25, 2015) provides no support for CEC.  In that case, the plaintiff unsuccessfully argued that the defendant's prior petition for attorney's fees should be treated as an implicit admission that the defendant was a guarantor.  *Id.*  Here, in contrast, Plaintiff's motion is premised on express statements included in CEC's court filings.

(emphasis added).  Here, CEC prevailed on UMB and BOKF's summary judgment motions—
which is all that is required under the law of this Circuit.

CEC's statements also should be treated as judicial admissions, notwithstanding the fact
that *BOKF* and *UMB* are separate proceedings.  At CEC's insistence, the guarantee actions were
coordinated based on substantial overlaps in the facts and underlying transactions.  *See* May 11,
2015 Ltr. from Lewis R. Clayton to the Hon. Shira A. Scheindlin [ECF No. 42], at 1.  Ironically,
CEC itself asked this Court to deny Plaintiffs' the right to move for summary judgment in this
matter based on portions of this Court's summary judgment decision in *BOKF* that CEC
contended should apply under the "law of the case" doctrine.  *See* Oct. 15, 2015 Ltr. from Eric
Seiler to the Hon. Shira A. Scheindlin [ECF No. 64], at 1 ("As the Court has made clear, its
rulings on BOKF's and UMB's summary judgment motions are law of this case.").  CEC also
asked this Court to require a joint trial of all of the guarantee actions so that Plaintiffs do not
have a "second bite at the apple" on common claims.  *See* Tr. of Nov. 10, 2015 Hr'g at 27-28.
CEC cites no case precluding the application of the judicial admission doctrine on these facts.
Thus, the Court can and should hold CEC to the statements it made in these closely-related
actions.

## III.   CEC IS LIABLE FOR ALL PRINCIPAL AND INTEREST DUE ON THE NOTES AND GUARANTEE

CEC has absolutely no basis to challenge Plaintiffs' right to recover all principal and
interest due on the Notes should they prevail on liability issues.  *See* Opp. Br. at 29-30.  TIA
Section 323(b) (on which CEC relies) has no application here because Plaintiffs are not seeking
damages under the TIA on this motion.  15 U.S.C. § 77www(b) (a plaintiff seeking "damages
under the provision of this subchapter" may not recover "a total amount in excess of his actual
damages on account of the act complained of.").  Rather, Plaintiffs seek: (i) a declaration that,

under the TIA, the Guarantee remains in place; and (ii) damages pursuant to the terms of the Indenture, the Notes, and CEC's Guarantee, under each of which Plaintiffs have a <u>contractual</u> right to principal and interest.

Where a party sues on a note or other security purchased in the secondary markets, the price paid for the security is wholly "irrelevant" to, and has no impact on, the substantive rights of a party seeking to enforce the terms of an instrument. *See In re Nortel Networks, Inc.*, 532 B.R. 494, 560 (Bankr. Del. 2015) ("When and at what prices the members of the Bondholder Group acquired their Bonds is irrelevant to this litigation. The purchaser of a debt instrument on the secondary market is entitled to the exact same rights as the original purchaser of that instrument."); *In re 785 Partners*, 470 B.R. 126, 133 (Bankr. S.D.N.Y 2012) (citing *Trans-United Indus., Inc. v. Cohn*, 351 F.2d 605, 606 (2d. Cir. 1965). In arguing otherwise, CEC relies on this Court's decision in *Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*, No. 14-CV-10101 (SAS), 2015 WL 3466121, at *5 (S.D.N.Y. June 1, 2015) (Scheindlin, J.). But that case involved <u>tort</u> claims against an indenture trustee, *Royal Park*, 2015 WL 3466121, at *1, not (as here) a suit against a guarantor based on the terms of an indenture agreement and guarantee. CEC cites no case that applies Section 323(b) to suits against obligors seeking to enforce the terms of a debt instrument, or that finds a discounted price agreed to by a note purchaser should preclude the purchaser from recovering from the obligor the face amount of the security. Based on the foregoing, the Court should order CEC to pay Plaintiffs all principal and interest due on the Notes and Guarantee.

## CONCLUSION

For all of the foregoing reasons, the Court should grant summary judgment against CEC on Counts One, Three, Four, Six, and Nine of Plaintiffs' Amended Complaint.

Dated:  December 2, 2015
        New York, New York

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: _____
      James H. Millar
      Kristin K. Going
      Clay J. Pierce

1177 Avenue of the Americas
41st Floor
New York, New York  10036
Telephone:  (212) 248-3140

*Attorneys for Plaintiffs MeehanCombs Global Credit Opportunities Master Fund, LP, Relative Value-Long/Short Debt, A Series of Underlying Funds Trust, and Trilogy Portfolio Company, LLC*

21