UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

MEEHANCOMBS GLOBAL CREDIT
OPPORTUNITIES MASTER FUND, LP,
RELATIVE VALUE-LONG/SHORT DEBT, A
SERIES OF UNDERLYING FUNDS TRUST,
and TRILOGY PORTFOLIO COMPANY, LLC,

              Plaintiffs,

        v.

CAESARS ENTERTAINMENT CORP. and
CAESARS ENTERTAINMENT OPERATING
CO., INC.,

              Defendants.

------------------------------------------------------------- X

FREDERICK BARTON DANNER, individually
and on behalf of all others similarly situated,

              Plaintiffs,

        v.

CAESARS ENTERTAINMENT CORP. and
CAESARS ENTERTAINMENT OPERATING
CO., INC.,

              Defendants.

------------------------------------------------------------- X

**OPINION AND ORDER**

14-cv-7091(SAS)

14-cv-7973(SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

These related actions are for enforcement of the Guarantee obligations

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/29/15

of Caesars Entertainment Corporation's ("CEC") on Notes issued by Caesars
Entertainment Operating Company ("CEOC").  Plaintiffs[1] now seek partial
summary judgment arguing that CEC violated section 316(b)[2] of the Trust
Indenture Act of 1939 (the "TIA"), as well as certain provisions of the Indenture
governing the Notes, when in August 2014, CEC amended the Indenture to remove
the Guarantee (the "August Transaction") without plaintiffs' consent.  CEC raises
several arguments in support of its position that the August Transaction did not
violate either the TIA or the Indenture.  One of those arguments is that the August
Transaction is "irrelevant" because the Guarantee had already been removed when,
after two transactions in May 2014, CEOC ceased to be a wholly owned subsidiary
of CEC (the "May Transactions").[3]  Because there is genuine dispute of material
fact as to whether CEOC continued to be a wholly owned subsidiary after the May
Transactions, summary judgment is DENIED.

---

[1]    Plaintiffs MeehanCombs Global Credit Opportunities Funds, LP,
Relative Value-Long/Short Debt, A Series of Underlying Funds Trust, and Trilogy
Portfolio Company, LLC are referred to as "MeehanCombs."  Plaintiff Frederick
Barton Danner, who brings his action on behalf of himself and a putative class, will
be referred to as "Danner."  MeehanCombs and Danner are referred to collectively,
as "plaintiffs."

[2]    *See* 15 U.S.C. §§ 77ppp(b).

[3]    Memorandum of Law of Caesars Entertainment Corporation in
Opposition to Plaintiffs' Motions for Partial Summary Judgment ("CEC Opp."), at
9.

## II.    BACKGROUND

### A.    CEC

CEC, through its subsidiaries, is one of the largest gaming companies in the world.[4]  CEC's principal operating subsidiary is CEOC, a chapter 11 debtor.[5] In 2008, CEC was acquired in a leveraged buyout transaction sponsored by Apollo Global Management ("Apollo") and TPG Capital, LP ("TPG").  In connection with that transaction, CEOC issued roughly $24 billion in debt, the proceeds of which were used by Apollo and TPG to acquire CEC's publicly traded shares.[6]

### B.    The 2016 Notes Indenture

Pursuant to an Indenture dated September 28, 2005, CEOC issued $750 million of 2016 Notes.[7]  MeehanCombs is the beneficial holder of approximately $15,318,000 of the 2016 Notes.[8]  Danner is also a  beneficial holder of 2016 Notes.[9]

---

[4]    *See* Plaintiff MeehanCombs' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 in Support of Its Motion for Partial Summary Judgment ("MC 56.1") ¶ 86.

[5]    *See id.* ¶ 7.

[6]    *See id.* ¶¶ 6, 87-88.

[7]    *See* Danner Compl. ¶ 19.

[8]    *See* MeehanCombs Compl. ¶¶ 1, 12-16.

[9]    *See* Danner Compl. ¶ 16.

The Notes are governed by an Indenture which is qualified under the TIA.[10]  CEC's Guarantee is found in section 1501 of the Indenture.  CEC agreed to guarantee the payment of all principal and interest due on the Notes, and that its guarantee obligations would be "unconditional, irrespective of . . . any waiver or consent by any Holder . . . ."  However, section 1503 of the Indenture states that the guarantee may be released under certain limited circumstances, including if CEOC "ceases for any reason to be a 'wholly owned subsidiary' of [CEC] (as such term is defined in Rule 1-02(z) of [ ] Regulation S-X promulgated by the [Securities Exchange Commission ("SEC")])."

Section 508 of the Indenture provides that "[n]otwithstanding any other provision of th[e] Indenture[, each holder's right] to receive payment of the principal of and any premium and . . . interest on . . . [any] Security . . . [is] absolute and unconditional . . . [and] shall not be impaired without the consent of such Holder."  Section 902 of the Indenture states that while supplemental indentures may be entered into with the consent of a majority of holders, "no such supplemental indenture shall, without the consent of the Holder of each Outstanding Security affected thereby," alter the principal or interest on any security.

---

[10]     *See* MC 56.1 ¶ 9.

### C.    The May 2014 Transactions

In May 2014, CEC sold five percent of its stock (the "5% Stock Sale").  After the 5% Stock Sale, CEC issued a press release stating that because CEOC was no longer a "wholly owned subsidiary" of CEC, CEC's guarantee obligations had been terminated under CEOC's bond indentures.[11]

Then, later that month, CEOC allocated another 6% of its shares for distribution to certain employees as part of a "performance incentive plan" (the "PIP").[12]  Following the PIP, CEC again publicly stated that its guarantee obligations for CEOC's bonds had been terminated.[13]

### D.    The August 2014 Transaction

On May 15, 2014, CEC received a letter on behalf of certain funds that held a majority of CEOC's 2016 outstanding unsecured notes (the "Majority Holders").[14]  The letter stated that contrary to CEC's press release, the guarantee for the 2016 Notes remained in place notwithstanding the effect the 5% Stock Sale may have had on CEOC's other indentures.[15]  In the August Transaction, CEC and

---

[11]    *See id.* ¶ 77.

[12]    *Id.* ¶¶ 69-71.

[13]    *See id.* ¶ 72.

[14]    *See id.* ¶ 78.

[15]    *See id.* ¶ 79.

CEOC agreed to purchase the Majority Holders' notes for approximately $155 million, which covered all principal and interest due on the notes, in exchange for the Majority Holders' consent to amendments that removed CEC's guarantee.[16]

The August Transaction was memorialized in a Note Purchase and Support Agreement dated August 12, 2014, and the transaction closed on August 22, 2014.[17]  On the day the transaction closed, CEC, CEOC, and the indenture trustee executed supplemental indentures that removed from the Indentures all provisions relating to the Guarantee.[18]  Plaintiffs did not consent to the indenture amendments, and were not given an opportunity to participate in the August Transaction.[19]

### E.    CEOC's Corporate Governance Following the May Transactions

Before June 27, 2014, CEOC's Board consisted of two employee directors.  On that date, one of the directors resigned and six new Board members were appointed, two of which CEC contends were independent directors.[20]  The two directors selected independent legal counsel.  On July 30, 2014, CEOC's

---

[16]    *See id.* ¶¶ 31-32, 36-37, 39, 45, 46.

[17]    *See id.* ¶¶ 29, 42-43.

[18]    *See id.* ¶¶ 40, 45-46.

[19]    *See id.* ¶¶ 33-35, 46.

[20]    *See* CEC Opp. at 8.

Board formed a Governance Committee consisting of the two independent directors.  These directors, together with the other members of the CEOC Board, approved the August Transaction.[21]

### F.    CEOC's Bankruptcy

CEOC filed for bankruptcy protection on January 15, 2015.  Under the terms of the Indenture, this constituted an "Event of Default" which triggered CEC's obligations under the Guarantee.[22]  Plaintiffs demanded payment on the Guarantee, and CEC refused payment.[23]

## III.   LEGAL STANDARD

Summary judgment is appropriate where, "viewing the record in the light most favorable to the non-moving party . . . 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[24]  "In making this determination . . . we resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is

---

[21]     *See id.*

[22]     *See* MC 56.1 ¶¶ 119, 121.

[23]     *See* Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment ("MC Mem."), at 6.

[24]     *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)) (quotations omitted).

sought."[25]  "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[26]

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact."[27]  To defeat a motion for summary judgment, the non-moving party must "'do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation.'"[28]

"'The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists.'"[29] "'Credibility determinations, the weighing of the evidence, and the drawing of

---

[25]    *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) (quotations omitted).

[26]    *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S.Ct. 2675 (2013) (quotations and alterations omitted).

[27]    *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[28]    *Robinson*, 781 F.3d at 44 (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).

[29]    *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).

legitimate inferences from the facts are jury functions, not those of a judge.'"[30]

## IV.   APPLICABLE LAW

### A.   The Trust Indenture Act

The TIA provides that instruments to which it applies must be issued under an indenture that has been qualified by the SEC.[31]  The requirements of such indentures are "designed to vindicate a federal policy of protecting investors."[32]

Section 316 of the TIA relates to collective action clauses.  For example, it is permissible for a majority of noteholders to direct the trustee to exercise its powers under the indenture or for not less than seventy-five percent of noteholders "to consent on behalf of the holders of all such indenture securities to the postponement of any interest payment for a period not exceeding three years

---

[30]      *Crawford*, 758 F.3d at 486 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

[31]      *See generally* 15 U.S.C. §§ 77eee-77ggg.  "A 'trust indenture' is a contract entered into between a corporation issuing bonds or debentures and a trustee for the holders of the bonds or debentures, which, in general, delineates the rights of the holders and the issuer."  *Upic & Co. v. Kinder-Care Learning Ctrs., Inc.*, 793 F. Supp. 448, 450 (S.D.N.Y. 1992).

[32]      *Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*, 85 F.3d 970, 974 (2d Cir. 1996) (explaining that the law was "enacted because previous abuses by indenture trustees had adversely affected 'the national public interest and the interest of investors in notes, bonds[, and] debentures . . . .'") (quoting 15 U.S.C. § 77bbb(a)).

from its due date."[33]  Section 316(a)'s terms are permissive — meaning an indenture can expressly exclude such majority action.

However, section 316(b) is mandatory.  It states that:

> Notwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder . . . .[34]

Thus, section 316(b) acts to protect a bondholder's right to receive payment of both principal and interest.

Section 316(b) addressed earlier practices whereby majority bondholders — often controlled by insiders — used collective or majority action clauses to change the terms of an indenture, to the detriment of minority bondholders.[35]  As a result of section 316(b), an issuer cannot — outside of bankruptcy[36] — alter its obligation to pay bondholders without the consent of each

---

[33]     15 U.S.C. § 77ppp(a).

[34]     *Id.* § 77ppp(b).

[35]     *See MeehanCombs Global Credit Opportunities Funds, LP v. Caesars Entm't Corp.*, Nos. 14 Civ. 7091, 14 Civ. 7937, 2015 WL 221055, at *3 n.31 (S.D.N.Y. Jan. 15, 2015) (collecting cases).

[36]     *See, e.g.*, *In re Board of Dirs. of Telecom Argentina, S.A.*, 528 F.3d 162, 172 (2d Cir. 2008) ("'[I]t is self-evident that Section 316(b) could not have

10

bondholder.[37]  In this way, section "316(b) was designed to provide judicial

scrutiny of debt readjustment plans to ensure their equity."[38]

      "Congress and the SEC were aware that the holdout problem would

frustrate some workouts, but the regulators wanted to impede workouts that took

place outside of regulatory and judicial control.  The SEC *wanted* trust indenture

legislation that would bring contractual recapitalizations under the jurisdiction of

---

been intended to impair the capacity of a debtor and its creditors to restructure debt
in the context of bankruptcy,' and '[t]he cases have uniformly recognized that
reorganization proceedings in Chapter 11 are not within the purview of TIA
Section 316(b).'") (quoting *In re Delta Air Lines, Inc.*, 370 B.R. 537, 550 (Bankr.
S.D.N.Y. 2007), *aff'd*, 374 B.R. 516 (S.D.N.Y. 2007)).

    [37]    *See In re Board of Dirs. of Multicanal S.A.*, 307 B.R. 384, 388-89
(Bankr. S.D.N.Y. 2004); Mark J. Roe, *The Voting Prohibition in Bond Workouts*,
97 Yale L.J. 232, 251 (1987) ("Only two events should change a company's
obligation to pay its bonds.  Either *each* affected bondholder would consent to the
alteration of the bond's terms, or a judge would value the company to determine
that the firm was insolvent, eliminate the stockholders, and then reduce the express
obligation to the bondholders.") (emphasis in original).

    [38]    *Brady v. UBS Fin. Servs., Inc.*, 538 F.3d 1319, 1325 (10th Cir. 2008)
(citing S. Rep. No. 76-248, at 26 (1939)); *see also id.* ("In practice, the provision
tends to force recapitalizations into bankruptcy court because of the difficulty of
completing a consensual workout."); George W. Shuster, Jr., *The Trust Indenture
Act and International Debt Restructurings*, 14 Am. Bankr. Inst. L. Rev. 431, 433-
37 (2006) ("Section 316(b) was adopted with a specific purpose in mind — to
prevent out-of-court debt restructurings from being forced upon minority
bondholders.").

the federal bankruptcy court."[39]  One reason was the concern that, "[b]y buying or otherwise controlling a majority of a distressed company's bonds[,] . . . equity owners could vote to suspend or reduce payments on the bonds, thus allowing value to move down the corporate chain to the equity holders."[40]  This outcome would not be permitted under bankruptcy law.  It would be "an inversion of the normal priorities in a corporate bankruptcy by which a company's debt holders are paid off before the equity holders."[41]

### B.    Contract Interpretation

Under New York law, "[t]he court's function in interpreting a contract is to apply the meaning intended by the parties, as derived from the language of the contract in question."[42]  "[T]he best evidence of what parties to a written agreement intend is what they say in their writing.  Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning

---

[39]     Roe, *The Voting Prohibition*, 97 Yale L.J. at 251 (emphasis in original).

[40]     Lee C. Buccheit & G. Mitu Gulati, *Sovereign Bonds and the Collective Will*, 51 Emory L.J. 1317, 1328 (2002).

[41]     *Id.*

[42]     *Marin v. Constitution Realty, LLC*, 11 N.Y.S.3d 550, 558–59 (1st Dep't 2015) (internal citations, quotations, and alterations omitted).

of its terms."[43]

"The question of whether a written contract is ambiguous is a question of law for the court."[44]  "Contract language is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion."[45]  However, contract language is ambiguous if "the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."[46]  "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing; evidence as to custom and usage is considered, as needed, to show what the parties' specialized

---

[43]     *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (internal citations and quotations omitted).

[44]     *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009).

[45]     *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000).

[46]     *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010).

language is fairly presumed to have meant."[47]

## V.    DISCUSSION

Section 1503(3) of the Indenture releases the Guarantee when CEOC ceases to be "wholly owned" by CEC "as such term is defined in Rule 1-02(z) of the Regulation S-X promulgated by the SEC[]."  Under Regulation S-X, a subsidiary is "wholly owned" if "substantially all of [its] outstanding voting shares are owned by its parent and/or the parent's other wholly owned subsidiaries."[48]

CEC argues that the validity of the August Transaction "is irrelevant if the Guarantee was released [under section 1503(3)] as a result of either or both of the May Transactions."[49]  According to CEC, "[p]laintiffs have failed to show that CEOC is still 'wholly owned' by CEC; at most, whether CEC holds 'substantially all' of CEOC's stock is an issue of fact that cannot be resolved on summary judgment."[50]

### A.    Indenture Section 508 Does Not Bar Release of the Guarantee

Section 508 of the Indenture states that

---

[47]    *Id.* at 466-67.

[48]    17 C.F.R. § 210.1-02(aa).

[49]    CEC Opp. at 9.

[50]    *Id.* at 10.

14

> Notwithstanding any other provision in this Indenture, the Holder of any Security shall have the right, which is absolute and unconditional, to receive payment of the principal of and any premium and . . . interest on such Security on the respective Stated Maturities expressed in such Security (or, in the case of redemption, on the Redemption Date) and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

Thus, section 508 includes the language mandated by section 316(b) of the TIA, but goes further, stating that the right to receive payment of the principal of and interest is "absolute and unconditional."[51]  Applying New York law to a similar provision modifying section 316(b), the Second Circuit has instructed that the absolute and unconditional language should be given effect.[52]  The Second Circuit has also interpreted the phrase "notwithstanding any other provision," explaining that "[t]his Court has recognized many times that under New York law, clauses

---

[51]    In addition, whereas section 316(b) refers only to payments on the "due dates expressed in such indenture," section 508 of the Indenture expressly applies to payments resulting from a call for redemption.

[52]    *See Bank of N.Y v. First Millennium, Inc.*, 607 F.3d 905, 917 (2d Cir. 2010) ("Nothing in Section 316(b), or the TIA in general, requires that bondholders be afforded 'absolute and unconditional' rights to payment, the precise term that the [Federal Deposit Insurance Company ("FDIC")] seeks to have us disregard.  The 'absolute and unconditional' right to repayment—a right that expressly conflicts with the limited recourse provision of the indenture—has no obvious relation to the purpose of preventing the oppression of minority bondholders.  We cannot read that right out of the contract because it is embedded in a provision that arguably was included for another reason.").

15

similar to the phrase '[n]otwithstanding any other provision' trump conflicting contract terms."[53]

Relying on *Bank of New York v. First Millennium, Inc.*, plaintiffs argue that section 508 of the Indenture "'overrides' any conflicting provisions of the Indenture," including the Guarantee release provisions.[54]  In *First Millennium*, the FDIC, as receiver for the issuer of certain notes, claimed that it was not liable for the full amount then due on the notes, because a "'limited recourse provision' of the master indenture limits the funds that the noteholders can pursue for repayment of their notes to those set aside as collateral."[55]  The Second Circuit stated that "[b]y its plain terms, the 'absolute and unconditional' right to repayment granted to the noteholders by the indenture overrides the conflicting limited recourse provision, and allows the noteholders to seek repayment from all the assets of the trust."[56]  More specifically, the reason for this conflict was that under New York law, "'an order or promise to pay out of a particular fund is *not*

---

[53]    *Id.* (citing cases).  *Accord Beardslee v. Inflection Energy, LLC*, 25 N.Y.3d 150, 158 (2015) (same).

[54]    MC Mem. at 11 (quoting *First Millennium, Inc.*, 607 F.3d at 917).

[55]    *First Millennium*, 607 F.3d at 916.

[56]    *Id.* at 917-18.

*unconditional.*'"[57]   As a consequence, an absolute and unconditional right to payment "cannot be limited to funds labeled 'collateral' in the transaction documents."[58]

Under New York law, a contract should be read to give effect to all of its provisions, and courts should avoid interpretations that render contract terms meaningless or superfluous.[59]   In *BOKF*, I explained that a guarantee release provision does not conflict with a guarantee providing an "absolute and unconditional" right to payment.   CEC had argued that the guarantees at issue in that case were not really meant to be guarantees at all, but were simply included for SEC reporting purposes.   To support that argument textually, CEC argued that if the guarantees had been unconditional, then the indentures would not have included release provisions.   I rejected this argument, explaining that

---

[57]     *Id.* at 916 (emphasis added) (quoting *Hibbs v. Brown*, 190 N.Y. 167, 174 (1907)).

[58]     *Id.*

[59]     *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005).  *Accord Greylock Global Opportunity Master Fund Ltd. v. Province of Mendoza*, No. 04 Civ. 7643, 2005 WL 289723, at *6 (S.D.N.Y. Feb. 8, 2005), *aff'd*, 162 Fed. App'x 85 (2d Cir. 2006) (holding that provision identical to section 508 did not preclude amendment (by majority vote) which allowed defendant to assert Sovereign Immunity, thereby potentially impeding the ability of bondholders to enforce a money judgment through attachment proceedings).

> [T]he mere fact that CEC could be released from the Guarantee
> under certain circumstances says little about the nature of the
> Guarantee itself.  That is, simply because a Guarantee may be
> easily terminated . . . does not indicate that the Guarantee was
> something other than an unconditional guarantee of full and
> punctual payment when due.[60]

Plaintiffs attempt to distinguish the import of *BOKF* — which is that the Guarantee does not conflict with provisions that permit its release.  They note that here the "absolute and unconditional" language is not in the Guarantee provision, but in the "notwithstanding provision" of the Indenture.[61]

However, this is a distinction without a difference.  Guarantees "must be strictly construed according to their terms" and the "guarantor's obligation must be narrowly construed and cannot be extended by construction beyond the plain and explicit language of the contract."[62]  Here, the Indenture explicitly permits the removal of the Guarantee under section 1503.  Under New York law, when a guarantee is "absolute and unconditional," this means that it is a guarantee of payment, rather than collection.  "As explained more than 13[5] years ago by the

---

[60]     *BOKF, N.A. v. Caesars Entm't Corp.*, No. 15 Civ. 1561, 2015 WL 5076785, at *7 (S.D.N.Y. Aug. 27, 2015).

[61]     Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Partial Summary Judgment, at 12.

[62]     *Chase Manhattan Bank v. American Nat'l Bank & Trust Co. of Chi.*, 93 F.3d 1064, 1073-74 (2d Cir. 1996) (internal quotation marks omitted).

New York Court of Appeals:

> The fundamental distinction between a guaranty of payment and one of collection is, that in the first case the guarantor undertakes unconditionally that the debtor will pay, and the creditor may, upon default, proceed directly against the guarantor, without taking any steps to collect of the principal debtor, and the omission or neglect to proceed against him is not (except under special circumstances) any defense to the guarantor; while in the second case the undertaking is that if the demand cannot be collected by legal proceedings the guarantor will pay, and consequently legal proceedings against the principal debtor, and a failure to collect of him by those means are conditions precedent to the liability of the guarantor . . . ."[63]

Thus, CEC's payment obligation under the Guarantee did not arise until after an event of default, and when it did, plaintiffs had the right to pursue claims directly against CEC under the Guarantee.[64]

It follows that *had* CEC attempted to invoke section 1503(3) to remove the Guarantee *after* its obligations under the Guarantee were triggered, this would patently violate section 508 (unless CEC received unanimous noteholder consent).  But removal of the Guarantee under the terms of section 1503(3) *prior to*

---

[63]  *In re South Side House, LLC*, 470 B.R. 659, 675 (Bankr. E.D.N.Y. 2012) (quoting *McMurray v. Noyes*, 72 N.Y. 523, 525 (1878)).

[64]  *See Phoenix Acquisition Corp. v. Campcore, Inc.*, 81 N.Y.2d 138, 142 (1993); *Kensington House Co. v. Oram*, 293 A.D.2d 304, 304-05 (1st Dep't 2002) ("Where, as here, a creditor seeks summary judgment upon a written guaranty, the creditor need prove no more than an absolute and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guarantee.").

the time the payment obligation under the Guarantee becomes due could violate the terms of section 508 in some contexts, but not in others.  Unlike plaintiffs' interpretation, this reading of the terms of the Indenture gives meaning to each of its terms.  It is also consistent with *First Millennium* and the rule that "under New York law, clauses similar to the phrase '[n]otwithstanding any other provision' trump *conflicting* contract terms."[65]  In *First Millennium*, the nonrecourse provision presented a clear conflict with the absolute and unconditional right to payment under the facts of that case — the notes at issue were due and owing, the noteholders had not been paid in full, and the FDIC was attempting to limit recovery "out of a particular fund."

In sum, plaintiffs' interpretation of section 508 fails to give appropriate meaning to the terms of the Guarantee and the provisions that permit the release of that Guarantee.  In addition — and in contrast to the cases cited by plaintiffs[66] — plaintiffs have not shown that there is a conflict between sections

---

[65]     *Beardslee*, 25 N.Y.3d at 158 (quoting *First Millennium*, 607 F.3d at 917) (emphasis in *Beardslee*).

[66]     *See Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 17-18 (1993) (addressing conflict between provision that rent on assisted housing units could be increased annually by prescribed adjustment factor without limitation and provision stating that "notwithstanding any other provision[,]" adjustments shall not result in material differences in rents charged on assisted and unassisted housing units); *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 438-39 (2d

508 and 1503(3).

**B.    CEC Is Not Precluded from Asserting that the May Transactions Released the Guarantee**

Plaintiffs contend that CEC is barred from relying on the May Transactions based on the law of judicial admissions and judicial estoppel. According to plaintiffs, CEC has taken the contrary position — *i.e.*, that the May Transactions did not release the Guarantee — in related lawsuits brought by BOKF, N.A. and UMB Bank, N.A.[67] to enforce CEC's guarantees of different notes.[68]  For example, CEC stated in its brief opposing BOKF's motion for partial summary judgment that:

> As a consequence of the August [ ] Transaction, the Guarantee was released under the last paragraph of Section 12.02(c) of the [Second Lien] Indenture.  That is because the transaction provided an independent basis for the release of CEC's guarantee of the 2016 and 2017 Notes, *which were the last outstanding "Existing*

---

Cir. 1995) (addressing conflict in contract between contractor and sub-contractor where one provision stated that subcontractor was entitled to recover costs as result of delay in construction project "notwithstanding any other provision contained in [the] agreement" and provision in which sub-contractor waived any claims for damages resulting from delay in construction project).

[67]    BOKF is the successor Indenture Trustee under the Indenture dated April 16, 2010 ("the Second Lien Indenture"), under which CEOC issued the 12.75% Second Priority Senior Secured Notes due 2018.  UMB is the Indenture Trustee under four First Lien Indentures — dated June 10, 2009 (due 2017), February 14, 2012, August 22, 2012 and February 15, 2013 (all three due in 2020).

[68]    *See* MC Mem. at 14.

>Notes" defined in the indenture, as CEC's guarantee of the other
>"Existing Notes" had already been discharged or released.[69]

In addition, "David Sambur, an Apollo partner who serves on CEC's Board and

testified as CEC's Rule 30(b)(6) witness in this action, made a nearly identical

statement in a sworn declaration CEC submitted with its opposition papers."[70]

However, these statements do not support preclusion under either the law of

judicial admissions or judicial estoppel.

The statements are not judicial admissions because they concern the

*legal* effect of certain transactions, and only statements of *fact* can be binding

judicial admissions.[71]  Moreover, the statements do not unequivocally state that

CEC believed that the May Transactions were insufficient to release the

Guarantee.[72]

---

[69]     *Id.* at 14-15 (internal quotation marks omitted) (emphasis in original).

[70]     *Id.* at 15.

[71]     *See Ancile Inv. Co. v. Archer Daniels Midland Co.*, No. 08 Civ. 9492,
2011 WL 3516128, at *2 (S.D.N.Y. Aug. 3, 2011) (citing *New York State Nat'l
Org. for Women v. Terry*, 159 F.3d 86, 97 n.7 (2d Cir. 1998)).

[72]     *See TR 39th St. Land Corp. v. Salsa Distribution USA, LLC*, No.
11 Civ. 7193, 2015 WL 1499173, at *5 (S.D.N.Y. Mar. 25, 2015) (finding that
statement was not a judicial admission because it was not "unequivocal" and
because other statements were to the contrary).  In addition, "[a] District Court,
convinced that an honest mistake had been made, the original allegation was untrue
and that justice required relief . . . may, in its discretion, relieve the party of its
otherwise binding consequence." *Triumph Const. Corp. v. New York City Council*

Both before and after this litigation, CEC's position has been that the August Transaction "'provided an independent basis' for releasing the Guarantee on the 2016 Notes."[73]  After the 5% Stock Sale, CEC filed an SEC Form 8-K reporting that its "guarantee of CEOC's outstanding secured and unsecured notes was automatically released."[74]  Likewise, CEC explained in its opposition to BOKF's motion for partial summary judgment that:

> On May 6, 2014, CEC and CEOC announced a transaction (the "B-7 Transaction") designed to repay CEOC's near-term maturities. Under the B-7 Transaction, CEOC obtained $1.75 billion of new term loans, which were used to repay, among other things, nearly all outstanding notes that were set to mature before 2016.  As a condition of the new financing, however, the lenders who negotiated the transaction demanded that CEC exercise its right under various indentures — including the BOKF and UMB Indentures — to release CEC's parent guarantee.  Because of the benefits to CEOC of obtaining the new loans, CEC and CEOC assented to the lenders' conditions. Accordingly, on May 5, 2014, CEC sold 5% of CEOC's stock to three unaffiliated investors for a total of $6.15 million.  The sale did not modify the Indenture, and the Indenture did not require any consent by the BOKF (or UMB) Holders.  As a consequence of the sale, CEOC was no longer a "Wholly Owned Subsidiary" of CEC, and the Guarantee was released.  Following this transaction, under Rule 3-10 and the

---

*of Carpenters Pension Fund*, 29 F. Supp. 3d 373, 380 (S.D.N.Y. 2014) (internal quotation marks omitted).

[73]     CEC Opp. at 18-19 (quoting 7/24/15 Memorandum of Law of Caesars Entertainment Corporation in Opposition to BOKF, N.A.'s Motion for Partial Summary Judgment ("BOKF SJ Opp."), at 13 [No. 15 Civ. 1561, Dkt. No. 44]).

[74]     CEC Opp. at 18 (internal quotation marks omitted).

Indenture, CEOC began to file its own audited financial statements with the SEC.[75]

On the day of the August Transaction, CEC filed a Form 8-K stating the Guarantee had been released following the 5% Stock Sale, and also "not[ing] that CEOC had provided additional notices to the trustees for outstanding secured notes reaffirming its position [as stated in earlier notices based in part on the 5% Stock Sale] that CEC's guarantee had been released as a result of the guarantee of CEOC's unsecured notes being released."[76]  On the basis of these statements and the overall context, plaintiffs fail to show that CEC has taken inconsistent positions in describing the effect of the May Transactions.

Plaintiffs' arguments regarding judicial estoppel also lack merit.  "'A party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner, such as by rendering a favorable judgment.'"[77]  However, as just described, the relevant statements are not unequivocally inconsistent.  Accordingly, CEC's argument based on the May

---

[75]   BOKF SJ Opp. at 11-12.

[76]   CEC Opp. at 18 (internal quotation marks omitted).

[77]   *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015) (quoting *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999)).

Transactions is not barred by the doctrines of judicial admission or judicial estoppel.

### C. There Is a Genuine Dispute of Material Fact as to Whether CEOC Was Wholly Owned by CEC Following the May Transactions

Section 1503 of the Indenture states that "[CEC] shall be released from all of its obligations under the Guarantee" if, among other things, CEOC "ceases for any reason to be a 'wholly owned subsidiary' of [CEC] (as such term is defined in Rule 1-02(z) of the Regulation S-X promulgated by the SEC)." Regulation S-X sets forth accounting rules and requirements for financial statements filed under the federal securities laws.[78]  Under Regulation S-X, a subsidiary is "wholly owned" if "substantially all of [its] outstanding voting shares are owned by its parent and/or the parent's other wholly owned subsidiaries."[79] "Voting shares" are defined to mean "the sum of all rights, other than as affected by events of default, to vote for election of directors and/or the sum of all interests in an unincorporated person."[80]

---

[78]    *See, e.g.*, 17 C.F.R. § 210.4-01 (Effective: Aug. 12, 2011) ("Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided.").

[79]    *Id.* § 210.1-02(aa).

[80]    *Id.* § 210.1-02(z).

The parties agree that following the 5% Stock Sale, CEC owned roughly 95% of CEOC's common shares, and that following the PIP, CEC owned roughly 89%. Plaintiffs argue that 89% ownership "falls within the plain meaning of 'substantially all,'" and then direct the Court to guidance issued by SEC Staff interpreting Regulation S-X.[81] CEC argues that the guidance is irrelevant because it has "nothing to do with guarantees of public debt, but the unrelated issue of 'push-down accounting,' the principles governing the financial statements of target companies in certain circumstances following an acquisition."[82] But the Indenture makes the applicable section of Regulation S-X relevant by referencing it in section 1503(3).[83]

---

[81]     *See* MC Mem. at 12-13 (citing FASB Emerging Issues Task Force ("EITF") Topic No. D-97: Push Down Accounting, Apr. 18-19, 2001 ("EITF D-97"); SEC Staff Accounting Bulletin No. 112, 74 Fed. Reg. 27427 ("SAB 112")). Of course, that guidance is only relevant if there is ambiguity in the meaning of "substantially all" in Regulation S-X. However, plaintiffs have not provided a plain meaning analysis.

[82]     CEC Opp. at 14. As discussed in the following footnote, there is, in fact, Staff guidance on reporting requirements relating to parent guarantors.

[83]     While the guidance is not "irrelevant," it is certainly confusing. Both EITF D-97 and SAB 112 refer to the concept of "substantially wholly owned." But neither Regulation S-X nor the Indenture use the term "substantially wholly owned." Rather, the question under Regulation S-X and the Indenture is whether, for purposes of determining whether CEOC is a *wholly owned* subsidiary, CEC owns *substantially all* of the voting shares of CEOC. The concept of "substantially wholly owned" makes even less sense when one considers another provision of Regulation S-X — Rule 3-10. *That* provision deals explicitly with parent

Plaintiffs rely heavily on the quantitative measures set forth in EITF D-97.  According to that document:

> In determining whether a company has become substantially wholly owned, the SEC staff has stated that push-down accounting would be required if 95 percent or more of the company has been acquired (unless the company has outstanding public debt or preferred stock that may impact the acquirer's ability to control the form of ownership of the company), permitted if 80 percent to 95 percent has been acquired, and prohibited if less than 80 percent of the company is acquired.

Putting aside that this Staff guidance refers to "substantially wholly owned" and not "wholly owned," it is unclear from the above why push-down accounting is *permitted*, but not *required*, at the 80% to 95% level.

---

guarantees.  Rather than borrow the definition of "wholly owned subsidiary" from Rule 2-10, it uses the concept of a "100% owned subsidiary," which is met when "all of [the subsidiary's] outstanding voting shares are owned, either directly or indirectly, by its parent company."  17 C.F.R. § 210.3-10(h)(1).  The SEC has explained why "100% owned" is used in Rule 3-10:

> Under [Staff Accounting Bulletin] 53, a subsidiary was 'wholly owned' if all of its outstanding voting shares and any outstanding securities convertible into its voting shares were owned, either directly or indirectly, by its parent company.  This meaning differs from the general definition of 'wholly-owned subsidiary' in Rule 1-02(aa) of Regulation S-X.  Rule 1-02(aa) treats a subsidiary as wholly owned if substantially all of its voting shares are held by its parent company.  We proposed that the meaning of "wholly owned" for the purposes of Rule 3-10 would be, in large part, the same as the staff's analysis under SAB 53.

SEC Release Notice, Release No. 55 (2000).

27

Moreover, plaintiffs fail to establish the qualitative factors discussed in the SEC Staff guidance.  Plaintiffs argue that CEC continued to control 100% of the shares that vote for the election of directors because (i) CEOC's Certificate of Incorporation permits directors to appoint directors to fill vacancies, and (ii) the new Board was elected on June 27, 2014 through that process.[84]  Plaintiffs likewise claim that the "'form of ownership[]' of CEOC remained in CEC's control" following the May Transactions because the minority shareholders did not vote for the new directors in June 2014.[85]

However, if the directors were elected pursuant to the provision in the Certificate of Incorporation that allows directors to fill vacancies, then the failure of the minority shareholders to vote is irrelevant.  Filling vacancies in this way is not done through voting shares.  For this reason, Delaware law contemplates that while vacancies can be filled by the Board, annual elections must be held at which Board members can be removed for any reason.[86]

Plaintiffs also argue that "CEC's 89% voting interest in CEOC has enabled CEC to dominate CEOC completely, dictating all aspects of CEOC's

---

[84]   Plaintiff Frederick Barton Danner's Reply Memorandum of Law in Further Support of Motion for Partial Summary Judgment, at 11-12.

[85]   *Id.* at 13.

[86]   *See* DGCL §§ 211, 233, 141(k).

existence, including day-to-day operations as well as extraordinary actions such as asset sales, related-party transactions, and CEOC's bankruptcy filing."[87]  Not one of these examples relates directly to *voting shares* or Board *elections*.  To the extent that they relate to controlling the "form of ownership," at all, they do so based on the premise that CEC controls CEOC's Board.  However,

> determining whether CEC "controls" CEOC requires consideration of fact specific issues — including the expansion of CEOC's Board in June 2014, the addition of independent CEOC directors, the creation of a CEOC Board Governance Committee in July 2014 (comprising those independent directors) that was empowered to evaluate material financial transactions and those that might have involved a material conflict with CEC, and the retention of independent legal and financial advisors to investigate potential claims by CEOC against CEC.[88]

In other words, there are genuine disputes of material fact that preclude summary judgment.

## VI.   CONCLUSION

Because there are genuine disputes of material fact as to whether the May Transactions independently released the Guarantee, I do not address whether the August Transaction violated the terms of either the TIA or the Indenture. For the foregoing reasons, plaintiffs' motions are DENIED.  The Clerk of the Court is

---

[87]     MC Mem. at 13.

[88]     CEC Opp. at 17.

directed to close these motions [Dkt. Nos. 67 and 74 in No. 14-cv-7091 and Dkt.

Nos. 60 and 67 in No. 14-cv-7973].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              December 29, 2015

30

**- Appearances -**

**For Plaintiffs MeehanCombs Global Credit Opportunities Funds, LP, Relative Value-Long/Short Debt, A Series of Underlying Funds Trust, and Trilogy Portfolio Company, LLC:**

James H. Millar, Esq.
Kristin K. Going, Esq.
Clay J. Pierce, Esq.
Drinker Biddle & Reath, LLP
1177 Avenue of the Americas
41st Floor
New York, NY 10036
(212) 248-3186

**For Plaintiff Frederick Barton Danner:**

Mark C. Gardy, Esq.
James S. Notis, Esq.
Meagan Farmer, Esq.
Gardy & Notis, LLP
Tower 56
126 East 56th Street, 8th Floor
New York, NY 10022
(212) 905-0509

Jay W. Eisenhofer, Esq.
Daniel L. Berger, Esq.
Gordon Z. Novod, Esq.
Brenda Szydlo, Esq.
Grant & Eisenhoffer P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
(646) 722-8500

**For Defendant Caesars Entertainment Corporation:**

Lewis R. Clayton, Esq.
Michael E. Gertzman, Esq.
Jonathan Hurwitz, Esq.
Ankush Khardori, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

Eric Seiler, Esq.
Philippe Adler, Esq.
Jason C. Rubenstein, Esq.
Friedman Kaplan Seiler & Adelman LLP
7 Times Square
New York, NY 10036
(212) 833-1100